# HILTON . v. GUYOT.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

# HILTON v. GUYOT.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES' FOR
THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 130, 34. Argued April 10, 1894. — Decided June 3, 1895.

A citizen and resident of this country, who has his principal place of busi-
ness here, but has an agent in a foreign country, and is accustomed to
purchase and store large quantities of goods there, and, in a suit brought
against him by a citizen and in a court of that country, appears and de-
fends with the sole object of preventing his property within the jurisdic-
tion, but not in the custody of that court, from being taken in satisfaction
of any judgment that may be recovered against him there, cannot, in an
action brought against him in this country upon such a judgment,
impeach it for want of jurisdiction of his person.

The admission, at the trial in a court of a foreign country, according to
its law and practice, of testimony not under oath and without opportunity
of cross-examination, and of documents with which the defendant had no
connection and which by our law would not be admissible against him, is
not of itself a sufficient ground for impeaching the judgment of that
court in an action brought upon it in this country.

When an action is brought in a court of this country, by a citizen of a
foreign country against one of our own citizens, to recover a sum of
money adjudged by a court of that country to be due from the defendant
to the plaintiff, and the foreign judgment appears to have been rendered
by a competent court, having jurisdiction of the cause and of the parties,
and upon due allegations and proofs, and opportunity to defend against
them, and its proceedings are according to the course of a civilized juris-
prudence, and are stated in a clear and formal record, the judgment is
prima facie evidence, at least, of the truth of the matter adjudged; and
the judgment is conclusive upon the merits tried in the foreign court,
unless some special ground is shown for impeaching it, as by showing
that it was affected by fraud or prejudice, or that by the principles of
international law, and by the comity of our own country, it is not en-
titled to full credit and effect.

A judgment for a sum of money, rendered by a court of a foreign country,
having jurisdiction of the cause and of the parties, in a suit brought by

one of its citizens against one of ours, is *prima facie* evidence only, and not conclusive of the merits of the claim, in an action brought here upon the judgment, if by the law of the foreign country, as in France, judgments of our own courts are not recognized as conclusive.

. THE first of these two cases was an action at law, brought December 18, 1885, in the Circuit Court of the United States for the Southern District of New York, by Gustave Bertin Guyot, as official liquidator of the firm of Charles Fortin & Co., and by the surviving members of that firm, all aliens and citizens of the Republic of France, against Henry Hilton and William Libbey, citizens of the United States and of the State of New York, and trading as copartners, in the cities of New York and Paris and elsewhere, under the firm name of A. T. Stewart & Co. The action was upon a judgment recovered in a French court at Paris in the Republic of France by the firm of Charles Fortin & Co., all whose members were French citizens, against Hilton and Libbey, trading as copartners as aforesaid, and citizens of the United States and of the State of New York.

The complaint alleged that in 1886, and since, during the time of all the transactions included in the judgment sued on, Hilton and Libbey, as successors to Alexander T. Stewart and Libbey, under the firm of A. T. Stewart & Co., carried on a general business as merchants in the cities of New York and Paris and elsewhere, and maintained a regular store and place of business at Paris; that during the same time Charles Fortin & Co. carried on the manufacture and sale of gloves at Paris, and the two firms had there large dealings in that business, and controversies arose in the adjustment of accounts between them.

The complaint further alleged that between March 1, 1879, and December 1, 1882, five suits were brought by Fortin & Co. against Stewart & Co. for sums alleged to be due, and three suits by Stewart & Co. against Fortin & Co., in the Tribunal of Commerce of the Department of the Seine, a judicial tribunal or court organized and existing under the laws of France, sitting at Paris, and having jurisdiction of suits and controversies between merchants or traders growing

out of commercial dealings between them; that Stewart & Co. appeared by their authorized attorneys in all those suits; and that, after full hearing before an arbitrator appointed by that court, and before the court itself, and after all the suits had been consolidated by the court, final judgment was rendered on January 20, 1883, that Fortin & Co. recover of Stewart & Co. various sums; arising out of the dealings between them, and amounting to 660,847 francs, with interest, and dismissed part of Fortin & Co.'s claim.

The complaint further alleged that appeals were taken by both parties from that judgment to the Court of Appeals of Paris, Third Section, an appellate court of record, organized and existing under the laws of the Republic of France, and having jurisdiction of appeals from the final judgments of the Tribunal of Commerce of the Department of the Seine, where the amount in dispute exceeded the sum of 1500 francs; and that the said court of appeal, by a final judgment, rendered March 19, 1884, and remaining of record in the office of its clerk at Paris, after hearing the several parties by their counsel, and upon full consideration of the merits, dismissed the appeal of the defendants, confirmed the judgment of the lower court in favor of the plaintiffs, and ordered, upon the plaintiffs' appeal, that they recover the additional sum of 152,528 francs, with 182,849 francs for interest on all the claims allowed, and 12,559 francs for costs and expenses.

The complaint further alleged that Guyot had been duly appointed, by the Tribunal of Commerce of the Department of the Seine, official liquidator of the firm of Fortin & Co., with full powers, according to law and commercial usage, for the verification and realization of its property, both real and personal, and to collect and cause to be executed the judgments aforesaid.

The complaint further alleged that the judgment of the Court of Appeals of Paris, and the judgment of the Tribunal of Commerce, as modified by the judgment of the appellate court, still remain in full force and effect; "that the said courts respectively had jurisdiction of the subject-matter of the controversies so submitted to them, and of the parties, the

said defendants having intervened, by their attorneys and counsel, and applied for affirmative relief in both courts; that the plaintiffs have hitherto been unable to collect the said judgments or any part thereof, by reason of the absence of the said defendants, they having given up their business in Paris prior to the recovery of the said judgment on appeal, and having left no property within the jurisdiction of the Republic of France, out of which the said judgments might be made;" and that there are still justly due and owing from the defendants to the plaintiffs upon those said judgments certain sums, specified in the complaint, and amounting in all to 1,008,783 francs in the currency of the Republic of France, equivalent to $195,122.47.

The defendants, in their answer, set forth in detail the original contracts and transactions in France between the parties, and the subsequent dealings between them, modifying those contracts; and alleged that the plaintiffs had no just claim against the defendants, but that, on the contrary, the defendants, upon a just settlement of the accounts, were entitled to recover large sums from the plaintiffs.

The answer admitted the proceedings and judgments in the French courts; and that the defendants gave up their business in France before the judgment on appeal, and had no property within the jurisdiction of France, out of which that judgment could be collected.

The answer further alleged that the Tribunal of Commerce of the Department of the Seine was a tribunal whose judges were merchants, ship captains, stockbrokers and persons engaged in commercial pursuits, and of which Charles Fortin had been a member until shortly before the commencement of the litigation.

The answer further alleged that in the original suits brought against the defendants by Fortin & Co. the citations were left at their storehouse in Paris; that they were then residents and citizens of the State of New York, and neither of them at that time or within four years before had been within, or resident or domiciled within, the jurisdiction of that tribunal, or owed any allegiance to France; but that

they were the owners of property situated in that country, which would by the law of France have been liable to seizure if they did not appear in that tribunal; and that they unwillingly, and solely for the purpose of protecting that property, authorized and caused an agent to appear for them in those proceedings; and that the suits brought by them against Fortin & Co. were brought for the same purpose, and in order to make a proper defence, and to establish counter claims arising out of the transactions between the parties, and to compel the production and inspection of Fortin & Co.'s books; and that they sought no other affirmative relief in that tribunal.

The answer further alleged that pending that litigation the defendants discovered gross frauds in the accounts of Fortin & Co.; that the arbitrator and the tribunal declined to compel Fortin & Co. to produce their books and papers for inspection; and that if they had been produced, the judgment would not have been obtained against the defendants.

The answer further alleged that, without any fault or negligence on the part of the defendants, there was not a full and fair trial of the controversies before the arbitrator, in that no witness was sworn or affirmed; in that Charles Fortin was permitted to make, and did make, statements not under oath, containing many falsehoods; in that the privilege of cross-examination of Fortin and other persons who made statements before the arbitrator was denied to the defendants; and in that extracts from printed newspapers, the knowledge of which was not brought home to the defendants, and letters and other communications in writing between Fortin & Co. and third persons, to which the defendants were neither privy nor party, were received by the arbitrator; that without such improper evidence the judgment would not have been obtained; and that the arbitrator was deceived and misled by the false and fraudulent accounts introduced by Fortin & Co., and by the hearsay testimony given without the solemnity of an oath and without cross-examination, and by the fraudulent suppression of the books and papers.

The answer further alleged that Fortin & Co. made up their statements and accounts falsely and fraudulently, and with

intent to deceive the defendants and the arbitrator and the said courts of France, and those courts were deceived and mis-led thereby; that, owing to the fraudulent suppression of the books and papers of Fortin & Co., upon the trial, and the false statements of Fortin regarding matters involved in the contro-versy, the arbitrator and the courts of France " were deceived and misled in regard to the merits of the controversies pend-ing before them and wrongfully decided against said Stewart & Co. as hereinbefore stated; that said judgment hereinbefore mentioned is fraudulent, and based upon false and fraudulent accounts and statements, and is erroneous, in fact and in law, and is void; that the trial hereinbefore mentioned was not conducted according to the usages and practice of the common law, and the allegations and proofs given by said Fortin & Co., upon which said judgment is founded, would not be com-petent or admissible in any court or tribunal of the United States in any suit between the same parties involving the same subject-matter; and it is contrary to natural justice and pub-lic policy that the said judgment should be enforced against a citizen of the United States; and that, if there had been a full and fair trial upon the merits of the controversies so pending before said tribunals, no judgment would have been obtained against said Stewart & Co.

" Defendants, further answering, allege that it is contrary to natural justice, that the judgment hereinbefore mentioned should be enforced without an examination of the merits thereof; that by the laws of the Republic of France, to wit, article 181 [121] of the Royal Ordinance of June 15, 1629, it is provided, namely: 'Judgments rendered, contracts or obli-gations recognized, in foreign kingdoms and sovereignties, for any cause whatever, shall give rise to no lien or execution in our kingdom. Thus the contracts shall stand for simple promises, and notwithstanding such judgments our subjects against whom they have been rendered may contest their rights anew before our own judges.'

" And it is further provided by the laws of France, by article 546 of the Code de Procedure Civile, as follows: ' Judg-ments rendered by foreign tribunals shall be capable of execu-

tion in France, only in the manner and in the cases set forth by articles 2123 and 2128 of the Civil Code.'

"And it is further provided by the laws of France, by article 2128 [2123] of the Code de Procedure Civile [Civil· Code], 'A lien cannot, in like manner, arise from judgments rendered in any foreign country, save only as they have been declared in force by a French tribunal, without prejudice, however, to provisions to the contrary, contained in public laws and treaties;' [and by article 2128 of that code, 'Contracts entered into in a foreign country cannot give a lien upon property in France, if there are no provisions contrary to this principle in public laws or in treaties.']

"That the construction given to said statutes by the judicial tribunals of France is such that no comity is displayed toward the judgments of tribunals of foreign countries against the citizens of France, when sued upon in said courts of France, and the merits of the controversies upon which the said judgments are based are examined anew, unless a treaty to the contrary effect exists between the said Republic of France and the country in which such judgment is obtained; that no treaty exists between the said Republic of France and the United States, by the terms or effect of which the judgments of either country are prevented from being examined anew upon the merits, when sued upon in the courts of the country other than that in which it is obtained; that the tribunals of the Republic of France give no force and effect, within the jurisdiction of the said country, to the duly rendered judgments of the courts of competent jurisdiction of the United States against citizens of France after proper personal service of the process of said courts is made thereon in this country."

The answer further set up, by way of counter claim, and in detail, various matters arising out of the dealings between the parties; and alleged that none of the plaintiffs had since 1881 been residents of the State of New York, or within the jurisdiction of that State, but the defendants were and always had been residents of that State.

The answer concluded by demanding that the plaintiffs'

complaint be dismissed, and that the defendants have judgment against them upon the counter claims, amounting to $102,942.91.

The plaintiffs filed a replication to so much of the answer as made counter claims, denying its allegations, and setting up in bar thereof the judgment sued on.

The defendants, on June 22, 1888, filed a bill in equity against the plaintiffs, setting forth the same matters as in their answer to the action at law, and praying for a discovery, and for an injunction against the prosecution of the action. To that bill a plea was filed, setting up the French judgments; and upon a hearing the bill was dismissed. 42 Fed. Rep. 249. From the decree dismissing the bill an appeal was taken, which was the second case now before this court.

The action at law afterwards came on for trial by a jury; and the plaintiffs put in the records of the proceedings and judgments in the French courts; and evidence that the jurisdiction of those courts was as alleged in the complaint, and that the practice followed and the method of examining the witnesses were according to the French law; and also proved the title of Guyot as liquidator.

It was admitted by both parties that, for several years prior to 1876, the firm of Alexander T. Stewart & Co., composed of Stewart and Libbey, conducted their business as merchants in the city of New York, with branches in other cities of America and Europe; that both partners were citizens and residents of the city and State of New York during the entire period mentioned in the complaint; and that in April, 1876, Stewart died, and Hilton and Libbey formed a partnership to continue the business under the same firm name, and became the owners of all the property and rights of the old firm.

The defendants made numerous offers of evidence in support of all the specific allegations of fact in their answer, including the allegations as to the law and comity of France. The plaintiffs, in their brief filed in this court, admitted that most of these offers "were offers to prove matters in support of the defences and counter claims set up by the defendants in the cases tried before the French courts, and which or most

of which would have been relevant and competent if the plaintiffs in error are not concluded by the result of those litigations, and have now the right to try those issues, either on the ground that the French judgments are only *prima facie* evidence of the correctness of those judgments, or on the ground that the case is within the exception of a judgment obtained by fraud."

The defendants, in order to show that they should not be concluded by having appeared and litigated in the suits brought against them by the plaintiff in the French courts, offered to prove that they were residents and citizens of the State of New York, and neither of them had been, within four years prior to the commencement of those suits, domiciled or resident within the jurisdiction of those courts; that they had a purchasing agent and a storehouse in Paris, but only as a means or facility to aid in the transaction of their principal business, which was in New York, and they were never otherwise engaged in business in France; that neither of them owed allegiance to France, but they were the owners of property there, which would, according to the laws of France, have been liable to seizure if they had not appeared to answer in those suits; that they unwillingly, and solely for the purpose of protecting their property within the jurisdiction of the French tribunal, authorized an agent to appear, and he did appear in the proceedings before it; and that their motion to compel an inspection of the plaintiffs' books, as well as the suits brought by the defendants in France, were necessary by way of defence or counter claim to the suits there brought by the plaintiffs against them.

Among the matters which the defendants alleged, and offered to prove, in order to show that the French judgments were procured by fraud, were that Fortin & Co., with intent to deceive and defraud the defendants, and the arbitrator and the courts of France, entered in their books, and presented to the defendants, and to the French courts, accounts, bearing upon the transactions in controversy, which were false and fraudulent, and contained excessive and fraudulent charges against the defendants, in various particulars specified; that the

defendants made due application to the Tribunal of Commerce to. compel Fortin & Co. to allow their account books and letter books to be inspected by the defendants, and the application was opposed by Fortin & Co., and denied by the tribunal; that the discovery and inspection of those books were necessary to determine the truth of the controversies between the parties; that, before the Tribunal of Commerce, Charles Fortin was permitted to and did give in evidence statements not under oath, relating to the merits of the controversies there pending; and falsely represented that a certain written contract, made in 1873, between Stewart & Co. and Fortin & Co., concerning their dealings, was not intended by the parties to be operative according to its terms; and, in support of that false representation, made statements as to admissions by Stewart in a private conversation with him; and that the defendants could not deny those statements, because Stewart was dead, and they were not protected from the effect of Fortin's statements by the privilege of cross-examining him under oath; and that the French judgments were based upon false and fraudulent accounts presented and statements made by Fortin & Co. before the Tribunal of Commerce during the trial before it.

The records of the judgments of the French courts, put in evidence by the plaintiffs, showed that all the matters now relied on to show fraud were contested in and considered by those courts.

The plaintiffs objected to all the evidence offered by the defendants, on the grounds that the matters offered to be proved were irrelevant, immaterial, and incompetent; that, in respect to them, the defendants were concluded by the judgment sued on and given in evidence; and that none of those matters, if proved, would be a defence to this action upon that judgment.

The court declined to admit any of the evidence so offered by the defendants, and directed a verdict for the plaintiffs in the sum of $277,775.44, being the amount of the French judgment and interest. The defendants, having duly excepted to the rulings and direction of the court, sued out a writ of error.

The writ of error in the action at law and the appeal in the suit in equity were argued together in this court January 19, 22, and 23, 1894; and, by direction of the court, were reargued in April, 1894, before a full bench.

*Mr. James C. Carter* and *Mr. Elihu Root* for plaintiffs in error and appellants. *Mr. Horace Russell* was on their briefs.

There is scarcely any doctrine of the law which, so far as respects formal and exact statement, is in a more unreduced and uncertain condition than that which relates to the question what force and effect should be given by the courts of one nation to the judgments rendered by the courts of another nation. Very numerous decisions have been had, especially in England, relating to this question in the various forms in which it has arisen; but if we should undertake to learn from the opinions of the courts in these cases what principles had been decided, we should find ourselves in utter confusion. On some occasions judges have said that the judgments of foreign tribunals should be treated as being as conclusive as those of our own; on others, that they are at most but *prima facie* evidence, and are subject to examination generally to ascertain whether justice has been done in them or not; and on others, that whether they are open to examination or not depends upon the circumstances under which they were pronounced.

In the learned notes to the *Duchess of Kingston's case*, in Smith's Leading Cases, a very minute reference is made to the various decisions in England and in this country, and some attempt made to group and classify them; but the reader will scarcely gain any assistance from them, and will, after perusal, feel certain of one thing only, viz.: that the subject is involved in great confusion.

The natural and obvious method of doing justice between two contending parties is to examine their allegations, to ascertain the facts respecting the matter in dispute, and to declare the law arising upon these facts. Aside from reasons of policy, this is the only course which should be pursued. It would be quite irrelevant for one of the parties to say,

"This same process has once been pursued before, and the result then reached ought to preclude further inquiry." To this answer it would be quite sufficient to reply that if justice had been done before, it could be again, and if it had not been done, it ought to be done now. But it would be an intolerable burden and expense, both to the public and to the parties, if the courts of the same country could be continually vexed with trials of the same controversy. "*Interest reipublicæ ut sit finis litium.*" It is necessary that some limitation should be imposed; and the conclusion of state policy in this country and in England has been that the parties should be allowed one full and fair opportunity to try their grievances, and one alone. This is sufficient to prevent attempts at the private redress of injuries. Hence, the general rule applicable to domestic judgments, that the judgment of a court of competent jurisdiction is conclusive between the same parties upon the same question in another court, whether as a plea, a bar, or as evidence.

In reaching this conclusion, some concession is perhaps made from strict and absolute justice in favor of convenience. But justice nevertheless is, as it always must be, the overruling consideration; and the doctrine would never have been adopted unless the conclusion had been thought to be a safe one, that the judgment in the first and only trial allowed would be, in the vast majority of cases, a sound and righteous one.

This doctrine has been established among us in view of the fact that rules and safeguards have been adopted which, if followed, will make the judgment one which may be enforced without further inquiry. It rests upon two principal considerations: (1) That there is a reasonably safe assurance that the former judgment, reached only after the employment of precautions carefully devised for the elimination of error, is just and right; and (2) that the maxim "*interest reipublicæ ut sit finis litium,*" which deems it a satisfaction of the duty of government to furnish remedial justice, if one fair opportunity has been given, has been duly considered. Both of these considerations are wanting in the case of foreign judgments.

Except in the case of England and some of her colonies, where the national standards of justice, and also the methods of procedure, very much resemble our own, we can have no full assurance that a just conclusion has been reached. In many, perhaps most, other instances, there are substantial differences in the general conceptions of justice, manifested sometimes by peculiar local laws, and sometimes by peculiar doctrines of general jurisprudence, and sometimes by both. And, generally, the methods deemed essential by us to the working out of a just conclusion are not enforced. Jury trials, exclusion of improper evidence, cross-examination of witnesses, etc., are matters to which comparatively little attention is given. And if we may believe what has often been alleged upon good authority, in many countries there is a scandalous amount of partiality, favor and even bribery, in the administration of justice.

The maxim, " *interest reipublicæ ut sit finis litium,*" applies to our own nation only. It is no part of our policy to restrict litigation in the world generally. In the case where a foreign judgment is set up as conclusive, we have not as yet afforded the one fair opportunity to litigate the question upon its original merits, which it is the duty of governments to furnish.

The suggestion that the comity of nations requires conclusive force to be given to foreign judgments, inasmuch as otherwise they will not give like force to our judgments, is wholly insufficient. This comity does, indeed, have a place in this branch of the law, but by no means the force thus suggested. We can never allow the assumption that Morocco, or Turkey, or Russia, or even Germany, Italy, or France has methods of judicial administration equal to our own, so as to justify ourselves in making a tacit agreement that we will enforce their judgments, if they will ours.

Our courts cannot show a comity toward England which they would deny to Russia. If a reciprocity in the treatment of judicial proceedings should be thought desirable, it can be safely brought about by treaty alone, where it may be yielded or withheld at pleasure. We shall consider this more at length later.

If, therefore, foreign judgments are in any case to be held conclusive with us, it must be for other reasons than those upon which we hold domestic judgments conclusive. It cannot be said that foreign judgments are ever so conclusive that no inquiry into them can be allowed; but there are many cases in which they may be justly held substantially conclusive. The common characteristic of all of them is that the obligation of the State to ascertain, declare, and enforce justice according to its own conceptions of justice does not in such cases exist, or is greatly diminished in force; and that it is wiser, safer, and better to adopt and enforce the judgment of the foreign State.

A careful examination of all the cases warrants us in assuming that the question whether a foreign judgment is conclusive, so as to preclude inquiry into the original merits of the controversy, depends upon the circumstances under which it was rendered; and that it is not thus conclusive where the State is under its ordinary obligation to the party demanding such inquiry to give him at least one full and fair opportunity of having his cause adjudicated upon its original merits. It is well settled that wherever a domestic judgment is interposed as a bar to an original investigation, it must appear that such judgment was the result of a proceeding so instituted and prosecuted as to show that the party sought to be precluded from original inquiry did have, in the suit in which the judgment was rendered, this full and fair opportunity. The American courts never can have any such complete assurance that the party against whom a foreign judgment has been rendered did have a full and fair opportunity for an adjudication of his cause, according to our conceptions of justice; and consequently, if, in any case, a foreign judgment is held conclusive, it must be because there is not, in the particular case, any such obligation on the part of the State to that party to afford him even one such full and fair opportunity to have his cause adjudicated according to its conceptions of justice.

Indeed, the general doctrine, as stated in most cases in the courts of the United States, goes much further than any of

the necessities of the present controversy require; and perhaps further than would be allowed in a precise statement of its extent. It declares that foreign judgments are *prima facie* evidence only. Only two cases are cited to the contrary. *Lazier* v. *Westcott*, 26 N. Y. 146; and *New York, Lake Erie & Western Railroad* v. *Henry*, 21 Blatchford, 400. In the first case the only question before the appellate court was whether the record was receivable in evidence notwithstanding the technical objections. The court held it was; but the learned Judge (Davies) who gave the opinion, then proceeded to argue a question not raised, namely, whether foreign judgments were conclusive, and held that they were. This opinion is unimportant. The second was a case of precisely the same character. The judgment was in no respect impeached.

A review of the English cases will show that the doctrine in England never has been, and is not now, inconsistent with the rule herein maintained; but that, on the contrary, the question whether a foreign judgment should be held conclusive depends upon the circumstances under which it was rendered.

First, as to the cases decided before A.D. 1800. *Isquiredo* v. *Forbes*, 1 Doug. 6 (n.). This is cited as a decision by Lord Hardwicke, that foreign judgments, when an action is brought upon them, are merely *prima facie* evidence on behalf of the plaintiffs.

*Gage* v. *Bulkeley*, 3 Atk. 215. On a plea of a foreign sentence in a Commissionary Court in France relating to the same matters for which a bill was brought in England, Lord Hardwicke said: "It must be overruled, for it is the most proper case to stand for an answer, with liberty to except, that I ever met with."

*Sinclair* v. *Fraser* (1768), 1 Doug. 5 (n.); more fully in Morison's Dec. 4542 (House of Lords). Mrs. Fraser, of Scotland, succeeded to an estate in Jamaica, and, being under age, her tutors appointed Sinclair to manage it. The estate was sold in 1763, and Sinclair procured a judgment in the Supreme Court of Jamaica for a balance due him upon an account cur-

rent, and then brought suit in Scotland on the Jamaica judgment. The defendant prayed that plaintiff should produce the vouchers of the debts claimed, in order to introduce a fair count. The Lord Ordinary ordered the vouchers to be produced. The plaintiff appealed to the Lords of Sessions, who sustained the Lord Ordinary; upon an appeal to the House of Lords they held that the judgment of the Supreme Court of Jamaica ought to be received as evidence *prima facie* of the debt, and that it lay upon the defendant to impeach the justice thereof, or to show the same to have been irregularly or unduly obtained.

The decision went only upon the question of evidence and the burden of proof. Morison so treats it. In his head note he epitomizes the decision as follows: "Found that a foreign decree bearing to have been *in foro contentio*, had not the effect of *res judicata* in Scotland, but entitled the party claiming under it to plead that the *onus probandi* rested on his opponent."

This decision is an authority for the claim that the merits of a foreign judgment may be attacked. The Scotch courts did not give it the effect of even *prima facie* evidence. In this, held they were in error, but in this alone.

*Herbert* v. *Cook*, Willes, 36 (n.), Lord Mansfield, in speaking of the judgment of the Hundred Court (a domestic tribunal), said: "Besides, it is not a judgment of a court of record, but like a foreign judgment, and not conclusive evidence of the debt."

*Walker* v. *Witter* (1778), 1 Doug. 1, was an action of debt brought in Middlesex County, England, upon a judgment of the Supreme Court of Jamaica. The question was whether *nil debet* or *nul tiel record* was the proper plea. Lord Mansfield held that the former was the proper plea, and said: "Foreign judgments are a ground of action everywhere, but they are examinable. He recollected a case of a decree on the chancery side in one of the courts of great sessions of Wales, from which there was an appeal to the House of Lords, and the decree affirmed there, and Lord Hardwicke thought himself entitled to examine into the justice of the decision of

the House of Lords, because the original decree was in the court of Wales, whose decisions were clearly liable to be examined. He also mentioned a case on the mortmain acts."

In this decision Justices Willes, Ashurst, and Buller, all concurred.

*Galbraith* v. *Neville* (A.D. 1789), 1 Doug. 6 (n.); *S. C.* 5 East, 475-9 (n.): This was an action of debt on a judgment recovered in the Supreme Court of Jamaica. There was a verdict for the plaintiff. An order to show cause was made why there should not be a new trial. The reporters are in conflict as to the decision made upon the return of this order. Douglas has it, that there was a new trial granted. East says— in a note on 5 East, 475 — "It is there [Douglas 5 and 6] stated that the rule for a new trial . . . . was absolute. But, according to my note of the case, it stood over from Easter 29 to Michaelmas 31 Geo. 3 for the court to advise upon it, when Lord Kenyon, C. J., said that the court had considered the matter, and were all of opinion that no new trial ought to be granted. He added that, without entering into the question how far a foreign judgment was impeachable, it was at all events clear that it was *prima facie* evidence of the debt; and they were of opinion that no evidence had been adduced to impeach this; and, therefore, discharged the rule."

It is apparent from these reports that if East was correct, as he probably was, in point of fact the judgment had been attacked on its merits, and the court finally determined to discuss the weight of evidence; and, upon this proposition it came to the conclusion that the weight of the impeaching evidence was not sufficient to overthrow the presumption in favor of the judgment. In this case Justice Buller said, and his opinion only is quoted, because if the report is correct in East, the court took a position side by side with him instead of with Lord Kenyon. He says: "The doctrine which was laid down in *Sinclair* v. *Fraser* has always been considered as the true line ever since; namely, that the foreign judgment shall be *prima facie* evidence of the debt, and conclusive till it be impeached by the other party. I have often heard Lord Mansfield repeat what was said by Lord Hardwicke in the

case alluded to from Wales, and the ground of his Lordship's
opinion was this: when you call for my assistance to carry
into effect the decision of some other tribunal, you shall not
have it, if it appears that you are wrong, and it was upon that
account that he said he would examine into the propriety of
the decree.

 " As to actions of this sort, see how far the court could go,
if what was said in *Walker* v. *Witter* were departed from; it
was there held that a foreign judgment was only. to be taken
to be right, *prima facie*, that is, we will allow the same force
to a foreign judgment that we do to those of our courts not
of record; but if the matter were carried further we should
give them more credit; we should give them equal force with
the courts of record here; now a foreign judgment has never
been considered as a record."

The next case in order is *Messin* v. *Massareene*, 4 T. R. 493
(1791). The plaintiff having obtained a judgment against the
defendant in the Châtelet of Paris, brought an action of
*assumpsit* in King's Bench upon that judgment. Judgment
was allowed to go by default. Walton, counsel of plaintiff,
obtained a rule or order to show cause why it should not be
referred to a master to see what was due for principal and
interest without executing a writ of inquiry. It was con-
tended that there was no instance in which such course had
been taken. Kenyon, C. J., said: " This is an attempt to
carry the rule further than has yet been done, and as there
is no instance of the kind I am not disposed to make a prec-
edent." Buller, J., said: " Though debt will lie here on a
foreign judgment, the defendant may go into consideration
of it."

The judgment involved in the *Duchess of Kingston's case*
was a domestic judgment, and not that of a foreign court.

This brings us to the close of the century with the follow-
ing result: We have Hardwicke, Mansfield, Ashurst, Buller,
and Willes holding that a foreign judgment was examinable
upon the merits. There were *dicta* by Lord Kenyon to the
contrary, but overruled by his court, if East is correct.

In no case do any of the judges combat the position, that

if it appears that there has not been a fair trial upon the merits the judgment has no force as a bar.

Since 1800 we have the following cases, which appear to have been relied upon below : *Henderson* v. *Henderson,* 3 Hare, 100 ; *Godard* v. *Gray,* L. R. 6 Q. B. 139 ; *Schibsby* v. *Westenholtz,* L. R. 6 Q. B. 155 ; *Rousillon* v. *Rousillon,* 14 Ch. D. 351 ; *General Steam Navigation Co.* v. *Guillou,* 11 M. & W. 877 ; *Becquet* v. *McCarthy,* 2 B. & Ad. 951 ; *Nouvion* v. *Freeman,* 37 Ch. D. 244 ; *Trafford* v. *Blanc,* 36 Ch. D. 600 ; *Voinet* v. *Barrett,* 55 Law Journal (N. S.) Q. B. 39 ; *Scott* v. *Pilkington,* 2 B. & S. 11 ; *Bank of Australasia* v. *Nias,* 16 Q. B. 717 ; *Martin* v. *Nicolls,* 3 Sim. 458.

These cases, however, do not support the decision below. On the contrary, a further search would have disclosed cases which rejected it. *De Cosse Brissac* v. *Rathbone,* 6 H. & N. 301, is the only case which appears to fully sustain the conclusiveness of a foreign judgment.

The cases in which it has been determined in England that the foreign judgment under consideration in them was conclusive happen to have been of a character in which there was no very good reason for allowing the judgment to be impeached ; but the courts in pronouncing their decisions, have sometimes announced a doctrine much broader than the case before them ; and, instead of saying that the foreign judgments, *in the particular cases they were considering,* were not open to impeachment, declared generally that such judgments were conclusive.

In declaring this large conclusion there has sometimes been an attempt to formulate a principle, or principles, which would sustain the doctrine in the eye of reason ; and two principles have been laid down as sufficient to justify the broad determination.

The first was originated by a judge of high authority, Mr. Baron Parke, in the case of *Russell* v. *Smyth,* 9 M. & W. 810, that the judgment of a court of competent jurisdiction over the defendant imposes a duty or obligation on the defendant to pay the sum for which judgment is given which the courts in England are bound to enforce. This was the principle

mainly relied upon in the court below by the counsel for the plaintiff in that court.

The other ground upon which the doctrine has been supported in the English cases is rather one of policy, namely, that the courts of that country should not engage in the work of retrying cases which have once been tried in a foreign country, for the reason that their judgments would not probably be any more agreeable to right and justice than the foreign judgment; which is the view which the learned judge in the court below preferred.

But an excellent opportunity was afforded to some English judges in 1882 to test the soundness of these principles, and the Court of King's Bench immediately and utterly broke away from them. *Abouloff* v. *Oppenheimer*, 10 Q. B. D. 295.

This action was brought on a Russian judgment rendered in an action where the plaintiff charged that the defendant had property in his possession which he refused to restore, and asked that its restoration on payment of its value by the defendant be compelled; and where the court decided in favor of the plaintiff and adjudged the defendant to pay the value of the goods. The defendant sought to impeach this judgment by a separate defence which alleged that it was obtained by the gross fraud of the plaintiff in representing to the court that the goods were in the defendant's possession, whereas they were at all times in the plaintiff's possession, as he well knew. To this defence a demurrer was interposed, and the argument was on this demurrer. It was not pretended that the Russian court had not full jurisdiction, or that a Russian judgment was not as conclusive as any other foreign judgment, or that the defendant in Russia was in any manner so deceived or imposed upon that he had not had a perfectly full and fair opportunity to defend himself, or that any artifice was employed by which the court was in any manner disabled or impeded in the discharge of its function of determining the truth. It was the simple case of the bringing of an action by a plaintiff who knew he had no good cause of action and supporting it by the falsehood of himself and witnesses, one or both.

The entire breaking down in this case of the rule, not founded upon the adjudications, but upon the *dicta*, of English cases, as well as of the erroneous principle upon which that rule had been said to rest, namely, that a foreign judgment created an obligation, is a proof of the falsity of the doctrine. In the presence of the fact, which the demurrer seemed to present, that the Russian judgment could not be enforced without committing a palpable wrong, the court determined not to enforce it. The mistake made was in not perceiving that the doctrine had been too largely stated, and that the true way of meeting the case was by limiting the doctrine to its just proportions, and making a discrimination between the cases where a foreign judgment should properly be held conclusive, and those where it should not.

This case was followed by *Vadala* v. *Lawes*, 25 Q. B. D. 310, in which the court, referring to *Aboulof* v. *Oppenheimer*, said: "I cannot fritter away that judgment, and I cannot read the judgments without seeing that they amount to this: that if the fraud upon the foreign court consists in the fact that the plaintiff has induced that court by fraud to come to a wrong conclusion you can reopen the whole case, even although you will have in this court to go into the very facts which were investigated, and which were in issue in the foreign court. The technical objection that the issue is the same is technically answered by the technical reply that the issue is not the same, because in this court you have to consider whether the foreign court has been imposed upon. That, to my mind, is only meeting technical argument by a technical answer, and I do not attach much importance to it; but, in that case, the court faced the difficulty that you could not give effect to the defence without retrying the merits. The fraud practised on the court, or alleged to have been practised on the court, was the misleading of the court by evidence known by the plaintiff to be false. That was the whole fraud. The question of fact, whether what the plaintiff had said in the court below was or was not false, was the very question of fact that had been adjudicated on in the foreign court; and, notwithstanding that was so, when the court came to con-

sider how the two rules, to which I have alluded, could be worked together, they said: 'Well, if that foreign judgment was obtained fraudulently, and if it is necessary, in order to prove that fraud, to retry the merits, you are entitled to do so according to the law of this country.' I cannot read that case in any other way. Lord Coleridge uses language which I do not think is capable of being misunderstood. In order to understand the judgment it is well to look at the argument for the defence — an argument conducted by Mr. Benjamin and Mr. Cohen, and an argument which I understand to have been accepted by the court: 'Even if the Russian courts had inquired into the existence of the fraud and had been induced by fabricated evidence to come to a wrong conclusion, the circumstances under which the judgments were given could be investigated in an English court.' "

Thus it is plain that, in the light of the above decisions, no one can say that the present doctrine of the English courts is that a foreign judgment is necessarily conclusive, even where there was full jurisdiction, and a full opportunity for trial of the very point upon which the judgment is assailed.

The leading decisions of the state and federal courts will be found reported in the following cases, and are not in conflict with our contentions: *Bissell* v. *Briggs*, 9 Mass. 462; *Wood* v. *Gamble*, 11 Cush. 8; *Hall* v. *Williams*, 6 Pick. 232; *Buttrick* v. *Allen*, 8 Mass. 273; *McKim* v. *Odom*, 3 Fairf. 12 Maine 94; *Williams* v. *Preston*, 3 J. J. Marsh. 600; *Tayler* v. *Barron*, 10 Foster (30 N. H.) 78; *Aldrich* v. *Kinney*, 4 Connecticut, 380; *Olden* v. *Hallet*, 2 Southard, 466; *Taylor* v. *Phelps*, 1 Har. & Gill, 492; *Robinson* v. *Prescott*, 4 N. H. 450; *Hitchcock* v. *Aicken*, 1 Caines, 460; *Taylor* v. *Bryden*, 8 Johns. 173; *Pawling* v. *Bird*, 13 Johns. 192; *Pease* v. *Howard*, 14 Johns. 479; *McElmoyle* v. *Cohen*, 13 Pet. 312, 324; *Croudson* v. *Leonard*, 4 Cranch, 434; *Burnham* v. *Webster*, 2 Ware, 236; *DeBrimont* v. *Penniman*, 10 Blatchford, 436; *Hanley* v. *Donoghue*, 116 U. S. 1; *New York, Lake Erie & Western Railway Co.* v. *McHenry*, 21 Blatchford, 400; *Wiggins Ferry Co.* v. *Chicago & Alton Railroad*, 11 Fed. Rep. 381.

Thus far nothing has been said in relation to the effect of the absolute denial by the French law to judgments of the courts of other nations of anything in the nature of conclusiveness. And this denial extends to all cases whatsoever as against French citizens. If the alleged conclusiveness of foreign judgments is placed upon grounds of comity, how can the doctrine apply to the judgments of the courts of a nation which absolutely refuses reciprocity?

This is not the case where our courts are called upon to enforce a statute, as in *The Scotland*, 105 U. S. 24, 33.; but where they are to declare what the law of comity is and requires. If a legislature passes a law the judicial tribunals are bound to execute it, even in favor of the citizens of a nation which has no similar law. A legislature may dispense, if it chooses, with the benefit of reciprocity.

The literal meaning of the word "comity" is "courtesy" — a disposition to accommodate — but the word is seldom employed, in juridical discussions, in that sense. No court is at liberty to deny or to refuse a claim made before it, according as mere courtesy or a disposition to accommodate shall require. What comity requires is as much required in courts of justice as anything else; and the inquiry, therefore, what comity is, is only another mode of inquiring what the law is in respect to the force which the laws, judicial proceedings or other acts done in one State ought to have in another State.

Says Chief Justice Taney in *Bank of Augusta* v. *Earle*, 13 Pet. 519, 589, " It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned. The cases of contracts made in a foreign country are familiar examples; and courts of justice have always expounded and executed them, according to the law of the place in which they were made; provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial

to its interests. But it contributes so largely to promote justice between individuals and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it as a part of the voluntary law of nations. It is truly said in Story's Conflict of Laws (p. 37), that 'in the silence of any positive rule affirming or denying, or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests. It is not the comity of the courts, but the comity of the nation which is administered and ascertained in the same way and guided by the same reasoning by which all other principles of municipal law are ascertained and guided.' "

Our main contention, as already argued, is that it was the duty of the United States, and of each of the States, to furnish to their citizens one fair and full opportunity of establishing their claims by a trial upon the original merits; that a foreign judgment could not be made the occasion for denying this right, unless it could be said that it was certain that such judgment was as effective as our own in securing justice to the litigants; and that with our notions of the essential merits of our own judicial procedure it was impossible to assent to the view that the procedure of foreign nations, indiscriminately, was as well calculated to secure justice as our own.

If we are right in this contention, it follows that the question of comity has nothing to do with this case; because, the giving effect here to the law of France which makes her own judgments conclusive there, would be prejudicial to our own policy and to the rights and interests of our own citizens.

Assuming that our contention is correct, that foreign judgments are, in general, not conclusive, but may be so under some circumstances, there is nothing in the circumstances of the present case making this particular judgment conclusive upon the defendants therein. In no just sense could the appearance of Stewart & Co. in the French suit be deemed to be a voluntary one, so as to charge them with the responsibility of the litigation. If they had conceived that they

could carry on the dry goods business in France also as well as in America, that they could cater to the wants of the French as well as French merchants, and thereby make money, and had, in pursuance of such a view, gone abroad and established a mercantile storehouse there, and offered to sell goods to the people of Paris, and thus to come in competition with other merchants of Paris; in other words, to do in France just the same thing that Frenchmen are doing, then, indeed, a very different case would be presented. They would then be doing something not required by any of the necessities of a New York business. The French themselves have drawn this distinction with great clearness by refusing general access to their courts as suitors to all foreigners who are not actually domiciled in France. Code Civil, Art. 13, 14, 15; Wheaton Int. Law, 192.

The defendants in error have been forced to partially abandon this ground of international comity, because France gives no effect to the judgments of our courts. Can they do so without endangering the stability of their entire structure?

Reciprocal comity is the only ground upon which any civilized nation in the world, aside from England and the United States, gives or ever has given conclusive effect to foreign judgments.

M. Foelix, a French author of high authority, in his Traité du Droit International Privé, gives an exhaustive review of the laws and usages of all civilized nations in respect of the effect given to foreign judgments. It appears, that aside from England and the United States, there are but two views followed. France, Spain, Portugal, Russia, Sweden and Norway, and some minor countries which derive their laws from France, such as Belgium, the canton of Geneva, Greece and Hayti, give no effect whatever to a foreign judgment as *res judicata.*

On the other hand, all the other countries of Europe, including Germany, Austria, Prussia, Denmark and a multitude of smaller States, have adopted the principle of reciprocity, and give the effect of *res judicata* to the judgments of other States which give a similar effect to their judgments.

The principle has been adopted and enforced alike by the decisions of the courts under the common law of Germany, and by the statutes of the other nations mentioned, but no nation whatever gives such effect to any foreign judgment except upon the express ground of reciprocal treatment.

The grounds upon which the German courts proceed are well illustrated by the reasons which this author recites as given by the court of Cologne, in Rhenish Prussia, in deciding that a native who has been defeated before a foreign tribunal can try anew his rights before "his *natural judges*, called upon to give execution to the foreign judgment." The principal reasons stated are, in substance: "That a new examination into the merits of the cause can alone assure to the subject that protection to which he has a right, and that foreign judgments ought not to receive their execution in Rhenish Prussia except as Prussian judgments receive equally their execution in the country where the judgment the execution of which is in question was rendered."

Many of the countries mentioned have express statutes embodying this reciprocal principle, and in all the others the author says "the jurisprudence and the opinion of authors have sanctioned the same principle."

The French theory is well stated in decisions of the courts of Nimes and Bordeaux. They say: "It is considered that it is a principle of the public law of France . . . that the right of the tribunals of the Kingdom to order or refuse the execution of foreign judgments draws with it that of verifying the correctness of the judgment in matters of fact as in matters of law: . . . that the party brought before the tribunals to have a judgment rendered in a foreign country put into execution against him has the right to defend himself by all the means of the law, both as to form and as to the merits, and in the same manner as if the judgment did not exist."

The entire weight of European authority, aside from Great Britain, therefore, is that no State should ever enforce against one of its own citizens the judgment of another State except upon the ground of reciprocal advantage.

It is to be observed that every decision in the United States upon which the defendants in error rely as illustrating what they claim to be a tendency towards a new rule, relates to an English or a Canadian judgment; that is, a judgment of a country which does, in fact, profess to give the effect of *res judicata* to our judgments.

In *Lazier* v. *Wescott*, 26 N. Y. 146, the judgment sued upon was recovered in Canada. In *Dunston* v. *Higgins*, 138 N. Y. 70, the judgment sued on was rendered by the High Court of Justice of England, Queen's Bench Division. In *Baker* v. *Palmer*, 83 Illinois, 568, the judgment sued on was Canadian. In *Fisher* v. *Fielding*, in the Superior Court of Connecticut, decided January 4, 1894, the judgment sued on was English.

The fact that England and Canada do give effect to our judgments, added to the fact that they proceed according to the course of the common law and dispense the same kind of justice in the same way as our own tribunals, may be supposed to have influenced the minds of the courts before whom these judgments were brought. Two at least of those courts (in the latest case in New York, and in the Illinois case) put their judgments upon the express ground of comity.

The Michigan case was a clear case of a voluntary appearance, the defendant having apparently gone to Canada for the express purpose of uniting with plaintiff to invoke the jurisdiction of the Canadian court, which could not otherwise have attached either to him or to his property.

The Connecticut case was decided by a single judge of a subordinate state court within the Second Circuit, and may be regarded as following rather than adding to, the decision of the Circuit Court of that circuit now under review.

The general expression of judicial opinion in this country in recent years has included this question of reciprocity as an important element in determining the treatment to be given to foreign judgments.

Judge Woodbury, in *Burnham* v. *Webster*, 1 Wood. & Min. 172 (see also 2 Ware, 236), says: "When offered and considered elsewhere than in their own jurisdiction they (foreign judgments) are *ex comitate* treated with respect according to the

nature of the judgment and the character of the tribunal which rendered it and the reciprocal mode, if any, in which that government treats our judgments."

Judge Woodruff, in *De Brimont* v. *Penniman*, 10 Blatchford, 436, says : " The principle upon which foreign judgments receive any recognition in our courts is one of comity."

Judge Coxe says, in *New York, Lake Erie &c. Railroad* v. *McHenry*, 21 Blatchford, 400 : " The rule as to foreign judgments rests upon considerations of comity."

Mr. Justice Cooley, in *McEwen* v. *Limmer*, American Law Register, speaking of the force and effect due Canadian judgments, says : " We should certainly never have assurance to demand from them more than we would freely and voluntarily concede to them. True comity is equality. We should demand nothing more and concede nothing less."

In the foregoing reference to the American authorities relied upon by the defendants in error we have omitted as having no real bearing upon the question the case of *Silver Lake Bank* v. *Harding*, 5 Ohio, 544, where the Supreme Court of Ohio held that the judgment of a Justice of the Peace in Pennsylvania was within the meaning of the constitutional provision, requiring full faith and credit to be given to the judgments of other States, and was entitled to receive effect as *res judicata;* and the case of *Glass* v. *Blackwell*, 48 Arkansas, 50, in which a judgment of a Justice of the Peace in Tennessee received a similar effect ; and the case of *Jones* v. *Jamison*, 15 La. Ann. 35, in which a plaintiff, who had himself brought suit against a defendant in the island of Jamaica, where both parties were domiciled, and obtained a judgment, was held not entitled to sue again here on the original demand which he had by his own act caused to be merged in the judgment.

It may fairly be said that in America, as well as in Europe, the general weight of opinion and of practice tends to the result that if foreign judgments are to receive any effect at all as *res judicata*, that effect should be limited to judgments rendered by the courts of a country which gives similar effect to the judgments of that country in which the proceeding is brought.

*Mr. William G. Choate,* (with whom was *Mr. William D. Shipman* on the brief,) for defendants in error and appellees.

I. The French courts having jurisdiction of the subject matter and of the parties, their judgments are conclusive to the same extent as domestic judgments, unless impeached for want of jurisdiction or for fraud in procuring the same.

The modern rule both in England and this country, over-ruling the earlier decisions which made a foreign judgment *prima facie* evidence only of a debt, is that a foreign judgment *in personam* is conclusive as to the existence of the debt established thereby, provided the court had jurisdiction of the subject matter and of the parties; and such judgment can be impeached only for fraud.

It having been contended by the plaintiffs in error upon the first argument of this case that the law is not settled in favor of the conclusiveness of foreign judgments we submit a statement of the English cases from the earliest times to the present day.

*Wier's case,* 1 Rolle's Abr. 530, is the earliest case. The plaintiff, a native of Friesland, attempted to enforce in England, by execution, a judgment obtained in Friesland against the defendant, an Englishman. The court said : " It is by the law of nations that the justice of one nation will be an aid to the justice of another nation, and the one execute the judgment of the other; and the law of England takes notice of this law and the Judge of Admiralty is the proper magistrate for this purpose, for he [sits] solely for the execution of the civil law in this realm." The Court of King's Bench, on *habeas corpus,* refused to release the defendant, who was taken in execution.

In *Cottington's case,* 2 Swanston, 326, *n* where the validity of a sentence of divorce by the Archbishop of Turin was involved, *Wier's case* was approved, the court saying: " In *Wytred's* [ *Wier's*] *case,* 5 Jac., a judgment given in Holland for debt was executed here by the Admiralty of England upon the person who fled from execution there, and this was allowed upon a *habeas corpus* in B. R., so long as the

judgment there remained in force; wherefore, if the petitioner can either by the laws of Savoy or of Rome repeal that sentence at Turin, let him do so; but till that be done it is not possible for the Arches or the delegates to give any other sentence than what they have given."

In *Gold* v. *Canham*, 2 Swanston, 325, the facts shown were that the plaintiff had been a member of a partnership at Leghorn with the defendant and one Lee, and upon its dissolution had received a certain sum of money and an agreement from his copartners to indemnify him against claims against the partnership, and afterwards went into a new partnership with others, and was forced by sentence of the court at Florence to pay custom to the Great Duke for goods imported during the time of the former copartnership. The defendant alleged that there were no customs due to the Duke after seven years, and that there had been a reference of all differences to arbitrators, before whom the matter of the customs was not insisted upon.

But the court said: "Let the plaintiff receive back so much of the money brought into court as may be adequate to the sum paid on the sentence for custom, the justice whereof is not examinable here."

In *Dupleix* v. *De Roven*, 2 Vernon, 543 (1705), the plaintiff filed a bill for discovery of assets and satisfaction of a judgment debt obtained in France against the defendant, an administrator. The court said: "Although the plaintiff obtained a judgment or sentence in France, yet here the debt must be considered as a debt by simple contract. The plaintiff can maintain no action here, but an *indebitatus assumpsit* or an *insumul computasset*, so that the statute of limitations is pleadable in this case."

In *Burrows* v. *Jemino* (cited as *Jamereau*, *Jamineau*, and *Jemineau*) (1726), 2 Stra. 733; *S. C.* 2 Eq. Cas. Ab. 476, a suit had been brought at Leghorn against the plaintiff as the acceptor of a bill of exchange drawn there, and the judges of the court being of the opinion that the acceptance was not valid by the law of the country, so adjudged. Both parties afterwards happening to come to England, the plaintiff in the

suit at Leghorn brought his action here, but the defendant in that suit brought his bill in chancery for an injunction, and Lord Chancellor King held that " the court at Leghorn having a general and proper jurisdiction of the cause, their judgment was binding and conclusive with the court here," and granted a perpetual injunction.

In *Boucher* v. *Lawson* (1734), Cas. temp., Hardwicke, 85, the plaintiff brought an action on the case against the defendant as owner of a ship for his failure to deliver Portuguese gold, which defendant undertook to carry from Portugal to London, and there deliver to plaintiff. On the trial a special verdict was found, which determined among other things that it was unlawful according to the laws of Portugal to export gold. The counsel for defendant contended that if the courts of England held the particular determination of courts abroad to be conclusive in England, they should have more regard for the general laws of the foreign country declaring anything an unlawful trade, and not give any countenance to actions brought upon illicit commerce, citing the case of *Burrows* v. *Jamineau*. Lord Hardwicke on this point said : " The reason gone upon by King, Lord Chancellor, in the case of *Burrows* v. *Jamineau*, was certainly right, and where any court, whether foreign or domestic, that has the proper jurisdiction of the cases makes a determination, it is conclusive to all other courts." He then criticised the decision of the chancellor, on the ground that the party could have set up the defence in the suit at law, and that on that ground the bill should have been dismissed. He then refers to the case of Cottington's appeal in the time of Charles II. as supporting the same conclusion.

In *Otway* v. *Ramsay*, 2 Stra. 1090 (1737), in the King's Bench, it was held that debt does not lie in Ireland on an English judgment. The case is more fully reported in a note to 4 B. & C. 414.

In *Gage* v. *Bulkeley*, 3 Atk. 215 (1744). This was a plea of a foreign sentence in a Commissary Court in France relating to the same matters, for which the bill was brought here. Lord Hardwicke said : " It must be overruled, for it is the most proper case to stand for an answer with liberty to ex-

cept that I ever met with; and the more so as it is the sentence in a commissary court only, which is of a political nature, in order to determine disputes which might arise in relation to French actions."

This case is referred to by Lord Chancellor Camden in *Bayley* v. *Edwards*, 3 Swanston, 703 (1792), as "going a great way to show the true effect of foreign sentences in this country." Yet it seems only to rule that a defence of a foreign judgment should be taken by answer and not by plea, and it is evident that Lord Hardwicke doubted whether the court was a competent court.

In *Roach* v. *Garvan*, 1 Ves. Sen. 157 (1748), before Lord Hardwicke, an infant, a ward of the court, having in France intermarried with the son of her guardian at that time, the husband petitioned for a decree for cohabitation with his wife, who was kept from him by her mother, who had lately been appointed her guardian. Lord Hardwicke: "Where a marriage is in fact had, or in a contract *in præsenti* or in a suit for restitution of conjugal rights, a sentence in the Ecclesiastical Court, (unless there be collusion which will overturn the whole,) will be conclusive and bind all; but not if given in a collateral suit, as for a criminal action, for it will only bind the rights of the marriage in the three cases above. This was in a criminal court in the Châtelet in Paris, and it is strange if they have no other jurisdiction in France for marriage than a criminal court."

Lord Hardwicke seems to have doubted in this case also whether the court could be considered as a competent court whose judgment would be conclusive and held binding in England.

Up to this time in the reported decisions, while the courts refused to give to the record of a foreign judgment the full effect of a record of the superior courts of Westminster, there seems to have been no diversity in the opinions of the judges that a foreign judgment of a competent court having jurisdiction over the party and the subject matter was to be held binding and conclusive.

The case of *Sinclair* v. *Fraser* (1771), reported in 1 Doug.

5, note, appears to be the earliest case containing a dictum to the effect that a foreign judgment is only *prima facie* evidence of a debt. The actual question there involved was not to what extent a foreign judgment could be reëxamined on the merits, but whether it could be made the basis of an action without proof of the original consideration. It is entirely consistent with the decision, and with anything said by the judges, that the court might have held that where the parties to a foreign suit had both been within the jurisdiction, and the court had jurisdiction of the subject matter, and the cause was tried on its merits, it would have been held binding upon the parties although the defendant offered to try it over again.

This idea is suggested by Lord Campbell, in his opinion in the case of *Bank of Australasia* v. *Nias*, 16 Q. B, 717 (1851); and the suggestion is supported by the very words of the declaration of the House of Lords, above cited, that it lies upon the defendant to impeach the justice thereof, or to show the same to have been irregularly or unduly obtained.

The case of *Sinclair* v. *Fraser* was followed in 1775 by the case of *Crawford* v. *Witten*, Lofft, 154; in which it was determined that although the original cause is not considered as merged in a foreign judgment the foreign judgment could be sued on alone in *assumpsit*, as implying a promise.

*The Duchess of Kingston's case*, 11 Hargrave's St. Trials, 198, hardly touches upon this controversy.

*Walker* v. *Witter* (1778), 1 Doug. 1, was debt on a judgment of the Supreme Court of Jamaica. The pleas were *nil debet* and *nul tiel record*. The real question in the case was whether *debt* would lie on a foreign judgment. On the plea of *nil debet* the plaintiff took issue and a verdict was found for him. On the plea of *nul tiel record*, the plaintiff replied that there was such a record and made profert of what purported to be a record of the court in Jamaica. The decision, in which all the judges of the King's Bench concurred, was that debt would lie upon a foreign judgment because it was for a sum certain. The *dicta* of Lord Mansfield in this case seem to have been substantially the basis for the notion that

afterwards prevailed, that a foreign judgment was only *prima facie* evidence of a debt, even to the extent of authorizing in all cases a retrial of the merits.

The case of *Herbert* v. *Cook* (1782), Willes, 36, note, also turns upon a question of pleading. It contains a dictum by Lord Mansfield that the judgment of a court not of record in "England, 'like a foreign judgment,' is not conclusive evidence of the debt." But neither in the case of *Sinclair* v. *Fraser*, or *Walker* v. *Witter*, or *Herbert* v. *Cook* was the question involved of what effect is to be given to a judgment of a foreign court or of an inferior court of England, having jurisdiction of the cause and of the parties.

In *Galbraith* v. *Neville* (1789), 1 Doug. 6, note, Lord Kenyon reviews and dissents from the conclusions of Lord Mansfield as reported in the case of *Walker* v. *Witter*. He says: "I cannot help entertaining serious doubts concerning the doctrine laid down in *Walker* v. *Witter* that foreign judgments are not binding upon the parties here."

It is true that Mr. Justice Buller dissents from these views and insists that the result of the authorities is, that a foreign judgment has no more credit than is given to every species of written agreement: that is, that it should be considered as good till it is impeached.

In a note on this case, 5 East, 475, it is said that the case stood over from the Easter Term, 29th, to Mich. Term, 31st George III., for the court to advise upon it, when Lord Kenyon said that the court had considered the matter and were of opinion that no new trial ought to be granted. He added that without entering into the question how far a foreign judgment was impeachable it was at all events clear that it was *prima facie* evidence of the debt, and they were of opinion that no evidence had been adduced to impeach this, and therefore discharged the rule.

In *Messin* v. *Massareene* (1791), 4 T. R. 493, the plaintiff having obtained a judgment against the defendant in the Châtelet of Paris, brought an action of *assumpsit* in England on that judgment, in which the defendant suffered judgment to go by default. A motion to refer it to the Master to com-

pute the amount due and for final judgment without executing a writ of enquiry was denied.

In *Bayley* v. *Edwards* (1793), 3 Swanston, 703, before the Privy Council, the point being whether a suit pending in Jamaica could be pleaded in abatement of a suit in England, Lord Camden said: "As to the inconvenience, considering the difficulties of administering justice between parties occasionally living under the separate jurisdiction, I think the parties ought to be amenable to every court possible, . . . and we must then endeavor to correct the mischiefs of these double suits as much as we can, by allowing in each country the benefit of all the other proceedings in the other part of the King's dominions."

In *Phillips* v. *Hunter* (1795), 2 H. Bl. 402, the question before the court being to whom money collected under a judgment recovered in Pennsylvania belonged, and not at all involving the question of the effect of the judgment as binding upon the parties or otherwise, Chief Justice Eyre said: "It is in one way only that the sentence or judgment of the court of a foreign state is examinable in our courts, and that is when the party who claims the benefit of it applies to our courts to enforce it. When it is thus voluntarily submitted to our jurisdiction, we treat it not as obligatory to the extent to which it would be obligatory, perhaps, in the country in which it was pronounced, nor as obligatory, to the extent to which, by our law, sentences and judgments are obligatory, not as conclusive, but as matter *in pais*, as consideration *prima facie* sufficient to raise a promise. We examine it as we do all other considerations or promises, and for that purpose we receive evidence of what the law of the foreign state is, and whether the judgment is warranted by that law."

In *Buchanan* v. *Rucker* (1807), 1 Campbell, 63, which was *assumpsit* on a judgment of a court in the island of Tobago, where the objection was that the judgment was obtained by default, the defendant never having been resident in the island, and the only service of the declaration made by the nailing a copy of the same on the court-house door in accord-

ance with the alleged law of the island, Lord Ellenborough, in answer to the suggestion that the presumption was in favor of a foreign judgment as well as of a judgment obtained in one of the courts of England, said: "That may be so if the judgment appears on the face of it consistent with reason and justice; but it is contrary to the first principles of reason and justice that either in civil or criminal proceedings a man should be condemned before he is heard."

In the same case on a motion for a new trial, 9 East, 192, an affidavit having been produced showing a law of the colony that in case of a defendant absent from the island, the declaration could be so served, Lord Ellenborough said: "There is no foundation for this motion, even upon the terms of the law disclosed in the affidavit."

In *Hall* v. *Odber* (1809), 11 East, 118, the plaintiff sued upon a balance due upon a foreign judgment and also upon the original cause of action in *assumpsit*. The judgment was the judgment of the province of Lower Canada. The court in directing the judgment ordered a stay of proceedings by execution for six months, in order to enable the defendant to prove a counterclaim, if he had any. The six months had elapsed before the commencement of this action, and no proceedings had been taken by the defendant for the proof of his counterclaim in the foreign court. The court held that both counts were good, the one upon the judgment and the other upon the balance of accounts.

That the general expressions used in this case as to the judgment being only evidence of the debt were not intended by the court as determining how far a foreign judgment upon the merits would conclude a party appears plainly from the case of *Tarleton* v. *Tarleton* (1815), 4 M. & S. 20, before the same court. The case was covenant on a bond by the defendant and one D. B., conditioned to indemnify the plaintiff against the debt of the copartnership which had existed between the three. The breach alleged was that certain creditors of the firm had recovered judgment against the defendants in the island of Grenada for their claim, which plaintiff had been obliged to satisfy on execution in Grenada. On the trial the defendant

proposed to show that the proceedings in the court of Grenada were erroneous, inasmuch as the account was incorrectly stated. His Lordship, however, ruled that the defendant could not go into that question, inasmuch as the foreign court being a court of competent jurisdiction, what was done in it must, for the purpose of this action, be taken to be rightly done and the plaintiff had a verdict.

A motion for a new trial, made on the ground that the proceedings in the foreign court were not conclusive evidence, that it was *prima facie* only, and the defendant might impeach the justice of it, was denied.

In *Cavan* v. *Stewart* (1816), 1 Starkie, 525, the judgment of a Jamaica court, whereby the balance due from the defendant to the plaintiffs had been attached and sequestered at the suit of a creditor, was offered in evidence as a bar. The papers recited that the plaintiffs were absentees. It was held that as there was a default in the case, and no proof of notice, the judgment was not a bar. Lord Ellenborough : " It is perfectly clear on every principle of justice that you must either prove that the party was summoned or at least that he was once on the island."

And in the case of *Power* v. *Whitmore* (1815), 4 M. & S. 141, Lord Ellenborough says : " By the comity which is paid by us to the judgment of other courts abroad of competent jurisdiction, we give a full and binding effect to such judgments so far as they profess to bind the persons and property immediately before them in judgment, and to which their adjudications properly relate."

In *Kennedy* v. *Earl of Cassilis* (1818), 2 Swanston, 313, Lord Eldon says : " The court is bound to presume that foreign tribunals will proceed regularly and administer the justice of the case."

*Arnot* v. *Redfern* (1825), 2 C. & P. 88, was a suit on a Scotch judgment which gave interest from 1811 to date on a contract governed by English law, by which interest was not allowed. Best, C. J. Judgment given excluding this interest. On appeal, affirmed.

*Harris* v. *Saunders* (1825), 4 B. & C. 411: Held that an

Irish judgment since the Union is not a record in England, and remedy is by *assumpsit.* So held on authority of *Otway* v. *Ramsay, supra.*

*Douglas* v. *Forrest* (1828), 4 Bing. 686. Best, C. J., discusses the necessity for service of summons upon the party objecting to a foreign judgment in order to bind him, and gives effect to a Scotch judgment, though without actual notice, in a proceeding similar to our foreign attachment, where the debtor was a native-born Scotchman, and left property in Scotland. He approves the views expressed by Lord Ellenborough in *Buchanan* v. *Rucker* and *Cavan* v. *Stewart.*

*Guinness* v. *Carroll* (1830), 1 B. & Ad. 459, touches on the effect of a foreign judgment (Irish), but decides nothing on the subject.

*Martin* v. *Nicolls* (1830), 3 Sim. 458, before Vice-Chancellor Shadwell, appears to be the first case in which the question of the binding effect of a foreign judgment not impeachable for want of proper jurisdiction over the party, or for fraud in obtaining the same, was passed upon. The bill was filed, representing in effect that an action had been brought by the defendant in Antigua, and that a judgment had been recovered, and that afterwards an action was commenced in the Common Pleas in England upon that judgment against the plaintiff in this suit in equity, and the object of the bill was to obtain a discovery and a commission to examine witnesses in Antigua. The Vice-Chancellor said: "If I were to allow this bill to stand, I should be in effect saying that the judgment obtained in Antigua may be overruled by the Common Pleas. I must, therefore, allow this demurrer."

*Novelli* v. *Rossi* (1831), 2 B. & Ad. 757, has been supposed to be an authority that a foreign judgment could be impeached for a clear mistake in applying the law of England, where the case was or should have been governed by the English law. Since the case of *Godard* v. *Gray,* hereafter referred to, it cannot be considered authority for that position.

*Becquet* v. *McCarthy* (1831), 2 B. & Ad. 951, was an action in the King's Bench, on a judgment obtained by the

plaintiff against the defendant's testator in the island of Mauritius. The trial was before Lord Tenterden, C. J. The record showed that the action was between the plaintiff and one McCarthy, defendant's testator, at present residing at the Cape of Good Hope, cited at the domicil of the substitute of the King's Attorney General in the tribunals and courts of this colony, defendant, and the Paymaster General of Her Majesty's forces also defendant.

It also appeared by the minute of the court that the defendants in the suit had been cited to answer touching a fire which was alleged to have broken out in the paymaster's office and consumed a house and other property of the plaintiff, and damages were claimed in accordance with the law of the colony. Defendant's testator having made default, a second citation issued and the defendant did not appear. The tribunal then went on and determined the case in favor of the plaintiff. It was objected that the judgment was invalid by the law of the colony itself, there being no allegation of negligence. Also that it appeared by the judgment that McCarthy was absent from the colony at the time of the proceedings against him, and it was claimed that it was contrary to justice that a man should be condemned unheard.

Lord Tenterden, C. J., said, that the island belonged to England, but the French law prevailed there. To the point that negligence was essential by that law, he said: " The law of France being the law of the colony, the French court was much more competent to decide questions arising upon that law than we can be. We ought to see very plainly that that court has decided against the French law before we say that their judgment is erroneous upon such ground. . . . Another objection, and not an unimportant one, was that the testator, when the proceedings were instituted against him, was absent from the island, and it was urged that it was contrary to the principles of natural justice that any one should be condemned unheard and in his absence. Proof, however, was given that by law of the colony, in the case of a person formerly resident in the island absenting himself and not leaving any attorney upon whom process in the suit might be

served, the procurator general or his deputy was bound to take care of the interests of such absent party. . .. . It must be presumed that he would do whatever was necessary on the discharge of that public duty ; and we cannot take upon ourselves to say that the law is so contrary to natural justice as to render the judgment void."

In *Alivon* v. *Furnival* (1834), 1 C. M. & R. 277, 293; *S. C.* 4 Tyrwh. 751, the Court of Exchequer enforced the sentence of a French tribunal of commerce in favor of syndics of a bankrupt against a party who had owed the bankrupt a certain sum in an action of debt. Parke, B. : " We must assume the judgment of the court to be according to the French law, at least until the contrary was distinctly proved, according to the principle laid down in *Becquet* v. *McCarthy*, 2 B. & Ad. ; " and as to the rule of damages allowed, he said : " And it is impossible for us to say that this principle of adjusting the damages is wrong as being contrary to natural justice, and there is no evidence that it is not conformable to the law of France."

In *Houlditch* v. *Donegal* (1834), 8 Bligh, N. S. 301; *S. C.* 2 Cl. & Fin. 470, *sub nom. Houlditch* v. *Donegall* before the House of Lords, upon an appeal from the Chancellor in Ireland upon a bill filed in the Irish court to enforce against the defendant decrees of the English chancery court, the defendant answered that the decrees were irregular and erroneous, and ought not to be taken as binding on him. The bill was dismissed, not on the merits, but on the ground that the bill would not lie in the court of chancery in Ireland for the purpose of carrying out and enforcing the decrees of the chancery court in England. While this case may be taken to represent the individual opinion at that time of Lord Brougham, it does not represent the opinion of the House of Lords, and the manner in which he disposed of the question seems to indicate that he had some misgivings that after all he might be wrong; or at least that the subject required a more careful examination than he gave it at that time.

*Don* v. *Lippmann* (1837), 5 Cl. & Fin. 1, was an appeal from the Scotch court. Lord Brougham's opinion is evi-

dence that he still entertained the same opinion expressed by him in *Houlditch* v. *Donegal*, that a foreign judgment is only *prima facie* evidence of a debt. But the case before the court was clearly one in which, upon admitted principles with regard to the necessity of the service of process upon a party or other proper notice of the suit, the judgment was a nullity outside of the country where it was rendered.

In *Price* v. *Dewhurst* (1837), 8 Sim. 279, Sir L. Shadwell, Vice-Chancellor, held that the decision of what was called the Executor's Court of Dealing in the island of St. Croix, consisting of the executors themselves, as to the disposition of personal property, would not be recognized as valid, as against an adverse party who was entitled to property by the law of England where the last will of the testator had been admitted to probate. This was affirmed (1838), 8 Sim. 617.

In *Ferguson* v. *Mahon* (1839), 11 Ad. & El. 179, in an action on an Irish judgment, the plea was, that the defendant was not arrested or served with process, nor had notice of process, nor appeared. The replication was that the defendant had had notice of certain process, to wit: a writ of summons issuing out of the court, etc. Demurrer to replication. The demurrer was overruled. On the plea judgment was given the defendant.

In *Smith* v. *Nicolls* (1839), 5 Bing. N. C. 208; *S. C.* 7 Scott, 147, it was held that a foreign judgment was void where defendant was not summoned. was neither present in the country, nor had an agent there. The judges review the cases and state it as a matter of some doubt whether a foreign judgment is conclusive or reëxaminable on the merits.

*Russell* v. *Smyth* (1842), 9 M. and W. 810, was an action to recover on a judgment for costs rendered in a Scotch court. Abinger, C. B.: "Foreign judgments are enforced in these courts, because the parties against whom they are pronounced are bound in duty to satisfy them."

*Williams* v. *Jones* (1843), 13 M. & W. 628. The action was on a judgment of a county court. Parke, B.: "The principle on which this action is founded is that where a court of competent jurisdiction has adjudicated a certain sum to be due

from one person to another, a legal obligation arises to pay that sum on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced, and the same rule applies to inferior courts in this country, and applies whether they be courts of record or not."

These two cases, and especially the views taken by Baron Parke in them, are referred to in the later English cases as establishing the principle on which foreign judgments are held to be conclusive on the merits.

*General Steam Navigation Co.* v. *Guillou* (1843), 11 M. & W. 877. Plaintiff sued in case for injuries to plaintiff's ship by a ship of the defendant, under charge of the defendant's servants. It was pleaded that the company to which the defendant's ship belonged, and of which defendant was a member, brought suit in a court of France against the plaintiffs for negligence of their officers and crew, whereby she was sunk ; that the plaintiffs appeared and defended themselves against the claim of the company, and insisted that the collision proceeded from the negligence of the defendant's servants, and that the court adjudged that the plaintiff's ship did, by the negligence of the plaintiff's officers and crew, run on board of and sink the ship of the company, and condemned the plaintiff in damages. The plea was held bad in form, so that it was unnecessary to determine whether it was bad in substance. Parke, B. : " But it is not to be understood that we feel much doubt on that question. They (the pleas) do not state that the plaintiffs were French subjects, or resident, or even present in France when the suit began, so as to be bound by reason of allegiance or domicil, or temporary presence, by a decision of a French court ; and they did not elect the tribunal and sue as plaintiffs ; in any of which cases the determination might have possibly bound them. They were mere strangers who put forward the negligence of the defendant as an answer, in an adverse suit in a foreign country, whose laws they were under no obligation to obey."

In *Henderson* v. *Henderson* (1843), 3 Hare, 100, the next of kin of an intestate filed their bill in equity in the Supreme

Court of Newfoundland against the plaintiff, and obtained a decree for a certain sum due them and afterwards brought their actions in England against him on the decree. The plaintiff thereupon brought this bill in England against the next of kin for an accounting concerning not only the same matters that had been passed upon in the colonial court, but other matters which might have been litigated in that suit, and alleged irregularities and errors in the proceedings in that court, and asked that the next of kin be restrained by injunction from proceeding with their action. The defendants demurred to the bill for want of equity. Vice-Chancellor Wigram held that the suit in Newfoundland was between the same parties as those in the present suit; that most of the matters concerning which an accounting was prayed for had been passed upon in that suit, and as to the remainder they were such as might have been litigated in it, and were therefore *res judicata* also.

*Henderson* v. *Henderson* (1843), 6 Q. B. 288, was an appeal by the plaintiff in the preceding suit from a judgment in the suit brought by the next of kin to enforce the Newfoundland decree. One of the points raised on the appeal was whether a foreign decree in equity could be enforced, the objection being that a decree for payment of money by a court of equity is not a declaration that the plaintiff has any legal right to the money, but only that upon certain views peculiar to the court the payment ought to be made.

The Court, per Lord Denman, C. J., after examining the authorities, was of the opinion that there was no doubt but that such a decree might be enforced where the chancery suit terminates in the simple result of ascertaining a clear balance and an unconditional decree that an individual must pay, but that there might be instances where such a decree would be enforceable nowhere but in courts of equity, because they involve collateral and provisional matters to which a court of law could give no effect.

Another point made on the appeal was that the defendants in the suit in chancery in Newfoundland had not had justice done them. Lord Denman, C. J.: " This is never to be presumed; but the contrary principle holds unless we see in the

clearest light that the foreign law or at least some part of the proceedings of the foreign court are repugnant to natural justice ; and this has been often made the subject of inquiry in our courts. But it steers clear of an inquiry into the merits of the case upon the facts found; for whatever constituted a defence in that court ought to have been pleaded there," etc.

In *Vallee* v. *Dumergue* (1849), 4 Exch. 290, plaintiff obtained a judgment in France against the defendant. The defendant claimed he had never resided or been in France nor subject to its laws, nor served with any process or notice whatever, nor did he have any notice or knowledge of any proceeding, nor did he appear. He claimed that the circumstances under which the judgment was obtained were contrary to natural justice. But it appeared that the defendant was a shareholder in a certain company in France; that by the law of France it was necessary for the defendant to elect a domicil in France if he resided abroad, at which the directors of the company might notify him of all proceedings relative to the company or himself as a shareholder; that by the law of France all legal proceedings affecting any party having his real domicil out of the kingdom, left for him at such elected domicil, were as valid as if left at his real domicil; that the defendant made election of domicil at Paris, and gave notice thereof to the plaintiff ; and the plaintiff caused the summons to be left at the elected domicil in Paris. The court, by Alderson, B., held that whether the defendant had had actual notice of the proceedings was unimportant, as he had waived that by becoming a shareholder and thereby agreeing to accept a particular form of notification less than actual notice.

Notwithstanding the seeming approval by Chief Justice Wilde in *Bank of Australasia* v. *Harding* (1850), 9 C. B. 661, of Lord Brougham's views as expressed in *Houlditch* v. *Donegal, supra*, the case is referred to in subsequent cases as sustaining the rule of the conclusiveness of foreign judgments upon the merits, and indeed, it was held that the declaration which set forth the colonial judgment as establishing his liability was good.

In the *Bank of Australasia* v. *Nias* (1851), 16 Q. B. 717,

which was *assumpsit* on the same judgment of the court of New South Wales, it was held that the judgment was binding on a member of the company sued in England. The question of the conclusiveness of the foreign judgment was fully argued.

In *Reimers* v. *Druce* (1856), 23 Beavan, 145, a bill by a foreign creditor to enforce a judgment obtained in the kingdom of Hanover was dismissed on the ground of laches, but the Master of the Rolls, Sir John Romilly, discussed at some length the extent to which a foreign judgment is impeachable when sought to be enforced in England, and after a review of the principal cases, and especially of the cases of the *Bank of Australasia* v. *Nias* and *Ricardo* v. *Garcias*, said it could be impeached for error apparent on the face of it, sufficient to show that such judgment ought not to have been pronounced, but that this error cannot be shown by extrinsic evidence.

It was held in *Sheehy* v. *Professional Life Ass. Co.* (1857), 3 C. B. (N. S.) 597, affirming 2 C. B. (N. S.) 211, that a foreign judgment could be enforced notwithstanding an irregularity in the service of process, where the defendant voluntarily appeared during the argument. Erle, J., said : "I have always understood that the only ground upon which our courts can refuse to give effect to a foreign judgment is that the whole foundation of the proceeding in the foreign court fails."

In *De Cosse Brissac* v. *Rathbone* (1861), 6 H. & N. 301, the suit was on a French judgment. The plea that it was erroneous on the merits. This plea was held bad. Wilde, B.: "*Ricardo* v. *Garcias* is an authority that the judgment of a foreign court of competent jurisdiction cannot be impeached upon the merits." Martin, B.: "We are all of opinion that this question is so concluded by the authorities that it is impossible for us to decide contrary to them, and the case must go to the Court of Errors. I may observe that the question does not come before me for the first time. For many years I have had occasion to consider it." In this case also it was ruled that a plea to the effect that a defendant appeared in the French action and defended the same for the purpose of protecting his property in France, which was subject to sequestration in case of a judgment, was bad.

*Scott* v. *Pilkington* (1862), 2 B. & S. 11. Suit on a New York judgment. Held, that the fact that an appeal is pending is not a bar, but may be a ground for delay; and that a plea that the court mistook the law of the forum was bad.

*Simpson* v. *Fogo* (1862), 1 Johns. & Hem. 18, on demurrer, and 1 Hem. & Mill. 195, on motion for a decree. In chancery. A ship being subject to a valid mortgage in England, went to Louisiana and was there attached by a creditor of the mortgagor. The mortgagee intervened and proved his rights, which were superior by the law of England, but they were disregarded, and the ship was sold and the proceeds paid to the attaching creditor. The purchaser having brought the ship to England, it was decided that the mortgagee might seize and sell her, and that the Louisiana decree was not binding, because founded on a perverse disregard of the English law, though a case properly subject to that law by the comity of nations.

In *Crawley* v. *Isaacs*, 16 Law Times, (N. S.) 529 (1867), it is said that the repugnancy to natural justice, spoken of in the cases, refers not to the decision on the merits of the case, but to matters of procedure.

The syllabus of *Godard* v. *Gray*, L. R. 6 Q. B. 139 (1870), gives a clear idea of the points decided.

"It is no bar to an action, on a judgment *in personam* of a foreign court having jurisdiction over the parties and cause, that the foreign tribunal has put a construction erroneous according to English law on an English contract.

"Declaration on a judgment of a French court having jurisdiction in the matter. Plea setting out the judgment, from which it appeared that the suit was for the breach by the shipowner of a charter party made in England, in which was a clause: 'Penalty for the non-performance of this agreement, estimated amount of freight'; and that the court had treated this clause (contrary to the English law) as fixing the amount of damages recoverable, and had given judgment accordingly for the amount of freight. The proceedings showed that both parties had appeared and been heard before the judgment was pronounced, but no objection was taken by the defendant to

the mode of assessing the damages. Held, by Blackburn and Mellor, JJ., that the defendant could not set up, as an excuse for not paying money awarded by a judgment of a foreign tribunal having jurisdiction over him and the cause, that the judgment proceeded on a mistake as to the English law, which was really a question of fact; and that it made no difference that the mistake appeared on the face of the proceedings. By Hannen, J., that the French court could only be informed of foreign law by evidence, and the defendant, having neglected to bring the English law to the knowledge of the French court, could not impeach the judgment given against him on the ground of error as to that law." See also *Castrique* v. *Imrie*, L. R. 4 H. L. 414 (1870).

In *Rousillon* v. *Rousillon*, 14 Ch. D. 351 (1880), Fry, J., undertakes to state with precision the circumstances under which the courts of England will hold the judgment of the foreign tribunal conclusive, viz.: 1. Where the defendant is a subject of a foreign country in which the judgment has been obtained. 2. Where he was resident in the foreign country when the action began. 3. Where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued. 4. *Where he has voluntarily appeared.* 5. Where he has contracted to submit himself to the forum in which the judgment was obtained, and possibly, 6. Where the defendant has real estate within the foreign jurisdiction, in respect to which the cause of action arose whilst he was within that jurisdiction.

The Court of Queen's Bench, in *Schibsby* v. *Westenholtz*, L. R. 6 Q. B. 155 (1870), which follows and reinforces the decision in *Godard* v. *Gray*, also said: " Now, on this, we think some things are quite clear on principle. If the defendants had been at the time of the judgments subjects of the country whose judgment is sought to be enforced against them, we think that its laws would have bound them. Again, if the defendants had been at the time when the suit was commenced resident in the country, so as to have the benefit of its laws protecting them, or, as it is sometimes expressed, owing temporary allegiance to that country, we think that its

laws would have bound them. . . . Again, we think it clear, upon principle, that if a person selected, as plaintiff, the tribunal of a foreign country as the one in which he would sue, he could not afterwards say that the judgment of that tribunal was not binding on him." Per Blackburn, J.

In *Messina* v. *Petrococchino* (1872), L. R. 4 P. C. 144, Sir Robert Phillimore says: "If the Greek Consular Tribunal was a competent court, having jurisdiction over the ship and cargo, then the sentence of that court was not open to examination by the court at Malta, but would be properly enforced by it, or in the clear language of Lord Ellenborough in the case of *Power* v. *Whitmore*, 4 M. & S. 150, 'By the comity which is paid by us to the judgments of other courts abroad of competent jurisdiction, we give a full and binding effect to such judgments, so far as they profess to bind the persons and property immediately before them in judgment, and to which their adjudications properly relate.'"

In *Trafford* v. *Blanc*, 36 Ch. D. 600, it is said : "The principle on which *Bank of Australasia* v. *Nias* was decided appears to be that the courts of this country do not sit to hear appeals from foreign tribunals, and that if the judgment of a foreign court is erroneous, the regular mode provided by every system of jurisprudence of procuring it to be examined and reversed ought to be followed. Neither do the courts of this country sit to rehear causes which have been tried abroad. Every system of jurisprudence provides a mode by which a judgment may be reviewed, and the cause reheard on the discovery of fresh evidence, and to the regular mode so provided recourse ought to be had, as in fact has been unsuccessfully done by the defendant in the present case."

The cases of *Aboulof* v. *Oppenheimer*, 10 Q. B. D. 295 (1882), and *Vadala* v. *Lawes*, 25 Q. B. D. 310 (1890), do not impair the authority of the above decisions. They apply to foreign judgments the principle of English law, that it is a defence that the plaintiff procured the former judgment by a fraud practised on the court in the trial, a defence which, by the decisive authority of this court, is not open to a domestic judgment here.

Counsel also cited and commented on the following cases decided in British colonial courts on the same subject: *Bukshee* v. *Samunt* (1871), Appellate Civil, Sutherland's Weekly Reporter, 500; *Mammi* v. *Kalandan* (1874), Appellate, 8 Madras H. C. R. 14; *Pillai* v. *Saib* (1880), Appellate Civil, Indian Law Reports, 2 Madras Series, 337; *Shevákrám* v. *Kálidás* (1882), Appellate Civil, Indian Law Reports, 6 Bombay Series, 292; *Mudaliar* v. *Pallai* (1879), Appellate Civil, Indian Law Reports, 2 Madras Series, 400; *Parry* v. *Pillai* (1880), Appellate Civil, Indian Law Reports, 2 Madras Series, 407; *Maubourquet* v. *Wyse* (1867), 1 Irish C. L. 471; *Fowler* v. *Vail* (1877), 27 U. Canada C. P. 417; *S. C.* 4 Canada App. 267; *Woodruff* v. *McLennan*, 14 Ontario App. 242; *Victorian &c. Photo. Litho. Co.* v. *Davis* (1890), 11 New South Wales, 257; *Star Kidney Pad Co.* v. *McCarthy* (1886), 26 New Brunswick, 107; *British Linen Co.* v. *McEwan* (1892), 8 Manitoba (Law), 99; *Corse* v. *Moon* (1890), 22 Nova Scotia (10 Russ. & Gel.), 191; *Denoon* v. *Northway* (1883), 5 Sup. Ct. Circular, Ceylon, 133; *Blaine* v. *Col. Mar. Ass. Co.* (1882), 1 Juta (Cape of Good Hope), 402; *Jones* v. *Reed* (1890), 16 Victoria, 372.

Counsel also cited, with comments, the following American cases: *Buttrick* v. *Allen*, 8 Mass. 273; *Rankin* v. *Goddard*, 54 Maine, 28; *S. C.* 55 Maine, 389; *Thurber* v. *Blackbourne*, 1 N. H. 242; *Konitzky* v. *Meyer*, 49 N. Y. 571; *Lazier* v. *Westcott*, 26 N. Y. 146; *Taylor* v. *Bryden*, 8 Johns. 173; *Hanley* v. *Donoghue*, 116 U. S. 1; *Christmas* v. *Russell*, 5 Wall. 290, 304; *McMullen* v. *Richie*, 41 Fed. Rep. 502; *De Brimont* v. *Penniman*, 10 Blatchford, 437; *Silver Lake Bank* v. *Harding*, 5 Ohio, 545; *Glass* v. *Blackwell*, 48 Arkansas, 50; *Fisher* v. *Fielding*, Connecticut, (1894); *Hopkins* v. *Lee*, 6 Wheat. 109; *Pennington* v. *Gibson*, 16 How. 65.

II. The fraud which will vitiate a judgment is fraud extrinsic to the matter tried in the cause, and fraud upon the party or upon the court whereby judgment was improperly procured to be entered; not a fraud committed in the matter tried or examinable in the action. *United States* v. *Throckmorton*, 98 U. S. 64; *Vance* v. *Burbank*, 101 U. S. 514; *Moffat* v. *United States*, 112 U. S. 24; *United States* v. *Minor*,

114 U. S. 233; *Marshall* v. *Holmes*, 141 U. S. 589; *Greene* v. *Greene*, 2 Gray, 361; *Ross* v. *Wood*, 70 N. Y. 8; *Ward* v. *Southfield*, 102 N. Y. 287; *Sanders* v. *Soutter*, 126 N. Y. 193; *Price* v. *Dewhurst,* 8 Sim. 279; *Ochsenbein* v. *Papelier*, L. R. 8 Ch. 695.

III. The point made by the plantiffs in error that France does not enforce judgments of foreign states against its own subjects is wholly immaterial.

While the efficacy of foreign judgments rests partly on principles of comity, or friendly dealing between nations at peace, or was formerly held to do so, the modern doctrine of their conclusiveness rests on the same general ground of public policy which makes domestic judgments equally conclusive, viz.: that the public interest is that there be an end of litigation — that one fair chance to prove his cause to be just, in a competent court, is all that the good of society or the general principles of justice demand or permit a litigant to enjoy.

Nor should the well-grounded and consistent principles of our law be marred by introducing under the cover of " comity " the principle of " retaliation." That principle has been repudiated as a ground of decision by this court where the law of this country is positive and established. *The Scotland*, 105 U. S. 24. See also *Baker* v. *Palmer*, 83 Illinois, 568; *Cross* v. *United States Trust Co.*, 131 N. Y. 330; *Dammert* v. *Osborn*, 140 N. Y. 30.

*Mr. George A. Black*, by leave, filed a brief on behalf of Bailey and others, to which *Mr. Choate* and *Mr. Shipman* filed suggestions in reply.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

These two cases, the one at law and the other in equity, of *Hilton* v. *Guyot*, and the case of *Ritchie* v. *McMullen* which has been under advisement at the same time, present important questions relating to the force and effect of foreign judgments, not hitherto adjudicated by this court, which have been argued

with great learning and ability, and which require for their satisfactory determination a full consideration of the authorities. To avoid confusion in indicating the parties, it will be convenient first to take the case at law of *Hilton* v. *Guyot.*

International law, in its widest and most comprehensive sense — including not only questions of right between nations, governed by what has been appropriately called the law of nations; but also questions arising under what is usually called private international law, or the conflict of laws, and concerning the rights of persons within the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation — is part of our law, and must be ascertained and administered by the courts of justice, as often as such questions are presented in litigation between man and man, duly submitted to their determination.

The most certain guide, no doubt, for the decision of such questions is a treaty or a statute of this country. But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this, the courts must obtain such aid as they can from judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations. *Fremont* v. *United States,* 17 How. 542, 557; *The Scotia,* 14 Wall. 170, 188; *Respublica* v. *De Longchamps,* 1 Dall. 111, 116; *Moultrie* v. *Hunt,* 23 N. Y. 394, 396.

No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call "the comity of nations." Although the phrase has been often criticised, no satisfactory substitute has been suggested.

"Comity," in the legal sense, is neither a matter of absolute

obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

Mr. Justice Story, in his Commentaries on the Conflict of Laws, treating of the question in what department of the government of any State, in the absence of any clear declaration of the sovereign will, resides the authority to determine how far the laws of a foreign State shall have effect, and observing that this differs in different States, according to the organization of the departments of the government of each, says: "In England and America, the courts of justice have hitherto exercised the same authority in the most ample manner: and the legislatures have in no instance (it is believed) in either country interfered to provide any positive regulations. The common law of both countries has been expanded to meet the exigencies of the times as they have arisen; and so far as the practice of nations, or the *jus gentium privatum*, has been supposed to furnish any general principle, it has been followed out." Story's Conflict of Laws, §§ 23, 24.

Afterwards, speaking of the difficulty of applying the positive rules laid down by the Continental jurists, he says that "there is indeed great truth" in these remarks of Mr. Justice Porter, speaking for the Supreme Court of Louisiana: "They have attempted to go too far, to define and fix that which cannot, in the nature of things, be defined and fixed. They seem to have forgotten that they wrote on a question which touched the comity of nations, and that that comity is, and ever must be, uncertain; that it must necessarily depend on a variety of circumstances which cannot be reduced to any certain rule; that no nation will suffer the laws of another to interfere with her own to the injury of her citizens; that whether they do or not must depend on the condition of the country in which the foreign law is sought to be enforced, the particular nature of her legislation, her policy, and the char-

acter of her institutions; that in the conflict of laws it must often be a matter of doubt which should prevail; and that, whenever a doubt does exist, the court, which decides, will prefer the laws of its own country to that of the stranger." Story's Conflict of Laws, § 28; *Saul* v. *His Creditors*, (1827) 5 Martin (N. S.) 569, 596.

Again: Mr. Justice Story says: "It has been thought by some jurists that the term *comity* is not sufficiently expressive of the obligation of nations to give effect to foreign laws when they are not prejudicial to their own rights and interests. And it has been suggested that the doctrine rests on a deeper foundation; that it is not so much a matter of comity or courtesy, as a matter of paramount moral duty. Now, assuming that such a moral duty does exist, it is clearly one of imperfect obligation, like that of beneficence, humanity and charity. Every nation must be the final judge for itself, not only of the nature and extent of the duty, but of the occasions on which its exercise may be justly demanded." And, after further discussion of the matter, he concludes: "There is then not only no impropriety in the use of the phrase 'comity of nations,' but it is the most appropriate phrase to express the true foundation and extent of the obligation of the laws of one nation within the territories of another." Story's Conflict of Laws, §§ 33–38.

Chief Justice Taney, likewise, speaking for this court while Mr. Justice Story was a member of it, and largely adopting his words, said : " It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned." "The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it, as a part of the voluntary law of nations." "It is not the comity of the courts, but the comity

of the nation, which is administered and ascertained in the same way, and guided by the same reasoning, by which all other principles of municipal law are ascertained and guided." *Bank of Augusta* v. *Earle*, (1839) 13 Pet. 519, 589; Story's Conflict of Laws, § 38.

Mr. Wheaton says: "All the effect, which foreign laws can have in the territory of a State, depends absolutely on the express or tacit consent of that State." "The express consent of a State, to the application of foreign laws within its territory, is given by acts passed by its legislative authority, or by treaties concluded with other States. Its tacit consent is manifested by the decisions of its judicial and administrative authorities, as well as by the writings of its publicists. There is no obligation, recognized by legislators, public authorities, and publicists, to regard foreign laws; but their application is admitted, only from considerations of utility and the mutual convenience of States — *ex comitate, ob reciprocam utilitatem.*" Wheaton's International Law, (8th ed.) §§ 78, 79. "No sovereign is bound, unless by special compact, to execute within his dominions a judgment rendered by the tribunals of another State; and if execution be sought by suit upon the judgment, or otherwise, the tribunal in which the suit is brought, or from which execution is sought, is, on principle, at liberty to examine into the merits of such judgment, and to give effect to it or not, as may be found just and equitable. The general comity, utility and convenience of nations have, however, established a usage among most civilized States, by which the final judgments of foreign courts of competent jurisdiction are reciprocally carried into execution, under certain regulations and restrictions, which differ in different countries." § 147.

Chancellor Kent says: "The effect to be given to foreign judgments is altogether a matter of comity, in cases where it is not regulated by treaty." 2 Kent Com. (6th ed.) 120.

In order to appreciate the weight of the various authorities cited at the bar, it is important to distinguish different kinds of judgments. Every foreign judgment, of whatever nature, in order to be entitled to any effect, must have been rendered

by a court having jurisdiction of the cause, and upon regular proceedings and due notice. In alluding to different kinds of judgments, therefore, such jurisdiction, proceedings and notice will be assumed. It will also be assumed that they are untainted by fraud, the effect of which will be considered later.

A judgment *in rem*, adjudicating the title to a ship or other movable property within the custody of the court, is treated as valid everywhere. As said by Chief Justice Marshall: "The sentence of a competent court, proceeding *in rem*, is conclusive with respect to the thing itself, and operates as an absolute change of the property. By such sentence, the right of the former owner is lost, and a complete title given to the person who claims under the decree. No court of coördinate jurisdiction can examine the sentence. The question, therefore, respecting its conformity to general or municipal law can never arise, for no coördinate tribunal is capable of making the inquiry." *Williams* v. *Armroyd*, 7 Cranch, 423, 432. The most common illustrations of this are decrees of courts of admiralty and prize, which proceed upon principles of international law. *Croudson* v. *Leonard*, 4 Cranch, 434; *Williams* v. *Armroyd*, above cited; *Ludlow* v. *Dale*, 1 Johns. Cas. 16. But the same rule applies to judgments *in rem* under municipal law. *Hudson* v. *Guestier*, 4 Cranch, 293; *Ennis* v. *Smith*, 14 How. 400, 430; *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 291; *Scott* v. *McNeal*, 154 U. S. 34, 46; *Castrique* v. *Imrie*, L. R. 4 H. L. 414; *Monroe* v. *Douglas*, 4 Sandf. Ch. 126.

A judgment affecting the status of persons, such as a decree confirming or dissolving a marriage, is recognized as valid in every country, unless contrary to the policy of its own law. *Cottington's case*, 2 Swanston, 326; *Roach* v. *Garvan*, 1 Ves. Sen. 157; *Harvey* v. *Farnie*, 8 App. Cas. 43; *Cheely* v. *Clayton*, 110 U. S. 701. It was of a foreign sentence of divorce, that Lord Chancellor Nottingham, in the House of Lords, in 1688, in *Cottington's case*, above cited, said: "It is against the law of nations not to give credit to the judgments and sentences of foreign countries, till they be reversed by the law,

and according to the form, of those countries wherein they were given. For what right hath one kingdom to reverse the judgment of another? And how can we refuse to let a sentence take place till it be reversed? And what confusion would follow in Christendom, if they should serve us so abroad, and give no credit to our sentences."

Other judgments, not strictly *in rem*, under which a person has been compelled to pay money, are so far conclusive that the justice of the payment cannot be impeached in another country, so as to compel him to pay it again. For instance, a judgment in foreign attachment is conclusive, as between the parties, of the right to the property or money attached. Story on Conflict of Laws, (2d ed.) § 592 *a*. And if, on the dissolution of a partnership, one partner promises to indemnify the other against the debts of the partnership, a judgment for such a debt, under which the latter has been compelled to pay it, is conclusive evidence of the debt in a suit by him to recover the amount upon the promise of indemnity. It was of such a judgment, and in such a suit, that Lord Nottingham said : " Let the plaintiff receive back so much of the money brought into court as may be adequate to the sum paid on the sentence for custom, the justice whereof is not examinable here." *Gold* v. *Canham*, (1689) 2 Swanston, 325 ; *S. C.* 1 Cas. in Ch. 311. See also *Tarleton* v. *Tarleton*, 4 M. & S. 20 ; *Konitzky* v. *Meyer*, 49 N. Y. 571.

Other foreign judgments which have been held conclusive of the matter adjudged were judgments discharging obligations contracted in the foreign country between citizens or residents thereof. Story's Conflict of Laws, §§ 330–341 ; *May* v. *Breed*, 7 Cush. 15. Such was the case, cited at the bar, of *Burroughs* or *Burrows* v. *Jamineau* or *Jemino*, Mosely, 1 ; *S. C.* 2 Stra. 733 ; 2 Eq. Cas. Ab. 525, pl. 7 ; 12 Vin. Ab. 87, pl. 9 ; Sel. Cas. in Ch. 69 ; 1 Dickens, 48.

In that case, bills of exchange, drawn in London, were negotiated, indorsed and accepted at Leghorn in Italy, by the law of which an acceptance became void if the drawer failed without leaving effects in the acceptor's hands. The acceptor, accordingly, having received advices that the drawer had failed

before the acceptances, brought a suit at Leghorn against the last indorsees, to be discharged of his acceptances, paid the money into court and obtained a sentence there, by which the acceptances were vacated as against those indorsees and all the indorsers and negotiators of the bills, and the money deposited was returned to him. Being afterwards sued at law in England by subsequent holders of the bills, he applied to the Court of Chancery and obtained a perpetual injunction. Lord Chancellor King, as reported by Strange, " was clearly of opinion that this cause was to be determined according to the local laws of the place where the bill was negotiated, and the plaintiff's acceptance of the bill having been vacated and declared void by a court of competent jurisdiction, he thought that sentence was conclusive and bound the Court of Chancery here;" as reported in Viner, that "the court at Leghorn had jurisdiction of the thing, and of the persons;" and, as reported by Mosely, that, though " the last indorsees had the sole property of the bills, and were therefore made the only parties to the suit at Leghorn, yet the sentence made the acceptance void against the now defendants and all others." It is doubtful, at the least, whether such a sentence was entitled to the effect given to it by Lord Chancellor King. See *Novelli* v. *Rossi*, 2 B. & Ad. 757; *Castrique* v. *Imrie*, L. R. 4 H. L. 414, 435; 2 Smith's Lead. Cas. (2d ed.) 450.

The remark of Lord Hardwicke, *arguendo*, as Chief Justice, in *Boucher* v. *Lawson*, (1734) that " the reason gone upon by Lord Chancellor King, in the case of *Burroughs* v. *Jamineau*, was certainly right, that where any court, whether foreign or domestic, that has the proper jurisdiction of the case, makes a determination, it is conclusive to all other courts," evidently had reference, as the context shows, to judgments of a court having jurisdiction of the thing; and did not touch the effect of an executory judgment for a debt. Cas. temp. Hardw. 85, 89; *S. C.* Cunningham, 144, 148.

In former times, foreign decrees in admiralty *in personam* were executed, even by imprisonment of the defendant, by the Court of Admiralty in England, upon letters rogatory from the foreign sovereign, without a new suit. Its right to

do so was recognized by the Court of King's Bench in 1607 in a case of *habeas corpus*, cited by the plaintiffs, and reported as follows: "If a man of Frizeland sues an Englishman in Frizeland before the Governor there, and there recovers against him a certain sum; upon which the Englishman, not having sufficient to satisfy it, comes into England, upon which the Governor sends his letters missive into England, *omnes magistratus infra regnum Angliæ rogans*, to make execution of the said judgment. The Judge of the Admiralty may execute this judgment by imprisonment of the party, and he shall not be delivered by the common law; for this is by the law of nations, that the justice of one nation should be aiding to the justice of another nation, and for one to execute the judgment of the other; and the law of England takes notice of this law, and the Judge of the Admiralty is the proper magistrate for this purpose; for he only hath the execution of the civil law within the realm.    Pasch. 5 Jac. B. R., *Weir's case*, resolved upon an *habeas corpus*, and remanded." 1 Rol. Ab. 530, pl. 12; 6 Vin. Ab. 512, pl. 12.    But the only question there raised or decided was of the power of the English Court of Admiralty, and not of the conclusiveness of the foreign sentence; and in later times the mode of enforcing a foreign decree in admiralty is by a new libel.    See *The City of Mecca*, 5 P. D. 28, and 6 P. D. 106.

The extraterritorial effect of judgments *in personam*, at law or in equity, may differ, according to the parties to the cause.    A judgment of that kind between two citizens or residents of the country, and thereby subject to the jurisdiction, in which it is rendered, may be held conclusive as between them everywhere.    So, if a foreigner invokes the jurisdiction by bringing an action against a citizen, both may be held bound by a judgment in favor of either.    And if a citizen sues a foreigner, and judgment is rendered in favor of the latter, both may be held equally bound.    *Ricardo* v. *Garcias*, 12 Cl. & Fin. 368; *The Griefswald*, Swabey, 430, 435; *Barber* v. *Lamb*, 8 C. B. (N. S.) 95; *Lea* v. *Deakin*, 11 Bissell, 23.

The effect to which a judgment, purely executory, rendered

in favor of a citizen or resident of the country, in a suit there brought by him against a foreigner, may be entitled in an action thereon against the latter in his own country — as is the case now before us — presents a more difficult question, upon which there has been some diversity of opinion.

Early in the last century, it was settled in England that a foreign judgment on a debt was considered not, like a judgment of a domestic court of record, as a record or a specialty, a lawful consideration for which was conclusively presumed; but as a simple contract only.

This clearly appears in *Dupleix* v. *De Roven*, (1706) where one of two merchants in France recovered a judgment there against the other for a sum of money, which, not being paid, he brought a suit in chancery in England for a discovery of assets and satisfaction of the debt; and the defendant pleaded the statute of limitations of six years, and prevailed, Lord Keeper Cowper saying : " Although the plaintiff obtained a judgment or sentence in France, yet here the debt must be considered as a debt by simple contract. The plaintiff can maintain no action here, but an *indebitatus assumpsit* or an *insimul computassent;* so that the statute of limitations is pleadable in this case." 2 Vernon, 540.

Several opinions of Lord Hardwicke define and illustrate the effect of foreign judgments, when sued on or pleaded in England.

In *Otway* v. *Ramsay*, (1736) in the King's Bench, Lord Hardwicke treated it as worthy of consideration, " what credit is to be given by one court to the courts of another nation, proceeding both by the same rules of law," and said, " It is very desirable, in such case, that the judgment given in one kingdom should be considered as *res judicata* in another." But it was held that debt would not lie in Ireland upon an English judgment, because " Ireland must be considered as a provincial kingdom, part of the dominions of the Crown of England, but no part of the realm," and an action of debt on a judgment was local. 4 B. & C. 414–416, note; *S. C.* 14 Vin. Ab. 569, pl. 5 ; 2 Stra. 1090.

A decision of Lord Hardwicke as Chancellor was mentioned

in *Walker* v. *Witter*, (1778) 1 Doug. 1, 6, by Lord Mansfield, who said : " He recollected a case of a decree on the chancery side in one of the courts of great sessions in Wales, from which there was an appeal to the House of Lords, and the decree affirmed there; afterwards, a bill was filed in the Court of Chancery, on the foundation of the decree so affirmed, and Lord Hardwicke thought himself entitled to examine into the justice of the decision of the House of Lords, because the original decree was in the court of Wales, whose decisions were clearly liable to be examined." And in *Galbraith* v. *Neville*, (1789) 1 Doug. 6, note, Mr. Justice Buller said : " I have often heard Lord Mansfield repeat what was said by Lord Hardwicke in the case alluded to from Wales; and the ground of his lordship's opinion was this: when you call for my assistance to carry into effect the decision of some other tribunal, you shall not have it, if it appears that you are in the wrong; and it was on that account, that he said, he would examine into the propriety of the decree." The case before Lord Hardwicke, mentioned by Lord Mansfield, would appear (notwithstanding the doubt of its authenticity expressed by Lord Kenyon in *Galbraith* v. *Neville*) to have been a suit to recover a legacy, briefly reported, with references to Lord Hardwicke's note book, and to the original record, as *Morgan* v. *Morgan*, (1737–8) West. Ch. 181, 597; *S. C.* 1 Atk. 53, 408.

In *Gage* v. *Bulkeley*, (1744) briefly reported in 3 Atk. 215, cited by the plaintiffs, a plea of a foreign sentence in a commissary court in France was overruled by Lord Hardwicke, saying, " It is the most proper case to stand for an answer, with liberty to except, that I ever met with." His reasons are fully stated in two other reports of the case. According to one of them, at the opening of the argument he said: " Can a sentence or judgment pronounced by a foreign jurisdiction be pleaded in this kingdom to a demand for the same thing in any court of justice here? I always thought it could not, because every sentence, having its authority from the sovereign in whose dominions it is given, cannot bind the jurisdiction of foreign courts, who own not the same authority,

and have a different sovereign, and are only bound by judicial sentence given under the same sovereign power by which they themselves act." "But though a foreign sentence cannot be used by way of plea in the courts here, yet it may be taken advantage of in the way of evidence." "You cannot in this kingdom maintain debt upon judgment obtained for money in a foreign jurisdiction; but you may an assumpsit in nature of debt upon a simple contract, and give the judgment in evidence, and have a verdict. So that the distinction seems to be, where such foreign sentence is used as a plea to bind the courts here as a judgment, and when it is made use of in evidence as binding the justice of the case only." And afterwards, in giving his decision, he said: "The first question is, Whether the subject-matter of the plea is good? The second is, Whether it is well pleaded? The first question depends upon this, Whether the sentence or judgment of a foreign court can be used by way of plea in a court of justice in England? And no authority, either at law or in equity, has been produced to shew that it may be pleaded: and therefore I shall be very cautious how I establish such a precedent." "It is true, such sentence is an evidence, which may affect the right of this demand, when the cause comes to be heard; but if it is no plea in a court of law to bind their jurisdiction, I do not see why it should be so here." Ridgeway temp. Hardw. 263, 264, 270, 273. A similar report of his judgment is in 2 Ves. Sen. (Belt's Supplt.) 409, 410.

In *Roach* v. *Garvan*, (1748) where an infant ward of the Court of Chancery had been married in France by her guardian to his son before a French court, and the son " petitioned for a decree for cohabitation with his wife, and to have some money out of the bank," Lord Hardwicke said, as to the validity of the marriage: "It has been argued to be valid from being established by the sentence of a court in France, having proper jurisdiction. And it is true, that if so, it is conclusive, whether in a foreign court or not, from the law of nations in such cases; otherwise the rights of mankind would be very precarious and uncertain. But the question is, whether this is a proper sentence, in a proper cause, and between proper

parties? Of which it is impossible to judge, without looking farther into the proceedings; this being rather the execution of the sentence, than the sentence itself." And after observing upon the competency of the French tribunal, and pointing out that restitution of conjugal rights was within the jurisdiction of the ecclesiastical court, and not of the Court of Chancery, he added, "Much less will I order any money out of the bank to be given him." 1 Ves. Sen. 157, 159. He thus clearly recognized the difference between admitting the effect of a foreign judgment as adjudicating the status of persons, and executing a foreign judgment by enforcing a claim for money.

These decisions of Lord Hardwicke demonstrate that in his opinion, whenever the question was of giving effect to a foreign judgment for money, in a suit in England between the parties, it did not have the weight of a domestic judgment, and could not be considered as a bar, or as conclusive, but only as evidence of the same weight as a simple contract, and the propriety and justice of the judgment might be examined.

In *Sinclair* v. *Fraser*, (1771) the appellant, having as attorney in Jamaica made large advances for his constituent in Scotland, and having been superseded in office, brought an action before the Supreme Court of Jamaica, and, after appearance, obtained judgment against him; and afterwards brought an action against him in Scotland upon that judgment. The Court of Session determined that the plaintiff was bound to prove before it the ground, nature and extent of the demand on which the judgment in Jamaica was obtained; and therefore gave judgment against him. But the House of Lords, (in which, as remarked by one reporter, Lord Mansfield was then the presiding spirit, acting in concert with, or for the Lord Chancellor, in disposing of the Scotch appeals,) "ordered and declared that the judgment of the Supreme Court of Jamaica ought to be received as evidence *prima facie* of the debt; and that it lies upon the defendant to impeach the justice thereof, or to show the same to have been irregularly obtained;" and therefore reversed the judgment of the Court of Session. 2 Paton, ix, 253; *S. C.* Morison Dict. Dec. 4542; 1 Doug. 5, note.

Accordingly, in *Crawford* v. *Witten*, (1773) a declaration in assumpsit, in an action in England upon a judgment recovered in the Mayor's Court of Calcutta in Bengal, without showing the cause of action there, was held good on demurrer. Lord Mansfield considered the case perfectly clear. Mr. Justice Aston, according to one report, said, " The declaration is sufficient; we are not to suppose it an unlawful debt;" and, according to another report, " They admitted the assumpsit by their demurrer. When an action comes properly before any court, it must be determined by the laws which govern the country in which the action accrued." And Mr. Justice Ashurst said: " I have often known assumpsit brought on judgments in foreign courts; the judgment is a sufficient consideration to support the implied promise." Lofft, 154; *S. C. nom. Crawford* v. *Whittal*, 1 Doug. 4, note.

In *Walker* v. *Witter*, (1778) an action of debt was brought in England upon a judgment recovered in Jamaica. The defendant pleaded *nil debet*, and *nul tiel record*. Judgment was given for the plaintiff, Lord Mansfield saying : " The plea of *nul tiel record* was improper. Though the plaintiffs had called the judgment a record, yet by the additional words in the declaration, it was clear they did not mean that sort of record to which implicit faith is given by the courts of Westminster Hall. They had not misled the court nor the defendant, for they spoke of it as a record of a court in Jamaica. The question was brought to a narrow point; for it was admitted on the part of the defendant, that *indebitatus assumpsit* would have lain; and on the part of the plaintiffs, that the judgment was only *prima facie* evidence of the debt. That being so, the judgment was not a specialty, but the debt only a simple contract debt; for assumpsit will not lie on a specialty. The difficulty in the case had arisen from not fixing accurately what a court of record is in the eye of the law. That description is confined properly to certain courts in England, and their judgments cannot be controverted. Foreign courts, and courts in England not of record, have not that privilege, nor the courts in Wales, etc. But the doctrine in the case of *Sinclair* v. *Fraser* was unquestionable. Foreign judgments are

a ground of action everywhere, but they are examinable." Justices Willes, Ashurst and Buller concurred, the two latter saying that wherever *indebitatus assumpsit* will lie, debt will also lie. 1 Doug. 1, 5, 6.

In *Herbert* v. *Cook*, (1782) again, in an action of debt upon a judgment of an inferior English court, not a court of record, Lord Mansfield said that it was "like a foreign judgment, and not conclusive evidence of the debt." Willes, 36, note.

In *Galbraith* v. *Neville*, (1789) upon a motion for a new trial after verdict for the plaintiff, in an action of debt on a judgment of the Supreme Court of Jamaica, Lord Kenyon expressed "very serious doubts concerning the doctrine laid down in *Walker* v. *Witter*, that foreign judgments are not binding on the parties here." But Mr. Justice Buller said : " The doctrine which was laid down in *Sinclair* v. *Fraser* has always been considered as the true line ever since ; namely, that the foreign judgment shall be *prima facie* evidence of the debt, and conclusive till it be impeached by the other party." " As to actions of this sort, see how far the court could go, if what was said in *Walker* v. *Witter* were departed from. It was there held, that the foreign judgment was only to be taken to be right *prima facie ;* that is, we will allow the same force to a foreign judgment, that we do to those of our own courts not of record. But, if the matter were carried farther, we should give them more credit; we should give them equal force with those of courts of record here. Now a foreign judgment has never been considered as a record. It cannot be declared on as such, and a plea of *nul tiel record*, in such a case, is a mere nullity. How then can it have the same obligatory force ? In short, the result is this ; that it is *prima facie* evidence of the justice of the demand in an action of assumpsit, having no more credit than is given to every species of written agreement, *viz.* that it shall be considered as good till it is impeached." 1 Doug. 6, note. And the court afterwards unanimously refused the new trial, because, "without entering into the question how far a foreign judgment was impeachable, it was at all events clear that it was *prima facie* evidence of the debt ; and they were of opinion

that no evidence had been adduced to impeach this." 5 East, 475, note.

In *Messin* v. *Massareene*, (1791) the plaintiff, having obtained a judgment against the defendants in a French court, brought an action of assumpsit upon it in England, and, the defendants having suffered a default, moved for a reference to a master, and for a final judgment on his report, without executing a writ of inquiry. The motion was denied, Lord Kenyon saying,·"·This is an attempt to carry the rule farther than has yet been done, and as there is no instance of the kind I am not disposed to make a precedent for it;" and Mr. Justice Buller saying, "Though debt will lie here on a foreign judgment, the defendant may go into the consideration of it." 4 T. R. 493.

In *Bayley* v. *Edwards*, (1792) the Judicial Committee of the Privy Council, upon appeal from Jamaica, held that a suit in equity pending in England was not a good plea in bar to a subsequent bill in Jamaica for the same matter; and Lord Camden said: " In *Gage* v. *Bulkeley*," (evidently referring to the full report in Ridgeway, above quoted, which had been cited by counsel,) " Lord Hardwicke's reasons go a great way to show the true effect of foreign sentences in this country. And all the cases show that foreign sentences are not conclusive bars here, but only evidence of the demand." 3 Swanston, 703, 708, 710.

In *Phillips* v. *Hunter*, (1795) the House of Lords, in accordance with the opinion of the majority of the judges consulted, and against that of Chief Justice Eyre, decided that a creditor of an English bankrupt, who had obtained payment of his debt by foreign attachment in Pennsylvania, was liable to an action for the money by the assignees in bankruptcy in England. But it was agreed, on all hands, that the judgment in Pennsylvania and payment under it were conclusive as between the garnishee and the plaintiff in that suit. And the distinction between the effect of a foreign judgment which vests title, and of one which only declares that a certain sum of money is due, was clearly stated by Chief Justice Eyre, as follows:

"This judgment against the garnishee in the court of Pennsylvania was recovered properly or improperly. If, notwithstanding the bankruptcy, the debt remained liable to an attachment according to the laws of that country, the judgment was proper; if, according to the laws of that country, the property in the debt was divested out of the bankrupt debtor, and vested in his assignees, the judgment was improper. But this was a question to be decided, in the cause instituted in Pennsylvania, by the courts of that country and not by us. We cannot examine their judgment, and if we could, we have not the means of doing it in this case. It is not stated upon this record, nor can we take notice, what the law of Pennsylvania is upon this subject. If we had the means, we could not examine a judgment of a court in a foreign State, brought before us in this manner.

"It is in one way only, that the sentence or judgment of a court of a foreign state is examinable in our courts, and that is, when the party who claims the benefit of it applies to our courts to enforce it. When it is thus voluntarily submitted to our jurisdiction, we treat it, not as obligatory to the extent to which it would be obligatory, perhaps, in the country in which it was pronounced, nor as obligatory to the extent to which, by our law, sentences and judgments are obligatory, not as conclusive, but as matter *in pais,* as consideration *prima facie* sufficient to raise a promise. We examine it as we do all other considerations or promises, and for that purpose we receive evidence of what the law of the foreign State is, and whether the judgment is warranted by that law." 2 H. Bl. 402, 409, 410.

In *Wright* v. *Simpson,* (1802) Lord Chancellor Eldon said: "Natural law requires the courts of this country to give credit to those of another for the inclination and power to do justice; but not, if that presumption is proved to be ill founded in that transaction, which is the subject of it; and if it appears in evidence, that persons suing under similar circumstances neither had met, nor could meet, with justice, that fact cannot be immaterial as an answer to the presumption." 6 Ves. 714, 730.

Under Lord Ellenborough, the distinction between a suit on a foreign judgment in favor of the plaintiff against the defendant, and a suit to recover money which the plaintiff had been compelled to pay under a judgment abroad, was clearly maintained.

In *Buchanan* v. *Rucker*, (1807) in assumpsit upon a judgment rendered in the island of Tobago, the defendant pleaded *non assumpsit*, and prevailed, because it appeared that he was not a resident of the island, and was neither personally served with process nor came in to defend, and the only notice was, according to the practice of the court, by nailing up a copy of the declaration at the court-house door. It was argued that "the presumption was in favor of a foreign judgment, as well as of a judgment obtained in one of the courts of this country." To which Lord Ellenborough answered : "That may be so, if the judgment appears, on the face of it, consistent with reason and justice ; but it is contrary to the first principles of reason and justice, that, either in civil or criminal proceedings, a man should be condemned before he is heard." "There might be such glaring injustice on the face of a foreign judgment, or it might have a vice rendering it so ludicrous, that, it could not raise an assumpsit, and, if submitted to the jurisdiction of the courts of this country, could not be enforced." 1 Camp. 63, 66, 67. A motion for a new trial was denied. 9 East, 192. And see *Sadler* v. *Robins*, (1808) 1 Camp. 253, 256.

In *Hall* v. *Odber*, (1809) in assumpsit upon a judgment obtained in Canada, with other counts on the original debt, Lord Ellenborough and Justices Grose, Le Blanc and Bayley agreed that a foreign judgment was not to be considered as having the same force as a domestic judgment, but only that of a simple contract between the parties, and did not merge the original cause of action, but was only evidence of the debt, and therefore assumpsit would lie, either upon the judgment, or upon the original cause of action. 11 East, 118.

In *Tarleton* v. *Tarleton*, (1815) on the other hand, the action was brought upon a covenant of indemnity in an agreement for dissolution of a partnership, to recover a sum which the

plaintiff had been compelled to pay under a decision in a suit between the parties in the island of Grenada. Such was the case, of which Lord Ellenborough, affirming his own ruling at the trial, said: "I thought that I did not sit at *nisi prius* to try a writ of error in this case upon the proceedings in the court abroad. The defendant had notice of the proceedings, and should have appeared and made his defence. The plaintiff, by this neglect, has been obliged to pay the money in order to avoid a sequestration." The distinction was clearly brought out by Mr. Justice Bayley, who said: "As between the parties to the suit, the justice of it might be again litigated; but as against a stranger it cannot." 4 M. & S. 20, 22, 23.

In *Harris* v. *Saunders*, (1825) Chief Justice Abbott (afterwards Lord Tenterden) and his associates, upon the authority of *Otway* v. *Ramsay*, above cited, held that, even since the Act of Union of 39 & 40 Geo. III, c. 67, assumpsit would lie in England upon a judgment recovered in Ireland, because such a judgment could not be considered a specialty debt in England. 4 B. & C. 411; *S. C.* 6 D. & R. 471.

The English cases, above referred to, have been stated with the more particularity and detail, because they directly bear upon the question what was the English law, being then our own law, before the Declaration of Independence. They demonstrate that by that law, as generally understood, and as declared by Hardwicke, Mansfield, Buller, Camden, Eyre and Ellenborough, and doubted by Kenyon only, a judgment recovered in a foreign country for a sum of money, when sued upon in England, was only *prima facie* evidence of the demand, and subject to be examined and impeached. The law of England, since it has become to us a foreign country, will be considered afterwards.

The law upon this subject, as understood in the United States, at the time of their separation from the mother country, was clearly set forth by Chief Justice Parsons, speaking for the Supreme Judicial Court of Massachusetts, in 1813, and by Mr. Justice Story, in his Commentaries on the Constitution of the United States, published in 1833. Both those

eminent jurists declared that by the law of England the general rule was that foreign judgments were only *prima facie* evidence of the matter which they purported to decide; and that by the common law, before the American Revolution, all the courts of the several Colonies and States were deemed foreign to each other, and consequently judgments rendered by any one of them were considered as foreign judgments, and their merits reëxaminable in another Colony, not only as to the jurisdiction of the court which pronounced them, but also as to the merits of the controversy, to the extent to which they were understood to be reëxaminable in England. And they noted that, in order to remove that inconvenience, statutes had been passed in Massachusetts, and in some of the other Colonies, by which judgments rendered by a court of competent jurisdiction in a neighboring Colony could not be impeached. *Bissell* v. *Briggs*, 9 Mass. 462, 464, 465; Mass. Stat. 1773–4, c. 16, 5 Prov. Laws, 323, 369; Story on the Constitution, (1st ed.) §§ 1301, 1302; (4th ed.) §§ 1306, 1307.

It was because of that condition of the law, as between the American Colonies and States, that the United States, at the very beginning of their existence as a nation, ordained that full faith and credit should be given to the judgments of one of the States of the Union in the courts of another of those States.

By the Articles of Confederation of 1777, art. 4, § 3, "Full faith and credit shall be given, in each of these States, to the records, acts and judicial proceedings of the courts and magistrates of every other State." 1 Stat. 4. By the Constitution of the United States, art. 4, § 1, "Full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State; and the Congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof." And the first Congress of the United States under the Constitution, after prescribing the manner in which the records and judicial proceedings of the courts of any State should be authenticated and proved, enacted that "the said records and judicial proceedings, authenticated as aforesaid, shall have

such faith and credit given to them in every court, within the United States, as they have by law or usage in the courts of the State from whence the said records are or shall be taken." Act of May 26, 1790, c. 11, 1 Stat. 122; Rev. Stat. § 905.

The effect of these provisions of the Constitution and laws of the United States was at first a subject of diverse opinions, not only in the courts of the several States, but also in the Circuit Courts of the United States; Mr. Justice Cushing, Mr. Justice Wilson and Mr. Justice Washington holding that judgments of the courts of a State had the same effect throughout the Union as within that State; but Chief Justice Marshall (if accurately reported) being of opinion that they were not entitled to conclusive effect, and that their consideration might be impeached. *Armstrong* v. *Carson*, (1794) 2 Dall. 302; *Green* v. *Sarmiento*, (1811) 3 Wash. C. C. 17, 21; *S. C.* Pet. C. C. 74, 78; *Peck* v. *Williamson*, (reported as in November, 1813, apparently a mistake for 1812,) 1. Carolina Law Repository, 53.

The decisions of this court have clearly recognized that judgments of a foreign state are *prima facie* evidence only, and that, but for these constitutional and legislative provisions, judgments of a State of the Union, when sued upon in another State, would have no greater effect.

In *Croudson* v. *Leonard*, (1808) in which this court held that the sentence of a foreign court of admiralty *in rem*, condemning a vessel for breach of blockade, was conclusive evidence of that fact in an action on a policy of insurance, Mr. Justice Washington, after speaking of the conclusiveness of domestic judgments generally, said: "The judgment of a foreign court is equally conclusive, except in the single instance where the party claiming the benefit of it applies to the courts in England to enforce it, in which case only the judgment is *prima facie* evidence. But it is to be remarked, that in such a case, the judgment is no more conclusive as to the right it establishes, than as to the fact it decides." 4 Cranch, 434, 442.

In *Mills* v. *Duryee*, (1813) in which it was established that, by virtue of the Constitution and laws of the United States, the judgment of a court of one of the States was conclusive

evidence, in every court within the United States, of the matter adjudged; and therefore *nul tiel record*, and not *nil debet*, was a proper plea to an action brought in a court of the United States in the District of Columbia upon a judgment recovered in a court of the State of New York; this court, speaking by Mr. Justice Story, said: "The pleadings in an action are governed by the dignity of the instrument on which it is founded. If it be a record, conclusive between the parties, it cannot be denied but by the plea of *nul tiel record;* and when Congress gave the effect of a record to the judgment, it gave all the collateral consequences." "Were the construction contended for by the plaintiff in error to prevail, that judgments of the state courts ought to be considered *prima facie* evidence only, this clause in the Constitution would be utterly unimportant and illusory. The common law would give such judgments precisely the same effect." 7 Cranch, 481, 484, 485.

In *Hampton* v. *McConnel*, (1818) the point decided in *Mills* v. *Duryee* was again adjudged, without further discussion, in an opinion delivered by Chief Justice Marshall. 3 Wheat. 234.

The *obiter dictum* of Mr. Justice Livingston in *Hopkins* v. *Lee*, (1821) 6 Wheat. 109. 114, repeated by Mr. Justice Daniel in *Pennington* v. *Gibson*, (1853) 16 How. 65, 78, as to the general effect of foreign judgments, has no important bearing upon the case before us.

In *McElmoyle* v. *Cohen*, (1839) Mr. Justice Wayne, discussing the effect of the act of Congress of 1790, said, that "the adjudications of the English courts have now established the rule to be, that foreign judgments are *prima facie* evidence of the right and matter they purport to decide." 13 Pet. 312, 325.

In *D'Arcy* v. *Ketchum*, (1850) in which this court held that the provisions of the Constitution and laws of the United States gave no effect in one State to judgments rendered in another State by a court having no jurisdiction of the cause or of the parties, Mr. Justice Catron said: "In construing the act of 1790, the law as it stood when the act was passed

must enter into that construction; so that the existing defect in the old law may be seen, and its remedy by the act of Congress comprehended. Now it was most reasonable, on general principles of comity and justice, that, among States and their citizens united as ours are, judgments rendered in one should bind citizens of other States, where defendants had been served with process, or voluntarily made defence. As these judgments, however, were only *prima facie* evidence, and subject to be inquired into by plea, when sued on in another State, Congress saw proper to remedy the evil, and to provide that such inquiry and double defence should not be allowed. To this extent, it is declared in the case of *Mills* v. *Duryee*, Congress has gone in altering the old rule." 11 How. 165, 175, 176.

In *Christmas* v. *Russell*, (1866) in which this court decided that, because of the Constitution and laws of the United States, a judgment of a court of one State of the Union, when sued upon in a court of another, could not be shown to have been procured by fraud, Mr. Justice Clifford, in delivering the opinion, after stating that, under the rules of the common law, a domestic judgment, rendered in a court of competent jurisdiction, could not be collaterally impeached or called in question, said: " Common law rules placed foreign judgments upon a different footing, and those rules remain, as a general remark, unchanged to the present time. Under these rules, a foreign judgment was *prima facie* evidence of the debt, and it was open to examination, not only to show that the court in which it was rendered had no jurisdiction of the subject-matter, but also to show that the judgment was fraudulently obtained." 5 Wall. 290, 304.

In *Bischoff* v. *Wethered*, (1869) in an action on an English judgment rendered without notice to the defendant, other than by service on him in this country, this court, speaking by Mr. Justice Bradley, held that the proceeding in England " was wholly without jurisdiction of the person, and whatever validity it may have in England, by virtue of statute law, against property of the defendant there situate, it can have no validity here, even of a *prima facie* character." 9 Wall. 812, 814.

In *Hanley* v. *Donoghue*, (1885) 116 U. S. 1, 4, and in *Wisconsin* v. *Pelican Ins. Co.*, (1888) 127 U. S. 265, 292, it was said that judgments recovered in one State of the Union, when proved in the courts of another, differed from judgments recovered in a foreign country in no other respect than in not being reëxaminable on their merits, nor impeachable for fraud in obtaining them, if rendered by a court having jurisdiction of the cause and of the parties.

But neither in those cases, nor in any other, has this court hitherto been called upon to determine how far foreign judgments may be reëxamined upon their merits, or be impeached for fraud in obtaining them.

In the courts of the several States, it was long recognized and assumed, as undoubted and indisputable, that by our law, as by the law of England, foreign judgments for debts were not conclusive, but only *prima facie* evidence of the matter adjudged. Some of the cases are collected in the margin.[1]

In the leading case of *Bissell* v. *Briggs*, above cited, Chief Justice Parsons said : "A foreign judgment may be produced here by a party to it, either to justify himself by the execution of that judgment in the country in which it was rendered, or to obtain the execution of it from our courts." "If the foreign court rendering the judgment had jurisdiction of the cause, yet the courts here will not execute the judgment, without first

---

[1] *Bartlet* v. *Knight*, (1805) 1 Mass. 401, 405; *Buttrick* v. *Allen*, (1811) 8 Mass. 273; *Bissell* v. *Briggs*, (1813) 9 Mass. 462, 464; *Hall* v. *Williams*, (1828) 6 Pick. 232, 238: *Gleason* v. *Dodd*, (1842) 4 Met. 333, 336; *Wood* v. *Gamble*, (1853) 11 Cush. 8; *McKim* v. *Odom*, (1835) 3· Fairf. 94, 96; *Middlesex Bank* v. *Butman*, (1848) 29 Maine, 19, 21; *Bryant* v. *Ela*, (1815) Smith (N. H.) 396, 404; *Thurber* v. *Blackbourne*, (1818) 1 N. H. 242; *Robinson* v. *Prescott*, (1828) 4 N. H. 450; *Taylor* v. *Barron*, (1855) 10 Foster, 78, 95; *King* v. *Van Gilder*, (1791) 1 D. Chip. 59; *Rathbone* v. *Terry*, (1837) 1 Rhode Island, 73, 76; *Aldrich* v. *Kinney*, (1822) 4 Connecticut, 380, 382; *Hitchcock* v. *Aicken*, (1803) 1 Caines, 460; *Smith* v. *Lewis*, (1808) 3 Johns. 157, 159; *Taylor* v. *Bryden*, (1811) 8 Johns. 173; *Andrews* v. *Montgomery*, (1821) 19 Johns. 162, 165; *Starbuck* v. *Murray*, (1830) 5 Wend. 148, 155; *Benton* v. *Burgot*, (1823) 10 S. & R. 240, 241, 242; *Barney* v. *Patterson*, (1824) 6 Har. & Johns. 182, 202, 203; *Taylor* v. *Phelps*, (1827) 1 Har. & Gill, 492, 503; *Rogers* v. *Coleman*, (1808) Hardin, 413, 414; *Williams* v. *Preston*, (1830) 3 J. J. Marsh. 600, 601.

allowing an inquiry into its merits. The judgment of a foreign court, therefore, is by our laws considered only as presumptive evidence of a debt, or as *prima facie* evidence of a sufficient consideration of a promise, where such .court had jurisdiction of the cause; and if an action of debt be sued on any such judgment, *nil debet* is the general issue; or, if it be made the consideration of a promise, the general issue is *non assumpsit*. On these issues, the defendant may impeach the justice of the judgment, by evidence relative to that point. On these issues, the defendant may also, by proper evidence, prove that the judgment was rendered by a foreign court, which had no jurisdiction; and if his evidence be sufficient for this purpose, he has no occasion to impeach the justice of the judgment." 9 Mass. 463, 464.

In a less known case, decided in 1815, but not published until 1879, the reasons for this view were forcibly stated by Chief Justice Jeremiah Smith, speaking for the Supreme Court of New Hampshire, as follows:

"The respect which is due to judgments, sentences and decrees of courts in a foreign State, by the law of nations, seems to be the same which is due to those of our own courts. Hence the decree of an admiralty court abroad is equally conclusive with decrees of our admiralty courts. Indeed, both courts proceed by the same rule, are governed by the same law — the maritime law of nations: Coll. Jurid. 100; which is the universal law of nations, except where treaties alter it.

"The same comity is not extended to judgments or decrees which may be founded on the municipal laws of the State in which they are pronounced, Independent States do not choose to adopt such decisions without examination. These laws and regulations may be unjust, partial to citizens, and against foreigners; they may operate injustice to our citizens, whom we are bound to protect; they may be, and the decisions of courts founded on them, just cause of complaint against the supreme power of the State where rendered. To adopt them is not merely saying that the courts have decided correctly on the law, but it is approbating the law itself. Wherever, then, the court may have proceeded on municipal

law, the rule is, that the judgments are not conclusive evidence of debt, but *prima facie* evidence only. The proceedings have not the conclusive quality which is annexed to the records or proceedings of our own courts, where we approve both of the rule and of the judges who interpret and apply it. A foreign judgment may be impeached; defendant may show that it is unjust, or that it was irregularly or unduly obtained. Doug. 5, note." *Bryant* v. *Ela*, Smith (N. H.) 396, 404.

From this review of the authorities, it clearly appears that, at the time of the separation of this country from England, the general rule was fully established that foreign judgments *in personam* were *prima facie* evidence only, and not conclusive of the merits of the controversy between the parties. But the extent and limits of the application of that rule do not appear to have been much discussed, or defined with any approach to exactness, in England or America, until the matter was taken up by Chancellor Kent and by Mr. Justice Story.

In *Taylor* v. *Bryden*, (1811) an action of assumpsit, brought in the Supreme Court of the State of New York, on a judgment obtained in the State of Maryland against the defendant as indorser of a bill of exchange, and which was treated as a foreign judgment, so far as concerned its effect in New York, (the decision of this court to the contrary in *Mills* v. *Duryee*, 7 Cranch, 481, not having yet been made,) Chief Justice Kent said : " The judgment in Maryland is presumptive evidence of a just demand; and it was incumbent upon the defendant, if he would obstruct the execution of the judgment here, to show, by positive proof, that it was irregularly or unduly obtained." " To try over again, as of course, every matter of fact which had been duly decided by a competent tribunal, would be disregarding the comity which we justly owe to the courts of other States, and would be carrying the doctrine of reëxamination to an oppressive extent. It would be the same as granting a new trial in every case, and upon every question of fact. Suppose a recovery in another State, or in any foreign court, in an action for a

tort, as for an assault and battery, false imprisonment, slander, etc., and the defendant was duly summoned and appeared, and made his defence, and the trial was conducted orderly and properly, according to the rules of a civilized jurisprudence, is every such case to be tried again here on the merits? I much doubt whether the rule can ever go to this length. The general language of the books is that the defendant must impeach the judgment by showing affirmatively that it was unjust by being irregularly or unfairly procured." But the case was decided upon the ground that the defendant had done no more than raise a doubt of the correctness of the judgment sued on. 8 Johns. 173, 177, 178.

Chancellor Kent, afterwards, treating of the same subject in the first edition of his Commentaries, (1827) put the right to impeach a foreign judgment somewhat more broadly, saying: "No sovereign is obliged to execute, within his dominion, a sentence rendered out of it; and if execution be sought by a suit upon the judgment, or otherwise, he is at liberty, in his courts of justice, to examine into the merits of such judgment [for the effect to be given to foreign judgments is altogether a matter of comity, in cases where it is not regulated by treaty]. In the former case, [of a suit to enforce a foreign judgment,] the rule is, that the foreign judgment is to be received, in the first instance, as *prima facie* evidence of the debt; and it lies on the defendant to impeach the justice of it, or to show that it was irregularly and unduly obtained. This was the principle declared and settled by the House of Lords, in 1771, in the case of *Sinclair* v. *Fraser*, upon an appeal from the Court of Session in Scotland." In the second edition, (1832) he inserted the passages above printed in brackets; and in a note to the fourth edition, (1840) after citing recent conflicting opinions in Great Britain, and referring to Mr. Justice Story's reasoning in his Commentaries on the Conflict of Laws, § 607, in favor of the conclusiveness of foreign judgments, he added, "and that is certainly the more convenient and the safest rule, and the most consistent with sound principle, except in cases in which the court which pronounced the judgment has not due jurisdiction of the case, or of the

defendant, or the proceeding was in fraud, or founded in palpable mistake or irregularity, or bad by the law of the *rei judicatæ;* and in all such cases the justice of the judgment ought to be impeached." 2 Kent Com. (1st ed.) 102; (later eds.) 120.

Mr. Justice Story, in his Commentaries on the Conflict of Laws, first published in 1834, after reviewing many English authorities, said, "The present inclination of the English courts seems to be to sustain the conclusiveness of foreign judgments" — to which, in the second edition in 1841, he added, "although certainly there yet remains no inconsiderable diversity of opinion among the learned judges of the different tribunals." § 606.

He then proceeded to state his own view of the subject, on principle, saying: "It is, indeed, very difficult to perceive what could be done, if a different doctrine were maintainable to the full extent of opening all the evidence and merits of the cause anew on a suit upon the foreign judgment. Some of the witnesses may be since dead; some of the vouchers may be lost or destroyed. The merits of the cause, as formerly before the court upon the whole evidence, may have been decidedly in favor of the judgment; upon a partial possession of the original evidence, they may now appear otherwise. Suppose a case purely sounding in damages, such as an action for an assault, for slander, for conversion of property, for a malicious prosecution, or for a criminal conversation; is the defendant to be at liberty to retry the whole merits, and to make out, if he can, a new case upon new evidence? Or is the court to review the former decision, like a court of appeal, upon the old evidence? In a case of covenant, or of debt or of a breach of contract, are all the circumstances to be reëxamined anew? If they are, by what laws and rules of evidence and principles of justice is the validity of the original judgment to be tried? Is the court to open the judgment, and to proceed *ex æquo et bono?* Or is it to administer strict law, and stand to the doctrines of the local administration of justice? Is it to act upon the rules of evidence acknowledged in its own jurisprudence, or upon those of the foreign jurisprudence? These and many more questions might be put to

show the intrinsic difficulties of the subject.    Indeed, the rule that the judgment is to be *prima facie* evidence for the plaintiff would be a mere delusion, if the defendant might still question it by opening all or any of the original merits on his side; for under such circumstances it would be equivalent to granting a new trial.    It is easy to understand that the defendant may be at liberty to impeach the original justice of the judgment by showing that the court had no jurisdiction, or that he never had any notice of the suit; or that it was procured by fraud; or that upon its face it is founded in mistake; or that it is irregular and bad by the local law, *fori rei judicatæ*.    To such an extent the doctrine is intelligible and practicable.    Beyond this, the right to impugn the judgment is in legal effect the right to retry the merits of the original cause at large, and to put the defendant upon proving those merits." § 607.

He then observed: " The general doctrine maintained in the American courts in relation to foreign judgments certainly is that they are *prima facie* evidence, but that they are impeachable.    But how far and to what extent this doctrine is to be carried does not seem to be definitely settled.    It has been declared that the jurisdiction of the court, and its power over the parties and the things in controversy, may be inquired into; and that the judgment may be impeached for fraud. Beyond this no definite lines have as yet been drawn."    § 608.

After stating the effect of the Constitution of the United States, and referring to the opinions of some foreign jurists, and to the law of France, which allows the merits of foreign judgments to be examined, Mr. Justice Story concluded his treatment of the subject as follows: " It is difficult to ascertain what the prevailing rule is in regard to foreign judgments in some of the other nations of continental Europe; whether they are deemed conclusive evidence, or only *prima facie* evidence.    Holland seems at all times, upon the general principle of reciprocity, to have given great weight to foreign judgments, and in many cases, if not in all cases, to have given to them a weight equal to that given to domestic judgments, wherever the like rule of reciprocity with regard to Dutch

judgments has been adopted by the foreign country whose judgment is brought under review. This is certainly a very reasonable rule, and may perhaps hereafter work itself firmly into the structure of international jurisprudence." § 618.

In *Bradstreet* v. *Neptune Ins. Co.,* (1839) in the Circuit Court of the United States for the District of Massachusetts, Mr. Justice Story said: "If a civilized nation seeks to have the sentences of its own courts held of any validity elsewhere, they ought to have a just regard to the rights and usages of other civilized nations, and the principles of public and national law in the administration of justice." 3 Sumner, 600, 608, 609.

In *Burnham* v. *Webster,* (1845) in an action of assumpsit upon a promissory note, brought in the Circuit Court of the United States for the District of Maine, the defendant pleaded a former judgment in the Province of New Brunswick in his favor in an action there brought by the plaintiff; the plaintiff replied that the note was withdrawn from that suit, by consent of parties and leave of the court, before verdict and judgment; and the defendant demurred to the replication. Judge Ware, in overruling the demurrer, said: "Whatever difference of opinion there may be as to the binding force of foreign judgments, all agree that they are not entitled to the same authority as the judgments of domestic courts of general jurisdiction. They are but evidence of what they purport to decide, and liable to be controlled by counter evidence, and do not, like domestic judgments, import absolute verity and remain incontrovertible and conclusive until reversed." And he added that, if the question stood entirely clear from authority, he should be of opinion that the plaintiff could not be allowed to deny the validity of the proceedings of a court whose authority he had invoked. 2 Ware, 236, 239, 241.

At a subsequent trial of that case before a jury, (1846) 1 Woodb. & Min. 172, the defendant proved the judgment in New Brunswick. The plaintiff then offered to prove the facts stated in his replication, and that any entry on the record of the judgment in New Brunswick concerning this note was therefore by mistake or inadvertence. This evidence was

excluded, and a verdict taken for the plaintiff, subject to the opinion of the court. Mr. Justice Woodbury, in granting a new trial, delivered a thoughtful and discriminating opinion upon the effect of foreign judgments, from which the following passages are taken:

"They do, like domestic ones, operate conclusively, *ex proprio vigore*, within the governments in which they are rendered, but not elsewhere. When offered and considered elsewhere, they are, *ex comitate*, treated with respect, according to the nature of the judgment, and the character of the tribunal which rendered it, and the reciprocal mode, if any, in which that government treats our judgments, and according to the party offering it, whether having sought or assented to it voluntarily or not, so as to give it in some degree the force of a contract, and hence to be respected elsewhere by analogy according to the *lex loci contractus*. With these views, I would go to the whole extent of the cases decided by Lord Mansfield and Buller; and where the foreign judgment is not *in rem*, as it is in admiralty, having the subject-matter before the court, and acting on that rather than the parties, I would consider it only *prima facie* evidence as between the parties to it." p. 175.

"By returning to that rule, we are enabled to give parties, at times, most needed and most substantial relief, such as in judgments abroad against them without notice, or without a hearing on the merits, or by accident or mistake of facts, as here, or on rules of evidence and rules of law they never assented to, being foreigners and their contracts made elsewhere, but happening to be travelling through a foreign jurisdiction, and being compelled *in invitum* to litigate there." p. 177.

"Nor would I permit the *prima facie* force of the foreign judgment to go far, if the court was one of a barbarous or semi-barbarous government, and acting on no established principles of civilized jurisprudence, and not resorted to willingly by both parties, or both not inhabitants and citizens of the country. Nor can much comity be asked for the judgments of another nation, which, like France, pays no respect to those of other countries — except, as before remarked, on the principle of the parties belonging there, or assenting to a trial there." p. 179.

" On the other hand, by considering a judgment abroad as only *prima facie* valid, I would not allow the plaintiff abroad, who had sought it there, to avoid it, unless for accident or mistake, as here. Because, in other respects, having been sought there by him voluntarily, it does not lie in his mouth to complain of it. Nor would I in any case permit the whole merits of the judgment recovered abroad to be put in evidence as a matter of course; but being *prima facie* correct, the party impugning it, and desiring a hearing of its merits, must show first, specifically, some objection to the judgment's reaching the merits, and tending to prove they had not been acted on; or [as?] by showing there was no jurisdiction in the court, or no notice, or some accident or mistake, or fraud, which prevented a full defence, and has entered into the judgment; or that the court either did not decide at all on the merits, or was a tribunal not acting in conformity to any set of legal principles, and was not willingly recognized by the party as suitable for adjudicating on the merits. After matters like these are proved, I can see no danger, but rather great safety in the administration of justice, in permitting, to every party before us, at least one fair opportunity to have the merits of his case fully considered, and one fair adjudication upon them, before he is estopped forever." p. 180.

In *De Brimont* v. *Penniman,* (1873) in the Circuit Court of the United States for the Southern District of New York, Judge Woodruff said : " The principle on which foreign judgments receive any recognition from our courts is one of comity. It does not require, but rather forbids it, where such a recognition works a direct violation of the policy of our laws, and does violence to what we deem the rights of our citizens." And he declined to maintain an action against a citizen of the United States (whose daughter had been married in France to a French citizen) upon a decree of a French court requiring the defendant, then resident in France and duly served with process there, to pay an annuity to his son-in-law. 10 Blatchford, 436, 441.

Mr. Justice Story and Chancellor Kent, as appears by the passages above quoted from their commentaries, concurred in

the opinion that, in a suit upon a foreign judgment, the whole merits of the case could not, as matter of course, be reëxamined anew; but that the defendant was at liberty to impeach the judgment, not only by showing that the court had no jurisdiction of the case, or of the defendant, but also by showing that it was procured by fraud, or was founded on clear mistake or irregularity, or was bad by the law of the place where it was rendered. Story's Conflict of Laws, § 607; 2 Kent Com. (6th ed.) 120.

The word "mistake" was evidently used by Story and Kent, in this connection, not in its wider meaning of error in judgment, whether upon the law or upon the facts; but in the stricter sense of misapprehension or oversight, and as equivalent to what, in *Burnham* v. *Webster*, before cited, Mr. Justice Woodbury spoke of as "some objection to the judgment's reaching the merits, and tending to prove that they had not been acted on;" "some accident or mistake," or "that the court did not decide at all on the merits." 1 Woodb. & Min. 180.

The suggestion that a foreign judgment might be impeached for error in law of the country in which it was rendered is hardly consistent with the statement of Chief Justice Marshall, when, speaking of the disposition of this court to adopt the construction given to the laws of a State by its own courts, he said: "This course is founded on the principle, supposed to be universally recognized, that the judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government. Thus, no court in the universe, which professed to be governed by principle, would, we presume, undertake to say, that the courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding. We receive the construction given by the courts of the nation as the true sense of the law, and feel ourselves no more at liberty to depart from that construction, than to depart from the words of the statute." *Elmendorf* v. *Taylor*, (1825) 10 Wheat. 152, 159, 160.

In recent times, foreign judgments rendered within the do-

minions of the English Crown, and under the law of England, after a trial on the merits, and no want of jurisdiction, and no fraud or mistake, being shown or offered to be shown, have been treated as conclusive by the highest courts of New York, Maine and Illinois. *Lazier* v. *Wescott*, (1862) 26 N. Y. 146, 150; *Dunstan* v. *Higgins*, (1893) 138 N. Y. 70, 74; *Rankin* v. *Goddard*, (1866) 54 Maine, 28, and (1868) 55 Maine, 389; *Baker* v. *Palmer*, (1876) 83 Illinois, 568. In two early cases in Ohio, it was said that foreign judgments were conclusive, unless shown to have been obtained by fraud. *Silver Lake Bank* v. *Harding*, (1832) 5 Ohio, 545, 547; *Anderson* v. *Anderson*, (1837) 8 Ohio, 108, 110. But in a later case in that State it was said that they were only *prima facie* evidence of indebtedness. *Pelton* v. *Platner*, (1844) 13 Ohio, 209, 217. In *Jones* v. *Jamison*, (1860) 15 La. Ann. 35, the decision was only that, by virtue of the statutes of Louisiana, a foreign judgment merged the original cause of action as against the plaintiff.

The result of the modern decisions in England, after much diversity, not to say vacillation of opinion, does not greatly differ (so far as concerns the aspects in which the English courts have been called upon to consider the subject) from the conclusions of Chancellor Kent and of Justices Story and Woodbury.

At one time, it was held that, in an action brought in England upon a judgment obtained by the plaintiff in a foreign country, the judgment must be assumed to be according to the law of that country, unless the contrary was clearly proved — manifestly implying that proof on that point was competent. *Becquet* v. *McCarthy*, (1831) 2 B. & Ad. 951, 957; *Alivon* v. *Furnival*, (1834) 1 Cr., M. & R. 277, 293; *S. C.* 4 Tyrwh. 751, 768.

Lord Brougham, in the House of Lords, as well as Chief Justice Tindal and Chief Justice Wilde (afterwards Lord Chancellor Truro) and their associates, in the Common Bench, considered it to be well settled that an Irish or Colonial judgment, or a foreign judgment, was not, like a judgment of a domestic court of record, conclusive evidence, but only, like a

simple contract, *prima facie* evidence of a debt.   *Houlditch* v. *Donegal*, (1834) 8 Bligh N. R. 301, 342, 346; *S. C.* 2 Cl. & Fin. 470, 476–479; *Don* v. *Lipmann*, (1837) 5 Cl. & Fin. 1, 20–22; *Smith* v. *Nicolls*, (1839) 7 Scott, 147, 166–170; *S. C.* 5 Bing. N. C. 208, 220–226; 7 Dowl. 282; *Bank of Australasia* v. *Harding*, (1850) 9 C. B. 661, 686, 687.

On the other hand, Vice Chancellor Shadwell, upon an imperfect review of the early cases, expressed the opinion that a foreign judgment was conclusive.   *Martin* v. *Nicolls*, (1830) 3 Sim. 458.

Like opinions were expressed by Lord Denman, speaking for the Court of Queen's Bench, and by Vice Chancellor Wigram, in cases of Irish or Colonial judgments, which were subject to direct appellate review in England.   *Ferguson* v. *Mahon*, (1839) 11 Ad. & El. 179, 183; *S. C.* 3 Per. & Dav. 143, 146; *Henderson* v. *Henderson*, (1844) 6 Q. B. 288, 298, 299; *Henderson* v. *Henderson*, (1843) 3 Hare, 100, 118.

In *Bank of Australasia* v. *Nias*, (1851) in an action upon an Australian judgment, pleas that the original promises were not made, and that those promises, if made, were obtained by fraud, were held bad on demurrer.   Lord Campbell, in delivering judgment, referred to Story on the Conflict of Laws, and adopted substantially his course of reasoning in § 607, above quoted, with regard to foreign judgments.   But he distinctly put the decision upon the ground that the defendant might have appealed to the Judicial Committee of the Privy Council, and thus have procured a review of the colonial judgment.   And he took the precaution to say: "How far it would be permitted to a defendant to impeach the competency, or the integrity, of a foreign court from which there was no appeal, it is unnecessary here to inquire."   16 Q. B. 717, 734–737.

The English courts, however, have since treated that decision as establishing that a judgment of any competent foreign court could not, in an action upon it, be questioned, either because that court had mistaken its own law, or because it had come to an erroneous conclusion upon the facts.   *De Cosse Brissac* v. *Rathbone*, (1861) 6 H. & N. 301; *Scott* v. *Pilking-*

*ton,* (1862) 2 B. & S. 11, 41, 42; *Vanquelin* v. *Bouard,* (1863) 15 C. B. (N. S.) 341, 368; *Castrique* v. *Imrie,* (1870) L. R. 4 H. L. 414, 429, 430; *Godard* v. *Gray,* (1870) L. R. 6 Q. B. 139, 150; *Ochsenbein* v. *Papelier,* (1873) L. R. 8 Ch. 695, 701. In *Meyer* v. *Ralli,* (1876) a judgment *in rem,* rendered by a French court of competent jurisdiction, was held to be reëxaminable upon the merits, solely because it was admitted by the parties, in the special case upon which the cause was submitted to the English court, to be manifestly erroneous in regard to the law of France. 1 C. P. D. 358.

In view of the recent decisions in England, it is somewhat remarkable that, by the Indian Code of Civil Procedure of 1877, "no foreign judgment" (which is defined as a judgment of "a civil tribunal beyond the limits of British India, and not having authority in British India, nor established by the Governor General in Council") "shall operate as a bar to a suit in British India," "if it appears on the face of the proceeding to be founded on an incorrect view of international law," or "if it is, in the opinion of the court before which it is produced, contrary to natural justice." Piggott on Foreign Judgments, (2d ed.) 380, 381.

It was formerly understood in England that a foreign judgment was not conclusive, if it appeared upon its face to be founded on a mistake or disregard of English law. *Arnott* v. *Redfern,* (1825–6) 2 Car. & P. 88, and 3 Bing. 353; *S. C.* 11 J. B. Moore, 209; *Novelli* v. *Rossi,* (1831) 2 B. & Ad. 757; 3.Burge on Colonial and Foreign Laws, 1065; 2 Smith's Lead. Cas. (2d ed.) 448; *Reimers* v. *Druce,* (1856) 23 Beavan, 145.

In *Simpson* v. *Fogo,* (1860) 1 Johns. & Hem. 18, and (1862) 1 Hem. & Mil. 195, Vice-Chancellor Wood (afterwards Lord Hatherley) refused to give effect to a judgment *in personam* of a court in Louisiana, which had declined to recognize the title of a mortgagee of an English ship under the English law. In delivering judgment upon demurrer, he said: "The State of Louisiana may deal as it pleases with foreign law; but if it asks courts of this country to respect its law, it must be on a footing of paying a like respect to ours. Any comity between the courts of two nations holding such

opposite. doctrines as to the authority of the *lex loci* is im-
possible.   While the courts of Louisiana refuse to recognize
a title acquired here which is valid according to our law,
and hand over to their own citizens property so acquired,
they cannot at'the same time expect us to defer to a rule
of their law which we are no more bound to respect than a
law that any title of foreigners should be disregarded in
favor of citizens of Louisiana.   The answer to such a demand
must be, that a country which pays so little regard to our laws,
as to set aside a paramount title acquired here, must not expect
at our hands any greater regard for the competing title so
acquired by the citizens of that country."   1 Johns. & Hem.
28, 29.   And upon motion for a decree, he elaborated the
same view, beginning by saying, "Whether this judgment
does so err or not against the recognized principles of. what
has been commonly called the comity of nations, by refusing
to regard the law of the country where the title to the ship
was acquired, is one of the points which I have to consider;"
and concluding that it was "so contrary to law, and to what
is required by the comity of nations," that he must disregard
it.   1 Hem. & Mil. 222–247.   See also *Liverpool Co.* v.
*Hunter*, (1867) L. R. 4 Eq. 62, 68, and (1868) L. R. 3 Ch.
479, 484.

In *Scott* v. *Pilkington*, (1862) Chief Justice Cockburn treated
it as an open question whether a judgment recovered in
New York for a debt could be impeached on the ground
that the record showed that the foreign court ought to
have decided the case according to English law, and had
either disregarded the comity of nations by refusing to apply
the English law, or erred in its view of English law.   2 B. &
S. 11, 42.   In *Castrique* v. *Imrie*, (1870) the French judgment
which was adjudged not to be impeachable for error in law,
French or English, was, as the House of Lords construed it,
a judgment *in rem*, under which the ship to which the plain-
tiff in England claimed title had been sold.   L. R. 4 H. L.
414.   In *Godard* v. *Gray*, (1870) shortly afterwards, in which
the Court of Queen's Bench held that a judgment *in personam*
of a French court could not be impeached because it had put

a construction erroneous, according to English law, upon an English contract, the decision was put by Justices Blackburn and Mellor upon the ground that it did not appear that the foreign court had "knowingly and perversely disregarded the rights given by the English law;" and by Justice Hannen, solely upon the ground that the defendant did not appear to have brought the English law to the knowledge of the foreign court. L. R. 6 Q. B. 139, 149, 154. In *Messina* v. *Petrocochino*, (1872) Sir Robert Phillimore, delivering judgment in the Privy Council, said: "A foreign judgment of a competent court may indeed be impeached, if it carries on the face of it a manifest error." L. R. 4 P. C. 144, 157.

The result of the English decisions, therefore, would seem to be that a foreign judgment *in personam* may be impeached for a manifest and wilful disregard of the law of England.

Lord Abinger, Baron Parke and Baron Alderson were wont to say that the judgment of a foreign court of competent jurisdiction for a sum certain created a duty or legal obligation to pay that sum; or, in Baron Parke's words, that the principle on which the judgments of foreign and colonial courts are supported and enforced was, "that where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained." *Russell* v. *Smyth*, (1842) 9 M. & W. 810, 818, 819; *Williams* v. *Jones*, (1845) 13 M. & W. 628, 633, 634.

But this was said in explaining why, by the technical rules of pleading, an action of assumpsit, or of debt, would lie upon a foreign judgment; and had no reference to the question how far such a judgment was conclusive of the matter adjudged. At common law, an action of debt would lie on a debt appearing by a record, or by any other specialty, such as a contract under seal; and would also lie for a definite sum of money due by simple contract. Assumpsit would not lie upon a record or other specialty; but would lie upon any other contract, whether expressed by the party, or implied by law. In an action upon a record, or upon a contract under seal, a lawful consideration was conclusively presumed to exist, and could not be denied;

but in an action, whether in debt or in assumpsit, upon a simple contract, express or implied, the consideration was open to inquiry. A foreign judgment was not considered, like a judgment of a domestic court of record, as a record or specialty. The form of action, therefore, upon a foreign judgment was not in debt, grounded upon a record or a specialty; but was either in debt, as for a definite sum of money due by simple contract, or in assumpsit upon such a contract. A foreign judgment, being a security of no higher nature than the original cause of action, did not merge that cause of action. The plaintiff might sue, either on the judgment, or on the original cause of action; and in either form of suit the foreign judgment was only evidence of a liability equivalent to a simple contract, and was therefore liable to be controlled by such competent evidence as the nature of the case admitted. See cases already cited, especially *Walker* v. *Witter*, 1 Doug. 1; *Phillips* v. *Hunter*, 2 H. Bl. 402, 410; *Bissell* v. *Briggs*, 9 Mass. 463, 464; *Mills* v. *Duryee*, 7 Cranch, 481, 485; *D'Arcy* v. *Ketchum*, 11 How. 165, 176; *Hall* v. *Odber*, 11 East, 118; *Smith* v. *Nicolls*, 7 Scott, 147; S. C. 5 Bing. N. C. 208. See also *Grant* v. *Easton*, 13 Q. B. D. 302, 303; *Lyman* v. *Brown*, 2 Curtis, 559.

Mr. Justice Blackburn, indeed, in determining how far a foreign judgment could be impeached, either for error in law, or for want of jurisdiction, expressed the opinion that the effect of such a judgment did not depend upon what he termed "that which is loosely called 'comity,'" but upon the saying of Baron Parke, above quoted; and consequently "that anything which negatives the existence of that legal obligation, or excuses the defendant from the performance of it, must form a good defence to the action." *Godard* v. *Gray*, (1870) L. R. 6 Q. B. 139, 148, 149; *Schibsby* v. *Westenholz*, (1870) L. R. 6 Q. B. 155, 159. And his example has been followed by some other English judges. Fry, J., in *Rousillon* v. *Rousillon*, (1880) 14 Ch. D. 351, 370; North, J., in *Nouvion* v. *Freeman*, (1887) 35 Ch. D. 704, 714, 715; Cotton and Lindley, L. JJ., in *Nouvion* v. *Freeman*, (1887) 37 Ch. D. 244, 250, 256.

But the theory that a foreign judgment imposes or creates a duty or obligation is a remnant of the ancient fiction, assumed by Blackstone, saying that "upon showing the judgment once obtained, still in full force, and yet unsatisfied, the law immediately implies that by the original contract of society the defendant hath contracted a debt, and is bound to pay it." 3 Bl. Com. 160. That fiction, which embraced judgments upon default, or for torts, cannot convert a transaction wanting the assent of parties into one which necessarily implies it. *Louisiana* v. *New Orleans,* 109 U. S. 285, 288. While the theory in question may help to explain rules of pleading which originated while the fiction was believed in, it is hardly a sufficient guide at the present day in dealing with questions of international law, public or private, and of the comity of our own country, and of foreign nations. It might be safer to adopt the maxim, applied to foreign judgments by Chief Justice Weston, speaking for the Supreme Judicial Court of Maine, *judicium redditur in invitum,* or, as given by Lord Coke, *in præsumptione legis judicium redditur in invitum. Jordan* v. *Robinson,* (1838) 15 Maine, 167, 168 ; Co. Lit. 248 *b*.

In *Russell* v. *Smyth,* above cited, Baron Parke took the precaution of adding, "Nor need we say how far the judgment of a court of competent jurisdiction, in the absence of fraud, is conclusive upon the parties." 9 M. & W. 819. He could hardly have contemplated erecting a rule of local procedure into a canon of private internationl law, and a substitute for "the comity of nations," on which, in an earlier case, he had himself relied as the ground for enforcing in England a right created by a law of a foreign country. *Alivon* v. *Furnival,* 1 Cr., M. & R. 277, 296 ; *S. C.* 4 Tyrwh. 751, 771.

In *Aboulhoff* v. *Oppenheimer,* (1882) Lord Coleridge and Lord Justice Brett carefully avoided adopting the theory of a legal obligation to pay a foreign judgment as the test in determining how far such a judgment might be impeached. 10 Q. B. D. 295, 300, 305. In *Hawksford* v. *Giffard,* (1886) in the Privy Council, on appeal from the Royal Court of Jersey, Lord Herschell said : "This action is brought upon an English judgment, which, until a judgment was obtained in Jersey, was in

that country no more than evidence of a debt." 12 App. Cas. 122, 126. In *Nouvion* v. *Freeman*, in the House of Lords, (1889) Lord Herschell, while he referred to the reliance placed by counsel on the saying of Baron Parke, did not treat a foreign judgment as creating or imposing a new obligation, but only as declaring and establishing that a debt or obligation existed. His words were: "The principle upon which I think our enforcement of foreign judgments must proceed is this: that in a court of competent jurisdiction, where according to its established procedure the whole merits of the case were open, at all events, to the parties, however much they may have failed to take advantage of them, or may have waived any of their rights, a final adjudication has been given that a debt or obligation exists, which cannot thereafter in that court be disputed, and can only be questioned in an appeal to a higher tribunal. In such a case it may well be said that, giving credit to the courts of another country, we are prepared to take the fact that such adjudication has been made as establishing the existence of the debt or obligation." And Lord Bramwell said: "How can it be said that there is a legal obligation on the part of a man to pay a debt, who has a right to say, 'I owe none, and no judgment has established against me that I do?' I cannot see." The foreign judgment in that case was allowed no force, for want of finally establishing the existence of a debt. 15 App. Cas. 1, 9, 10, 14.

In view of all the authorities upon the subject, and of the trend of judicial opinion in this country and in England, following the lead of Kent and Story, we are satisfied that, where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect,

the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants, therefore, cannot be permitted, upon that general ground, to contest the validity or the effect of the judgment sued on.

But they have sought to impeach that judgment upon several other grounds, which require separate consideration.

It is objected that the appearance and litigation of the defendants in the French tribunals were not voluntary, but by legal compulsion, and therefore that the French courts never acquired such jurisdiction over the defendants, that they should be held bound by the judgment.

Upon the question what should be considered such a voluntary appearance, as to amount to a submission to the jurisdiction of a foreign court, there has been some difference of opinion in England.

In *General Steam Navigation Co.* v. *Guillou*, (1843) in an action at law to recover damages to the plaintiff's ship by a collision with the defendant's ship through the negligence of the master and crew of the latter, the defendant pleaded a judgment by which a French court, in a suit brought by him, and after the plaintiffs had been cited, had appeared, and had asserted fault on this defendant's part, had adjudged that it was the ship of these plaintiffs, and not that of this defendant, which was in fault. It was not shown or suggested that the ship of these plaintiffs was in the custody or possession of the French court. Yet Baron Parke, delivering a considered judgment of the Court of Exchequer, (Lord Abinger and Barons Alderson and Rolfe concurring,) expressed a decided opinion that the pleas were bad in substance, for these reasons: "They do not state that the plaintiffs were French subjects, or resident, or even present in France when the suit began, so as to be bound by reason of allegiance, or domicil, or temporary presence, by a decision of a French court; and they did not select the tribunal and sue as plaintiffs; in any of which cases the determination might have possibly bound them. They were mere strangers, who put forward the negligence

of the defendant as an answer, in an adverse suit in a foreign country, whose laws they were under no obligation to obey." 11 M. & W. 877, 894; *S. C.* 13 Law Journal (N. S.) Exch. 168, 176.

But it is now settled in England that, while an appearance by the defendant in a court of a foreign country, for the purpose of protecting his property already in the possession of that court, may not be deemed a voluntary appearance, yet an appearance solely for the purpose of protecting other property in that country from seizure is considered as a voluntary appearance. *De Cosse Brissac* v. *Rathbone*, (1860) 6 H. & N. 301; *S. C.* 20 Law Journal (N. S.) Exch. 238; *Schibsby* v. *Westenholz*, (1870) L. R. 6 Q. B. 155, 162; *Voinet* v. *Barrett*, (1885) 1 Cab. & El. 554; *S. C.* 54 Law Journal (N. S.) Q. B. 521, and 55 Law Journal (N. S.) Q. B. 39.

The present case is not one of a person travelling through or casually found in a foreign country. The defendants, although they were not citizens or residents of France, but were citizens and residents of the State of New York, and their principal place of business was in the city of New York, yet had a storehouse and an agent in Paris, and were accustomed to purchase large quantities of goods there, although they did not make sales in France. Under such circumstances, evidence that their sole object in appearing and carrying on the litigation in the French courts was to prevent property, in their storehouse at Paris, belonging to them, and within the jurisdiction, but not in the custody, of those courts, from being taken in satisfaction of any judgment that might be recovered against them, would not, according to our law, show that those courts did not acquire jurisdiction of the persons of the defendants.

It is next objected that in those courts one of the plaintiffs was permitted to testify not under oath, and was not subjected to cross-examination by the opposite party, and that the defendants were, therefore, deprived of safeguards which are by our law considered essential to secure honesty and to detect fraud in a witness; and also that documents and papers were admitted in evidence, with which the defendants had no con-

nection, and which would not be admissible under our own system of jurisprudence. But it having been shown by the plaintiffs, and hardly denied by the defendants, that the practice followed and the method of examining witnesses were according to the laws of France, we are not prepared to hold that the fact that the procedure in these respects differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment.

. It is also contended that a part of the plaintiffs' claim is affected by one of the contracts between the parties having been made in violation of the revenue laws of the United States, requiring goods to be invoiced at their actual market value. Rev. Stat. § 2854. It may be assumed that, as the courts of a country will not enforce contracts made abroad in evasion or fraud of its own laws, so they will not enforce a foreign judgment upon such a contract. *Armstrong* v. *Toler*, 11 Wheat. 258; *De Brimont* v. *Penniman*, 10 Blatchford, 436; *Lang* v. *Holbrook*, Crabbe, 179; Story's Conflict of Laws, §§ 244, 246; Wharton's Conflict of Laws, § 656. But as this point does not affect the whole claim in this case, it is sufficient, for present purposes, to say that there does not appear to have been any distinct offer to prove that the invoice value of any of the goods sold by the plaintiffs to the defendants was agreed between them to be, or was, in fact, lower than the actual market value of the goods.

. It must, however, always be kept in mind that it is the paramount duty of the court, before which any suit is brought, to see to it that the parties have had a fair and impartial trial, before a final decision is rendered against either party.

When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal

record, the judgment is *prima facie* evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

There is no doubt that both in this country, as appears by the authorities already cited, and in England, a foreign judgment may be impeached for fraud.

Shortly before the Declaration of Independence, the House of Lords, upon the trial of the Duchess of Kingston for bigamy, put to the judges the question whether — assuming a sentence of the ecclesiastical court against a marriage, in a suit for jactitation of marriage, to be conclusive evidence so as to prevent the counsel for the Crown from proving the marriage upon an indictment for polygamy — " the counsel for the Crown may be admitted to avoid the effect of such sentence, by proving the same to have been obtained by fraud or collusion." Chief Justice De Grey, delivering the opinion of the judges, which was adopted by the House of Lords, answering this question in the affirmative, said: " But if it was a direct and decisive sentence upon the point, and, as it stands, to be admitted as conclusive evidence upon the court, and not to be impeached from within; yet, like all other acts of the highest judicial authority, it is impeachable from without; although it is not permitted to show that the court was mistaken, it may be shown that they were misled. Fraud is an intrinsic collateral act; which vitiates the most solemn proceedings of courts of justice. Lord Coke says, it avoids all judicial acts, ecclesiastical or temporal." 20 Howell's State Trials, 537, 543, note; *S. C.* in 2 Smith's Lead. Cas.

All the subsequent English authorities concur in holding that any foreign judgment, whether *in rem* or *in personam*, may be impeached upon the ground that it was fraudulently obtained. *White* v. *Hall*, (1806) 12 Ves. 321, 324; *Bowles* v. *Orr*, (1835) 1 Yo. & Col. Exch. 464, 473; *Price* v. *Dewhurst*, (1837) 8 Sim. 279, 302–305; *Don* v. *Lippmann*, (1837) 5 Cl. &

Fin. 1, 20; *Bank of Australasia* v. *Nias*, (1851) 16 Q. B. 717, 735; *Reimers* v. *Druce*, (1856) 23 Beavan, 145, 150; *Castrique* v. *Imrie*, (1870) L. R. 4 H. L. 414, 445, 446; *Godard* v. *Gray*, (1870) L. R. 6 Q. B. 139, 149; *Messina* v. *Petrococchino*, (1872) L. R. 4 P. C. 144, 157; *Ochsenbein* v. *Papelier*, (1873) L. R. 8 Ch. 695.

Under what circumstances this may be done does not appear to have ever been the subject of judicial investigation in this country.

It has often, indeed, been declared by this court that the fraud which entitles a party to impeach the judgment of one of our own tribunals must be fraud extrinsic to the matter tried in the cause, and not merely consist in false and fraudulent documents or testimony submitted to that tribunal, and the truth of which was contested before it and passed upon by it. *United States* v. *Throckmorton*, 98 U. S. 61, 65, 66; *Vance* v. *Burbank*, 101 U. S. 514, 519; *Steel* v. *Smelting Co.*, 106 U. S. 447, 453; *Moffat* v. *United States*, 112 U. S. 24, 32; *United States* v. *Minor*, 114 U. S. 233, 242. And in one English case, where a ship had been sold under a foreign judgment, the like restriction upon impeaching that judgment for fraud was suggested; but the decision was finally put upon the ground that the judicial sale passed the title to the ship. *Cammell* v. *Sewell*, (1858–60) 3 H. & N. 617, 646; 5 H. & N. 728, 729, 742.

But it is now established in England, by well considered and strongly reasoned decisions of the Court of Appeal, that foreign judgments may be impeached, if procured by false and fraudulent representations and testimony of the plaintiff, even if the same question of fraud was presented to and decided by the foreign court.

In *Aboulof* v. *Oppenheimer*, (1882) the plaintiff had recovered a judgment at Tiflis in Russia, ordering the defendants to return certain goods or to pay their value. The defendants appealed to a higher Russian court, which confirmed the judgment, and ordered the defendants to pay, besides the sum awarded below, an additional sum for costs and expenses. In an action in the English High Court of

Justice upon those judgments, the defendants pleaded that
they were obtained by the gross fraud of the plaintiff, in
fraudulently representing to the Russian courts that the goods
in question were not in her possession when the suit was com-
menced, and when the judgment was given, and during the
whole time the suit was pending; and by fraudulently con-
cealing from those courts the fact that those goods, as the
fact was, and as she well knew, were in her actual possession.
A demurrer to this plea was overruled, and judgment entered
for the defendants. And that judgment was affirmed in the
Court of Appeal by Lord Chief Justice Coleridge, Lord Justice
Baggallay and Lord Justice Brett, all of whom delivered con-
curring opinions, the grounds of which sufficiently appear in
the opinion delivered by Lord Justice Brett (since Lord Esher,
Master of the Rolls), who said: "With regard to an action
brought upon a foreign judgment, the whole doctrine as to
fraud is English, and is to be applied in an action purely
English. I am prepared to hold, according to the judgment
of the House of Lords adopting the proposition laid down by
De Grey, C. J., that if the judgment upon which the action is
brought was procured from the foreign court by the successful
fraud of the party who is seeking to enforce it, the action in
the English court will not lie. This proposition is absolute
and without any limitation, and, as the Lord Chief Justice has
pointed out, is founded on the doctrine that no party in an
English court shall be able to take advantage of his own
wrongful act, or, as it may be stated in other language, that no
obligation can be enforced in an English court of justice which
has been procured by the fraud of the person relying upon it
as an obligation." "I will assume that in the suit in the Rus-
sian courts the plaintiff's fraud was alleged by the defendants,
and that they gave evidence in support of the charge. I will
assume even that the defendants gave the very same evidence
which they propose to adduce in this action; nevertheless the
defendants will not be debarred at the trial of this action from
making the same charge of fraud and from adducing the same
evidence in support of it; and if the High Court of Justice is
satisfied that the allegations of the defendants are true, and

that the fraud was committed, the defendants will be entitled to succeed in the present action. It has been contended that the same issue ought not to be tried in an English court which was tried in the Russian courts; but I agree that the question whether the Russian courts were deceived never could be an issue in the action tried before them." "In the present case, we have had to consider the question fully; and, according to the best opinion which I can form, fraud committed by a party to a suit, for the purpose of deceiving a foreign court, is a defence to an action in this country, founded upon the judgment of that foreign court. It seems to me that if we were to accede to the argument for the plaintiff, the result would be that a plausible deceiver would succeed, whereas a deceiver who is not plausible would fail. I cannot think that plausible fraud ought to be upheld in any court of justice in England. I accept the whole doctrine, without any limitation, that whenever a foreign judgment has been obtained by the fraud of the party relying upon it, it cannot be maintained in the courts of this country; and further, that nothing ought to persuade an English court to enforce a judgment against one party, which has been obtained by the fraud of the other party to the suit in the foreign court." 10 Q. B. D. 295, 305–308.

The same view was affirmed and acted on in the same court by Lords Justices Lindley and Bowen in *Vadala* v. *Lawes,* (1890) 25 Q. B. D. 310, 317–320, and by Lord Esher and Lord Justice Lopes in *Crozat* v. *Brogden,* (1894) 2 Q. B. 30, 34, 35.

In the case at bar, the defendants offered to prove, in much detail, that the plaintiffs presented to the French court of first instance and to the arbitrator appointed by that court, and upon whose report its judgment was largely based, false and fraudulent statements and accounts against the defendants, by which the arbitrator and the French courts were deceived and misled, and their judgments were based upon such false and fraudulent statements and accounts. This offer, if satisfactorily proved, would, according to the decisions of the English Court of Appeal in *Abouloff* v. *Oppenheimer, Vadala* v. *Lawes,* and *Crozat* v. *Brogden,* above cited,

be a sufficient ground for impeaching the foreign judgment, and examining into the merits of the original claim.

But whether those decisions can be followed in regard to foreign judgments, consistently with our own decisions as to impeaching domestic judgments for fraud, it is unnecessary in this case to determine, because there is a distinct and independent ground upon which we are satisfied that the comity of our nation does not require us to give conclusive effect to the judgments of the courts of France; and that ground is, the want of reciprocity, on the part of France, as to the effect to be given to the judgments of this and other foreign countries.

In France, the Royal Ordinance of June 15, 1629, art. 121, provided as follows: "Judgments rendered, contracts or obligations recognized, in foreign kingdoms and sovereignties, for any cause whatever, shall have no lien or execution in our kingdom. Thus the contracts shall stand for simple promises; and, notwithstanding the judgments, our subjects against whom they have been rendered may contest their rights anew before our judges." Touillier, Droit Civil, lib. 3, tit. 3, c. 6, sect. 3, no. 77.

By the French Code of Civil Procedure, art. 546, "Judgments rendered by foreign tribunals, and acts acknowledged before foreign officers, shall not be capable of execution in France, except in the manner and in the cases provided by articles 2123 and 2128 of the Civil Code," which are as follows: By article 2123, "A lien cannot arise from judgments rendered in a foreign country, except so far as they have been declared executory by a French tribunal; without prejudice to provisions to the contrary which may exist in public laws and treaties." By article 2128, "Contracts entered into in a foreign country cannot give a lien upon property in France, if there are no provisions contrary to this principle in public laws or in treaties." Touillier, ub. sup. no. 84.

The defendants, in their answer, cited the above provisions of the statutes of France, and alleged, and at the trial offered to prove, that, by the construction given to

these statutes by the judicial tribunals of France, when the judgments of tribunals of foreign countries against the citizens of France are sued upon in the courts of France, the merits of the controversies upon which those judgments are based are examined anew, unless a treaty to the contrary effect exists between the Republic of France and the country in which such judgment is obtained, (which is not the case between the Republic of France and the United States,) and that the tribunals of the Republic of France give no force and effect, within the jurisdiction of that country, to the judgments duly rendered by courts of competent jurisdiction of the United States against citizens of France after proper personal service of the process of those courts has been made thereon in this country. We are of opinion that this evidence should have been admitted.

In *Odwin* v. *Forbes*, (1817) President Henry, in the Court of Demerara, which was governed by the Dutch law, and was, as he remarked, " a tribunal foreign to and independent of that of England," sustained a plea of an English certificate in bankruptcy, upon these grounds : " It is a principle of their law, and laid down particularly in the ordinances of Amsterdam," " that the same law shall be exercised towards foreigners in Amsterdam as is exercised with respect to citizens of that State in other countries ; and upon this principle of reciprocity, which is not confined to the city of Amsterdam, but pervades the Dutch laws, they have always given effect to the laws of that country which has exercised the same comity and indulgence in admitting theirs." " That the Dutch bankrupt laws proceed on the same principles as those of the English ; that the English tribunals give effect to the Dutch bankrupt laws ; and that, on the principle of reciprocity and mutual comity, the Dutch tribunals, according to their own ordinances, are bound to give effect to the English bankrupt laws when duly proved, unless there is any express law or ordinance prohibiting their admission." And his judgment was affirmed in the Privy Council on Appeal. Case of *Odwin* v. *Forbes*, pp. 89, 159–161, 173–176 ; *S. C.* (1818) Buck Bankr. Cas. 57, 64.

President Henry, at page 76 of his Treatise on Foreign Law, published as a preface to his report of that case, said: "This comity, in giving effect to the judgments of other tribunals, is generally exercised by States under the same sovereign, on the ground that he is the fountain of justice in each, though of independent jurisdiction; and it has also been exercised in different States of Europe with respect to foreign judgments, particularly in the Dutch States, who are accustomed by the principle of reciprocity to give effect in their territories to the judgments of foreign States, which show the same comity to theirs; but the tribunals of France and England have never exercised this comity to the degree that those of Holland have, but always required a fresh action to be brought, in which the foreign judgment may be given in evidence. As this is a matter of positive law and internal policy in each State, no opinion need be given; besides, it is a mere question of comity, and perhaps it might be neither politic nor prudent, in two such great States, to give indiscriminate effect to the judgment of each other's tribunals, however the practice might be proper or convenient in federal States, or those under the same sovereign."

It was that statement, which appears to have called forth the observations of Mr. Justice Story, already cited: "Holland seems at all times, upon the general principle of reciprocity, to have given great weight to foreign judgments, and in many cases, if not in all cases, to have given to them a weight equal to that given to domestic judgments, wherever the like rule of reciprocity with regard to Dutch judgments has been adopted by the foreign country whose judgment is brought under review. This is certainly a very reasonable rule, and may perhaps hereafter work itself firmly into the structure of international jurisprudence." Story's Conflict of Laws, § 618.

This rule, though never either affirmed or denied by express adjudication in England or America, has been indicated, more or less distinctly, in several of the authorities already cited.

Lord Hardwicke threw out a suggestion that the credit to be given by one court to the judgment of a foreign court

might well be affected by "their proceeding both by the same rules of law." *Otway* v. *Ramsay*, 4 B. & C. 414–416, note.

Lord Eldon, after saying that "natural law" (evidently intending the law of nations) "requires the courts of this country to give credit to those of another for the inclination and power to do justice," added that "if it appears in evidence, that persons suing under similar circumstances neither had met, nor could meet, with justice, that fact cannot be immaterial as an answer to the presumption." *Wright* v. *Simpson*, 6 Ves. 714, 730.

Lord Brougham, presiding as Lord Chancellor in the House of Lords, said: "The law in the course of procedure abroad sometimes differs so mainly from ours in the principles upon which it is bottomed, that it would seem a strong thing to hold that our courts were bound conclusively to give execution to the sentence of foreign courts, when, for aught we know, there is not any one of those things which are reckoned the elements or the corner stones of the due administration of justice, present to the procedure in these foreign courts." *Houlditch* v. *Donegal*, 8 Bligh N. R. 301, 338.

Chief Justice Smith, of New Hampshire, in giving reasons why foreign judgments or decrees, founded on the municipal laws of the State in which they are pronounced, are not conclusive evidence of debt, but *prima facie* evidence only, said: "These laws and regulations may be unjust, partial to citizens, and against foreigners; they may operate injustice to our citizens, whom we are bound to protect; they may be, and the decisions of courts founded on them, just cause of complaint against the supreme power of the State where rendered. To adopt them is not merely saying that the courts have decided correctly on the law, but it is approbating the law itself." *Bryant* v. *Ela*, Smith (N. H.) 396, 404.

Mr. Justice Story said: "If a civilized nation seeks to have the sentences of its own courts held of any validity elsewhere, they ought to have a just regard to the rights and usages of other civilized nations, and the principles of public and national law in the administration of justice." *Bradstreet* v. *Neptune Ins. Co.*, 3 Sumner, 600, 608.

Mr. Justice Woodbury said that judgments *in personam*, rendered under a foreign government, "are, *ex comitate*, treated with respect, according to the nature of the judgment, and the character of the tribunal which rendered it, and the reciprocal mode, if any, in which that government treats our judgments;" and added, "Nor can much comity be asked for the judgments of another nation, which, like France, pays no respect to those of other countries." *Burnham* v. *Webster*, 1 Woodb. & Min. 172, 175, 179.

Mr. Justice Cooley said, "True comity is equality; we should demand nothing more, and concede nothing less." *McEwan* v. *Zimmer*, 38 Michigan, 765, 769.

Mr. Wheaton said : "There is no obligation, recognized by legislators, public authorities, and publicists, to regard foreign laws; but their application is admitted only from considerations of utility and the mutual convenience of States — *ex comitate, ob reciprocam utilitatem.*" "The general comity, utility and convenience of nations have, however, established a usage among most civilized States, by which the final judgments of foreign courts of competent jurisdiction are reciprocally carried into execution." Wheaton's International Law, (8th ed.) §§ 79, 147.

Since Story, Kent and Wheaton wrote their commentaries, many books and essays have been published upon the subject of the effect to be allowed by the courts of one country to the judgments of another, with references to the statutes and decisions in various countries. Among the principal ones are Foelix, Droit International Privé, (4th ed. by Demangeat, 1866) lib. 2, tits. 7, 8; Moreau, Effets Internationaux des Jugements (1884); Piggott, on Foreign Judgments (2d ed. 1884); Constant, de l'Exécution des Jugements Étrangers (2d ed. 1890), giving the text of the articles of most of the modern codes upon the subject, and of French treaties with Italian, German and Swiss States; and numerous papers in Clunet's Journal de Droit International Privé, established in 1874, and continued to the present time. For the reasons stated at the outset of this opinion, we have not thought it important to state the conflicting theories of continental commenta-

tors and essayists as to what each may think the law ought to be; but have referred to their works only for evidence of authoritative declarations, legislative or judicial, of what the law is.

By the law of France, settled by a series of uniform decisions of the Court of Cassation, the highest judicial tribunal, for more than half a century, no foreign judgment can be rendered executory in France without a review of the judgment *au fond* — to the bottom, including the whole merits of the cause of action on which the judgment rests. Pardessus, Droit Commercial, § 1488; Bard, Précis de Droit International, (1883) nos. 234–239; Story's Conflict of Laws, §§ 615–617; Piggott, 452; Westlake on Private International Law, (3d ed. 1890) 350.

A leading case was decided by the Court of Cassation on April 19, 1819, and was as follows: A contract of partnership was made between Holker, a French merchant, and Parker, a citizen of the United States. Afterwards, and before the partnership accounts were settled, Parker came to France, and Holker sued him in the Tribunal of Commerce of Paris. Parker excepted, on the ground that he was a foreigner, not domiciled in France; and obtained a judgment, affirmed on appeal, remitting the matter to the American courts — *obtint son renvoi devant les tribunaux Américains.* Holker then sued Parker in the Circuit Court of the United States for the District of Massachusetts, and in 1814 obtained a judgment there, ordering Parker to pay him $529,949. (One branch of the controversy had been brought before this court in 1813. *Holker* v. *Parker,* 7 Cranch, 436.) Holker, not being able to obtain execution of that judgment in America, because Parker had no property there and continued to reside in Paris, obtained from a French judge an order declaring the judgment executory. Upon Parker's application to nullify the proceeding, the Royal Court of Paris, reversing the judgment of a lower court, set aside that order, assigning these reasons: "Considering that judgments rendered by foreign courts have neither effect nor authority in France; that this rule is doubtless more particularly appli-

cable in favor of Frenchmen, to whom the King and his officers owe a special protection; but that the principle is absolute, and may be invoked by all persons without distinction, being founded on the independence of States; that the Ordinance of 1629, in the beginning of its article 121, lays down the principle in its generality, when it says that judgments rendered in foreign kingdoms and sovereignties, for any cause whatever, shall have no execution in the Kingdom of France; and that the Civil Code, art. 2123, gives to this principle the same latitude, when it declares that a lien cannot result from judgments rendered in a foreign country, except so far as they have been declared executory by a French tribunal — which is not a matter of mere form, like the granting in past times of a *pareatis* from one department to another for judgments rendered within the kingdom; but which assumes, on the part of the French tribunals, a cognizance of the cause, and a full examination of the justice of the judgment presented for execution, as reason demands, and this has always been practised in France, according to the testimony of our ancient authorities; that there may result from this an inconvenience, where the debtor, as is asserted to have happened in the present case, removes his property and his person to France, while keeping his domicil in his native country; that it is for the creditor to be watchful, but that no consideration can impair a principle on which rests the sovereignty of governments, and which, whatever be the case, must preserve its whole force." The court therefore adjudged that, before the tribunal of first instance, Holker should state the grounds of his action, to be contested by Parker, and to be determined by the court upon cognizance of the whole cause. That judgment was confirmed, upon deliberate consideration, by the Court of Cassation, for the reasons that the Ordinance of 1629 enacted, in absolute terms and without exception, that foreign judgments should not have execution in France; that it was only by the Civil Code and the Code of Civil Procedure that the French tribunals had been authorized to declare them executory; that therefore the Ordinance of 1629 had no application; that the articles of the Codes.

referred to, did not authorize the courts to declare judgments, rendered in a foreign country, executory in France without examination; that such an authorization would be as contrary to the institution of the courts, as would be the award or the refusal of execution arbitrarily and at will; would impeach the right of sovereignty of the French government, and was not in the intention of the legislature; and that the Codes made no distinction between different judgments rendered in a foreign country, and permitted the judges to declare them all executory; and therefore those judgments, whether against a Frenchman or against a foreigner, were subject to examination on the merits. *Holker* v. *Parker*, Merlin, Questions de Droit, Jugement, § 14, no. 2.

The Court of Cassation has ever since constantly affirmed the same view. Moreau, no. 106, note, citing many decisions; Clunet, 1882, p. 166. In Clunet, 1894, p. 913, note, it is said to be "settled by judicial decisions — *il est de jurisprudence* — that the French courts are bound, in the absence of special diplomatic treaties, to proceed to the revision on the whole merits — *au fond* — of foreign judgments, execution of which is demanded of them," citing, among other cases, a decision of the Court of Cassation on February 2, 1892, by which it was expressly held to result from the articles of the Codes, above cited, "that judgments rendered, in favor of a foreigner against a Frenchman, by a foreign court, are subject, when execution of them is demanded in France, to the revision of the French tribunals, which have the right and the duty to examine them, both as to the form, and as to the merits." Sirey, 1892, 1, 201.

In Belgium, the Code of Civil Procedure of 1876 provides that if a treaty on the basis of reciprocity be in existence between Belgium and the country in which the foreign judgment has been given, the examination of the judgment in the Belgian courts shall bear only upon the questions whether it "contains nothing contrary to public order, to the principles of the Belgian public order;" whether, by the law of the country in which it was rendered, it has the force of *res judicata;* whether the copy is duly authenticated; whether the

defendant's rights have been duly respected; and whether the
foreign court is not the only competent court, by reason of
the nationality of the plaintiff.   Where, as is the case between
Belgium and France, there is no such treaty, the Belgian Court
of Cassation holds that the foreign judgment may be reëxam-
ined upon the merits.   Constant, 111, 116; Moreau, no. 189;
Clunet, 1887, p. 217; 1888, p. 837; Piggott, 439.   And in a
very recent case, the Civil Tribunal of Brussels held that,
"considering that the right of revision is an emanation of the
right of sovereignty ; that it proceeds from the *imperium*,
and that, as such, it is within the domain of public law ; that
from that principle it manifestly follows that, if the legisla-
ture does not recognize executory force in foreign judgments
where there exists no treaty upon the basis of reciprocity, it
cannot belong to the parties to substitute their will for that
of the legislature, by arrogating to themselves the power of
delegating to the foreign judge a portion of sovereignty."
Clunet, 1894, pp. 164, 165.

   In Holland, the effect given to foreign judgments has always
depended upon reciprocity, but whether by reason of Dutch
ordinances only, or of general principles of jurisprudence,
does not clearly appear.   *Odwin* v. *Forbes*, and Henry on
Foreign Law, above cited; Story's Conflict of Laws, § 618;
Foelix, no. 397, note ; Clunet, 1879, p. 369; 1 Ferguson's
International Law, 85; Constant, 171; Moreau, no. 213.

   In Denmark, the courts appear to require reciprocity to be
shown before they will execute a foreign judgment.   Foelix,
nos. 328, 345; Clunet, 1891, p. 987; Westlake, *ub. sup.*   In
Norway, the courts reëxamine the merits of all foreign judg-
ments, even of those of Sweden.   Foelix, no. 401; Piggott,
504, 505 ; Clunet, 1892, p. 296.   In Sweden, the principle of
reciprocity has prevailed from very ancient times; the courts
give no effect to foreign judgments, unless upon that principle;
and it is doubtful whether they will even then, unless reciproc-
ity is secured by treaty with the country in which the judg-
ment was rendered.   Foelix, no. 400; Olivecrona, in Clunet,
1880, p. 83 ; Constant, 191; Moreau, no. 222; Piggott, 503;
Westlake, *ub. sup.*

In the Empire of Germany, as formerly in the States which now form part of that Empire, the judgments of those States are mutually executed; and the principle of reciprocity prevails as to the judgments of other countries. Foelix, nos. 328, 331, 333–341; Moreau, nos. 178, 179; Vierhaus, in Piggott, 460–474 ; Westlake, *ub. sup.* By the German Code of 1877, "compulsory execution of the judgment of a foreign court cannot take place, unless its admissibility has been declared by a judgment of exequatur;" "the judgment of exequatur is to be rendered without examining whether the decision is conformable to law ;" but it is not to be granted "if reciprocity is not guaranteed." Constant, 79–81; Piggott, 466. The Reichsgericht, or Imperial Court, in a case reported in full in Piggott, has held that an English judgment cannot be executed in Germany, because, the court said, the German courts, by the Code, when they execute foreign judgments at all, are "bound to the unqualified recognition of the legal validity of the judgments of foreign courts," and "it is, therefore, an essential requirement of reciprocity, that the law of the foreign State should recognize in an equal degree the legal validity of the judgments of German courts, which are to be enforced by its courts ; and that an examination of their legality, both as regards the material justice of the decision as to matters of fact or law, and with respect to matters of procedure, should neither be required as a condition of their execution, by the court *ex officio,* nor be allowed by the admission of pleas which might lead to it." Piggott, 470, 471. See also Clunet, 1882, p. 35 ; 1883, p. 246 ; 1884, p. 600.

In Switzerland, by the Federal Constitution, civil judgments in one canton are executory throughout the Republic. As to foreign judgments, there is no federal law, each canton having its own law upon the subject. But in the German cantons, and in some of the other cantons, foreign judgments are executed according to the rule of reciprocity only. Constant, 193–204; Piggott, 505–516 ; Clunet, 1887, p. 762; Westlake, *ub. sup.* The law upon this subject has been clearly stated by Brocher, President of the Court of Cassation of Geneva, and professor of law in the university there. In his Nouveau

Traité de Droit International Privé, (1876) § 174, treating of the question whether "it might not be convenient that States should execute, without reviewing their merits, judgments rendered on the territory of each of them respectively," he says: "It would, certainly, be advantageous for the parties interested to avoid the delays, the conflicts, the differences of opinion, and the expenses resulting from the necessity of obtaining a new judgment in each locality where they should seek execution. There might thence arise, for each sovereignty, a juridical or moral obligation to lend a strong hand to foreign judgments. But would not such an advantage be counterbalanced, and often surpassed, by the dangers that might arise from that mode of proceeding? There is here, we believe, a question of reciprocal appreciation and confidence. One must, at the outset, inquire whether the administration of the foreign judiciary, whose judgments it is sought to execute without verifying their merits, presents sufficient guaranties. If the propriety of such an execution be admitted, there is ground for making it the object of diplomatic treaties. That form alone can guarantee the realization of a proper reciprocity; it furnishes, moreover, to each State the means of acting upon the judicial organization and procedure of other States." In an article in the Journal, after a review of the Swiss decisions, he recognizes and asserts that "it comes within the competency of each canton to do what seems to it proper in such matters." Clunet, 1879, pp. 88, 94. And in a later treatise, he says: "We cannot admit that the recognition of a State as sovereign ought necessarily to have as a consequence the obligation of respecting and executing the judicial decisions rendered by its tribunals; in strict right, the authority of such acts does not extend beyond the frontier. Each sovereignty possesses in particular, and more or less in private, the territory subject to its power. No other can exercise there an act of its authority. This territorial independence finds itself, in principle, directly included in the very act by which one nation recognizes a foreign State as sovereign; but there cannot result therefrom a promise to adopt, and to cause to be executed upon the national territory, judgments rendered by

the officials of the foreign State, whoever they may be. That would be an abdication of its own sovereignty; and would bind it in such sort as to make it an accomplice in acts often injurious, and in some cases even criminal. Such obligations suppose a reciprocal confidence; they are not undertaken, moreover, except upon certain conditions, and by means of a system of regulations intended to prevent or to lessen the dangers which might result from them." 3 Cours de Droit International Privé, (1885) 126, 127.

In Russia, by the Code of 1864, "the judgments of foreign tribunals shall be rendered executory according to the rules established.by reciprocal treaties and conventions," and, where no rules have been established by such treaties, are to be "put in execution in the Empire, only after authorization granted by the courts of the Empire;" and, "in deciding upon demands of this kind, the courts do not examine into the foundation of the dispute adjudged by the foreign tribunals, but decide only whether the judgment does not contain dispositions which are contrary to the public order, or which are not permitted by the laws of the Empire." Constant, 183–185. Yet a chamber of the Senate of St. Petersburg, sitting as a Court of Cassation, and the highest judicial tribunal of the Empire in civil matters, has declined to execute a French judgment, upon the grounds that, by the settled law of Russia, "it is a principle in the Russian Empire that only the decisions of the authorities to whom jurisdiction has been delegated by the sovereign power have legal value by themselves and of full right;" and that "in all questions of international law, reciprocity must be observed and maintained as a fundamental principle." *Adam v. Schipoff*, Clunet, 1884, pp. 45, 46, 134. And Professor Englemann, of the Russian University of Dorpat, in an able essay, explaining that and other Russian decisions, takes the following view of them: "The execution of a treaty is not the only proof of reciprocity." "It is necessary to commit the ascertainment of the existence of reciprocity to the judicial tribunals, for the same reasons for which there is conferred upon them the right to settle all questions incident to the cause to be adjudged. The existence of reciprocity be-

tween two States ought to be proved in the same manner as all the positive facts of the case." "It is true that the principle of reciprocity is a principle, not of right, but of policy; yet the basis of the principle of all regular and real policy is also the fundamental principle of right, and the point of departure of all legal order — the *suum cuique.* This last principle comprehends right, reciprocity, utility; and reciprocity is the application of right to policy." "Let this principle be applied wherever there is the least guaranty, or even a probability of reciprocity, and the cognizance of this question be committed to the judicial tribunals, and one will arrive at important results, which, on their side, will touch the desired end, international accord. But, for this, it is indispensable that the application of this principle should be entrusted to judicial tribunals, accustomed to decide affairs according to right, and not to administrative authorities, which look above all to utility, and are accustomed to be moved by political reasons, intentions, and even passions." Clunet, 1884, pp. 120–122. But it would seem that no foreign judgment will be executed in Russia, unless reciprocity is secured by treaty. Clunet, 1884, pp. 46, 113, 139, 140, 602.

In Poland, the provisions of the Russian Code are in force; and the Court of Appeal of Warsaw has decided that, where there is no treaty, the judgments of a foreign country cannot be executed, because, "in admitting a contrary conclusion, there would be impugned one of the cardinal principles of international relations, namely, the principle of reciprocity, according to which each State recognizes juridical rights and relations, originating or established in another country, only in the measure in which the latter, in its turn, does not disregard the rights and relations existing in the former." Clunet, 1884, pp. 494, 495.

In Roumania, it is provided by code that "judicial decisions rendered in foreign countries cannot be executed in Roumania, except in the same manner in which Roumanian judgments are executed in the country in question, and provided they are declared executory by competent Roumanian judges;" and this article seems to be held to require legislative reciprocity.

Moreau, no. 219; Clunet, 1879, p. 351; 1885, p. 537; 1891, p. 452; Piggott, 495.

In Bulgaria, by a resolution of the Supreme Court, in 1881, " the Bulgarian judges should, as a general rule, abstain from entering upon the merits of the foreign judgment; they ought only to inquire whether the judgment submitted to them does not contain dispositions contrary to the public order, and to the Bulgarian laws." Constant, 129, 130; Clunet, 1886, p. 570. This resolution closely follows the terms of the Russian Code, which, as has been seen, has not precluded applying the principle of reciprocity.

In Austria, the rule of reciprocity does not rest upon any treaty or legislative enactment, but has been long established, by imperial decrees and judicial decisions, upon general principles of jurisprudence. Foelix, no. 331; Constant, 100–108; Moreau, no. 185; Weiss, Traité de Droit International, (1886) 980; Clunet, 1891, p. 1003; 1894, p. 908; Piggott, 434. In Hungary, the same principles were always followed as in Austria; and reciprocity has been made a condition by a law of 1880. Constant, 109; Moreau, no. 186 & note; Piggott, 436; Weiss, *ub. sup.*

In Italy before it was united into one kingdom, each State had its own rules. In Tuscany, and in Modena, in the absence of treaty, the whole merits were reviewed. In Parma, as by the French Ordinance of 1629, the foreign judgment was subject to fundamental revision, if against a subject of Parma. In Naples, the code and the decisions followed those of France. In Sardinia, the written laws required above all the condition of reciprocity, and, if that condition was not fulfilled, the foreign judgment was reëxaminable in all respects. Fiore, Effetti Internazionali delle Sentenze, (1875) 40–44; Moreau, no. 204. In the Papal States, by a decree of the Pope in 1820, " the exequatur shall not be granted, except so far as the judgments rendered in the States of his Holiness shall enjoy the same favor in the foreign countries; this reciprocity is presumed, if there is no particular reason to doubt it." Touillier, Droit Civil, lib. 3, tit. 3, c. 6, sec. 3, no. 93. And see Foelix, no. 343; Westlake, *ub. sup.* In the Kingdom of Italy,

by the Code of Procedure of 1865, " executory force is given
to the judgments of foreign judicial authorities by the court
of appeal in whose jurisdiction they are to be executed, by
obtaining a judgment on an exequatur in which the court
examines (*a*) if the judgment has been pronounced by a com-
petent judicial authority; (*b*) if it has been pronounced, the
parties being regularly cited; (*c*) if the parties have been
legally represented or legally defaulted; (*d*) if the judgment
contains dispositions contrary to public order or to the inter-
nal public law of the realm." Constant, 157. In 1874, the
Court of Cassation of Turin, "considering that in inter-
national relations is admitted the principle of reciprocity, as
that which has its foundation in the natural reason of equality
of treatment, and, in default thereof, opens the way to the ex-
ercise of the right of retaliation ;" and that the French courts
examine the merits of Italian judgments, before allowing their
execution in France; decided that the Italian courts of appeal,
when asked to execute a French judgment, ought not only
to inquire into the competency of the foreign court, but also
to review the merits and the justice of the controversy. *Levi*
v. *Pitre*, in Rossi, Esecuzione delle Sentenze Straniere, (1st ed.
1875) 70, 284; and in Clunet, 1879, p. 295. Some commenta-
tors, however, while admitting that decision to be most authori-
tative, have insisted that it is unsound, and opposed to other
Italian decisions, to which we have not access. Rossi, *ub. sup.*
(2d ed. 1890) 92; Fiore, 142, 143; Clunet, 1878, p. 237;
Clunet, 1879, pp. 296, 305; Piggott, 483; Constant, 161.

In the principality of Monaco, foreign judgments are not
executory, except by virtue of a special ordinance of the
Prince, upon a report of the Advocate General. Constant,
169 ; Piggott, 488.

In Spain, formerly, foreign judgments do not appear to have
been executed at all. Foelix, no. 398; Moreau, no. 197; Sil-
vela, in Clunet, 1881, p. 20. But by the Code of 1855, revised
in 1881 without change in this respect, "judgments pronounced
in foreign countries shall have in Spain the force that the
respective treaties give them; if there are no special treaties
with the nation in which they have been rendered, they shall

have the same force that is given by the laws of that nation
to Spanish executory judgments; if the judgment to be exe-
cuted proceeds from a nation by whose jurisprudence effect is
not given to the judgments pronounced by Spanish tribunals,
it shall have no force in Spain;" and "application for the
execution of judgments pronounced in foreign countries shall
be made to the Supreme Tribunal of Justice; which, after
examining an authorized translation of the foreign judgment,
and after hearing the party against whom it is directed and
the public minister, shall decide whether it ought or ought not
to be executed." Constant, 141, 142; Piggott, 499, 500. A
case in which the Supreme Court of Spain in 1880 ordered
execution of a French judgment, after reviewing its merits, is
reported in Clunet, 1881, p. 365. In another case, in 1888,
the same court, after hearing the parties and the public min-
ister, ordered execution of a Mexican judgment. The public
minister, in his demand for its execution, said: "Our law of
civil procedure, inspired, to a certain point, by the modern
theories of international law, which, recognizing among civ-
ilized nations a true community of right, and considering man-
kind as a whole in which nations occupy a position identical
with that of individuals towards society, gives authority, in
Spain, to executory judgments rendered by foreign tribunals,
even in the absence of special treaty, provided that those
countries do not proscribe the execution there of our judgments,
and under certain conditions which, if they limit the principle,
are inspired by the wish of protecting our sovereignty and by
the supreme exigencies of justice. When nothing appears,
either for or against, as to the authority of the judgments of
our courts in the foreign country, one should not put an obstacle
to the fulfilment, in our country, of judgments emanating from
other nations, especially when the question is of a country
which, by its historic origin, its language, its literature, and
by almost the identity of its customs, its usages, and its social
institutions, has so great a connection with our own — which
obliges us to maintain with it the most intimate relations of
friendship and courtesy." And he pointed out that Mexico,
by its code, had adopted reciprocity as a fundamental prin-

ciple. Among the reasons assigned by the court for ordering the Mexican judgment to be executed was that " there exists in Mexico no precedent of jurisprudence which refuses execution to judgments rendered by the Spanish tribunals." Clunet, 1891, pp. 288–292.

In Portugal, foreign judgments, whether against a Portuguese or against a foreigner, are held to be reviewable upon the merits before granting execution thereof. Foelix, no. 399 ; Clunet, 1875, pp. 54, 448 ; Moreau, no. 217 ; Constant, 176–180 ; Westlake, *ub. sup.*

In Greece, by the provisions of the Code of 1834, foreign judgments, both parties to which are foreigners, are enforced without examination of their merits ; but if one of the parties is a Greek, they are not enforced if found contradictory to the facts proved, or if they are contrary to the prohibitive laws of Greece. Foelix, no. 396 ; Constant, 151, 152 ; Moreau, no. 202 ; Saripolos, in Clunet, 1880, p. 173 ; Piggott, 475.

In Egypt, under the influence of European jurisprudence, the code of civil procedure has made reciprocity a condition upon which foreign judgments are executed. Constant, 136 ; Clunet, 1887, pp. 98, 228 ; 1889, p. 322.

In Cuba and in Porto Rico, the codes of civil procedure are based upon the Spanish code of 1855. Piggott, 435, 503. In Hayti, the code reënacts the provisions of the French code. Constant, 153 ; Moreau, no. 203 ; Piggott, 460.

In Mexico, the system of reciprocity has been adopted, by the Code of 1884, as the governing principle. Constant, 168 ; Clunet, 1891, p. 290.

The rule of reciprocity likewise appears to have generally prevailed in South America. In Peru, foreign judgments do not appear to be executed without examining the merits, unless when reciprocity is secured by treaty. Clunet, 1879, pp. 266, 267 ; Piggott, 548. In Chili, there appears to have been no legislation upon the subject; but, according to a decision of the Supreme Court of Santiago in 1886, " the Chilian tribunals should not award an exequatur, except upon decisions in correct form, and also reserving the general principle of reciprocity." Clunet, 1889, p. 135 ; Constant, 131,

132. In Brazil, foreign judgments are not executed, unless because of the country in which they were rendered admitting the principle of reciprocity, or because of a *placet* of the government of Brazil, which may be awarded according to the circumstances of the case. Constant, 124 & note; Moreau, no. 192; Piggott, 543–546; Westlake, *ub. sup.* In the Argentine Republic, the principle of reciprocity was maintained by the courts, and was affirmed by the Code of 1878, as a condition *sine qua non* of the execution of foreign judgments, but has perhaps been modified by later legislation. Moreau, no. 218; Palomeque, in Clunet, 1887, pp. 539–558.

It appears, therefore, that there is hardly a civilized nation on either continent, which, by its general law, allows conclusive effect to an executory foreign judgment for the recovery of money. In France, and in a few smaller States — Norway, Portugal, Greece, Monaco, and Hayti — the merits of the controversy are reviewed, as of course, allowing to the foreign judgment, at the most, no more effect than of being *prima facie* evidence of the justice of the claim. In the great majority of the countries on the continent of Europe — in Belgium, Holland, Denmark, Sweden, Germany, in many cantons of Switzerland, in Russia and Poland, in Roumania, in Austria and Hungary, (perhaps in Italy,) and in Spain — as well as in Egypt, in Mexico, and in a great part of South America, the judgment rendered in a foreign country is allowed the same effect only as the courts of that country allow to the judgments of the country in which the judgment in question is sought to be executed.

The prediction of Mr. Justice Story (in § 618 of his Commentaries on the Conflict of Laws, already cited,) has thus been fulfilled, and the rule of reciprocity has worked itself firmly into the structure of international jurisprudence.

The reasonable, if not the necessary, conclusion appears to us to be that judgments rendered in France, or in any other foreign country, by the laws of which our own judgments are reviewable upon the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are *prima facie* evidence only of the justice of the plaintiffs' claim.

In holding such a judgment, for want of reciprocity, not to be conclusive evidence of the merits of the claim, we do not proceed upon any theory of retaliation upon one person by reason of injustice done to another; but upon the broad ground that international law is founded upon mutuality and reciprocity, and that by the principles of international law recognized in most civilized nations, and by the comity of our own country, which it is our judicial duty to know and to declare, the judgment is not entitled to be considered conclusive.

By our law, at the time of the adoption of the Constitution, a foreign judgment was considered as *prima facie* evidence, and not conclusive. There is no statute of the United States, and no treaty of the United States with France, or with any other nation, which has changed that law, or has made any provision upon the subject. It is not to be supposed that, if any statute or treaty had been or should be made, it would recognize as conclusive the judgments of any country, which did not give like effect to our own judgments. In the absence of statute or treaty, it appears to us equally unwarrantable to assume that the comity of the United States requires anything more.

If we should hold this judgment to be conclusive, we should allow it an effect to which, supposing the defendants' offers to be sustained by actual proof, it would, in the absence of a special treaty, be entitled in hardly any other country in Christendom, except the country in which it was rendered. If the judgment had been rendered in this country, or in any other outside of the jurisdiction of France, the French courts would not have executed or enforced it, except after examining into its merits. The very judgment now sued on would be held inconclusive in almost any other country than France. In England, and in the Colonies subject to the law of England, the fraud alleged in its procurement would be a sufficient ground for disregarding it. In the courts of nearly every other nation, it would be subject to reëxamination, either merely because it was a foreign judgment, or because judgments of that nation would be reëxaminable in the courts of France.

For these reasons, in the action at law, the

*Judgment is reversed, and the cause remanded to the Circuit
Court with directions to set aside the verdict and to order
a new trial.*

For the same reasons, in the suit in equity between these parties, the foreign judgment is not a bar, and, therefore, the

*Decree dismissing the bill is reversed, the plea adjudged bad,
and the cause remanded to the Circuit Court for further
proceedings not inconsistent with this opinion.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE HARLAN, MR. JUSTICE BREWER, and MR. JUSTICE JACKSON, dissenting.

Plaintiffs brought their action on a judgment recovered by them against the defendants in the courts of France, which courts had jurisdiction over person and subject-matter, and in respect of which judgment no fraud was alleged, except in particulars contested in and considered by the French courts. The question is whether under these circumstances, and in the absence of a treaty or act of Congress, the judgment is reëxaminable upon the merits. This question I regard as one to be determined by the ordinary and settled rule in respect of allowing a party, who has had an opportunity to prove his case in a competent court, to retry it on the merits, and it seems to me that the doctrine of *res judicata* applicable to domestic judgments should be applied to foreign judgments as well, and rests on the same general ground of public policy that there should be an end of litigation.

This application of the doctrine is in accordance with our own jurisprudence, and it is not necessary that we should hold it to be required by some rule of international law. The fundamental principle concerning judgments is that disputes are finally determined by them, and I am unable to perceive why a judgment *in personam* which is not open to question on the ground of want of jurisdiction, either intrinsically or over the parties, or of fraud, or on any other recognized ground of impeachment, should not be held *inter partes*, though recovered abroad, conclusive on the merits.

Judgments are executory while unpaid, but in this country execution is not given upon a foreign judgment as such, it being enforced through a new judgment obtained in an action brought for that purpose.

The principle that requires litigation to be treated as terminated by final judgment properly rendered, is as applicable to a judgment proceeded on in such an action, as to any other, and forbids the allowance to the judgment debtor of a retrial of the original cause of action, as of right, in disregard of the obligation to pay arising on the judgment and of the rights acquired by the judgment creditor thereby.

That any other conclusion is inadmissible is forcibly illustrated by the case in hand. Plaintiffs in error were trading copartners in Paris as well as in New York, and had a place of business in Paris at the time of these transactions and of the commencement of the suit against them in France. The subjects of the suit were commercial transactions, having their origin, and partly performed, in France under a contract there made, and alleged to be modified by the dealings of the parties there; and one of the claims against them was for goods sold to them there. They appeared generally in the case, without protest, and by counterclaims relating to the same general course of business, a part of them only connected with the claims against them, became actors in the suit and submitted to the courts their own claims for affirmative relief, as well as the claims against them. The courts were competent and they took the chances of a decision in their favor. As traders in France they were under the protection of its laws and were bound by its laws, its commercial usages and its rules of procedure. The fact that they were Americans and the opposite parties were citizens of France is immaterial, and there is no suggestion on the record that those courts proceeded on any other ground than that all litigants, whatever their nationality, were entitled to equal justice therein. If plaintiffs in error had succeeded in their cross suit and recovered judgment against defendants in error, and had sued them here on that judgment, defendants in error would not have been permitted to say that the judgment in France was

not conclusive against them. As it was, defendants in error recovered, and I think plaintiffs in error are not entitled to try their fortune anew before the courts of this country on the same matters voluntarily submitted by them to the decision of the foreign tribunal. We are dealing with the judgment of a court of a civilized country, whose laws and system of justice recognize the general rules in respect to property and rights between man and man prevailing among all civilized peoples. Obviously the last persons who should be heard to complain are those who identified themselves with the business of that country, knowing that all their transactions there would be subject to the local laws and modes of doing business. The French courts appear to have acted "judicially, honestly, and with the intention to arrive at the right conclusion;" and a result thus reached ought not to be disturbed.

The following view of the rule in England was expressed by Lord Herschell in *Nouvion* v. *Freeman*, L. R. 15 App. Cas. 1, 9, quoted in the principal opinion: "The principle upon which I think our enforcement of foreign judgments must proceed is this: that in a court of competent jurisdiction, where according to its established procedure the whole merits of the case were open, at all events, to the parties, however much they may have failed to take advantage of them, or may have waived any of their rights, a final adjudication has been given that a debt or obligation exists which cannot thereafter in that court be disputed, and can only be questioned in an appeal to a higher tribunal. In such a case it may well be said that giving credit to the courts of another country we are prepared to take the fact that such adjudication has been made as establishing the existence of the debt or obligation." But in that connection the observations made by Mr. Justice Blackburn in *Godard* v. *Gray*, L. R. 6 Q. B. 139, 148, and often referred to with approval, may usefully again be quoted:

"It is not an admitted principle of the law of nations that a state is bound to enforce within its territories the judgments of a foreign tribunal. Several of the continental nations (including France) do not enforce the judgments of other coun-

tries, unless where there are reciprocal treaties to that effect. But in England and in those states which are governed by the common law, such judgments are enforced, not by virtue of any treaty, nor by virtue of any statute, but upon a principle very well stated by Parke, B., in *Williams* v. *Jones*, 13 M. & W. at p. 633 : 'Where a court of competent jurisdiction had adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced.' And taking this as the principle, it seems to follow that anything which negatives the existence of that legal obligation, or excuses the defendant from the performance of it, must form a good defence to the action. It must be open, therefore, to the defendant to show that the court which pronounced the judgment had not jurisdiction to pronounce it, either because they exceeded the jurisdiction given to them by the foreign law, or because he, the defendant, was not subject to that jurisdiction; and so far the foreign judgment must be examinable. Probably the defendant may shew that the judgment was obtained by the fraud of the plaintiff, for that would shew that the defendant was excused from the performance of an obligation thus obtained; and it may be that where the foreign court has knowingly and perversely disregarded the rights given to an English subject by English law, that forms a valid excuse for disregarding the obligation thus imposed on him; but we prefer to imitate the caution of the present Lord Chancellor in *Castrique* v. *Imrie*, L. R. 4 H. L. at p. 445, and to leave those questions to be decided when they arise, only observing in the present case, as in that ' the whole of the facts appear to have been inquired into by the French courts, judicially, honestly, and with the intention to arrive at the right conclusion, and having heard the facts as stated before them, they came to a conclusion which justified them in France in deciding as they did decide.' . . . Indeed, it is difficult to understand how the common course of pleading is consistent with any notion that the judgment was only evidence. If that were so, every count on a

foreign judgment must be demurrable on that ground. The mode of pleading shews that the judgment was considered, not as merely *prima facie* evidence of that cause of action for which the judgment was given, but as in itself giving rise, at least *prima facie*, to a legal obligation to obey that judgment and pay the sum adjudged. This may seem a technical mode of dealing with the question; but in truth it goes to the root of the matter. For if the judgment were merely considered as evidence of the original cause of action, it must be open to meet it by any counter evidence negativing the existence of that original cause of action. If, on the other hand, there is a *prima facie* obligation to obey the judgment of a tribunal having jurisdiction over the party and the cause, and to pay the sum decreed, the question would be, whether it was open to the unsuccessful party to try the cause over again in a court, not sitting as a court of appeal from that which gave the judgment. It is quite clear that this could not be done where the action is brought on the judgment of an English tribunal; and, on principle, it seems the same rule should apply, where it is brought on that of a foreign tribunal."

In any aspect, it is difficult to see why rights acquired under foreign judgments do not belong to the category of private rights acquired under foreign laws. Now the rule is universal in this country that private rights acquired under the laws of foreign states will be respected and enforced in our courts unless contrary to the policy or prejudicial to the interests of the state where this is sought to be done; and although the source of this rule may have been the comity characterizing the intercourse between nations, it prevails to-day by its own strength, and the right to the application of the law to which the particular transaction is subject is a juridical right.

And, without going into the refinements of the publicists on the subject, it appears to me that that law finds authoritative expression in the judgments of courts of competent jurisdiction over parties and subject-matter.

It is held by the majority of the court that defendants cannot be permitted to contest the validity and effect of this judgment on the general ground that it was erroneous in law

or in fact; and the special grounds relied on are *seriatim* rejected. In respect of the last of these, that of fraud, it is said that it is unnecessary in this case to decide whether certain decisions cited in regard to impeaching foreign judgments for fraud could be followed consistently with our own decisions as to impeaching domestic judgments for that reason, "because there is a distinct and independent ground upon which we are satisfied that the comity of our nation does not require us to give conclusive effect to the judgments of the courts of France, and that ground is the want of reciprocity on the part of France as to the effect to be given to the judgments of this and other foreign countries." And the conclusion is announced to be " that judgments rendered in France or in any other foreign country, by the laws of which our own judgments are reviewable upon the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are *prima facie* evidence only of the justice of the plaintiff's claim." In other words, that although no special ground exists for impeaching the original justice of a judgment, such as want of jurisdiction or fraud, the right to retry the merits of the original cause at large, defendant being put upon proving those merits, should be accorded in every suit on judgments recovered in countries where our own judgments are not given full effect, on that ground merely.

I cannot yield my assent to the proposition that because by legislation and judicial decision in France that effect is not there given to judgments recovered in this country which, according to our jurisprudence, we think should be given to judgments wherever recovered, (subject, of course, to the recognized exceptions,) therefore we should pursue the same line of conduct as respects the judgments of French tribunals. The application of the doctrine of *res judicata* does not rest in discretion; and it is for the government, and not for its courts, to adopt the principle of retorsion, if deemed under any circumstances desirable or necessary.

As the court expressly abstains from deciding whether the judgment is impeachable on the ground of fraud, I refrain from any observations on that branch of the case.

Mr. Justice Harlan, Mr. Justice Brewer, and Mr. Justice Jackson concur in this dissent.